IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
**********************************************************

MORGAN GARTNER, INDIVIDUALLY,)
AND AS NEXT FRIEND OF E.G.,  )
A MINOR CHILD,               )
                             )
VS.                          )    CIVIL ACTION NO.
                             )      4:18-CV-02242
                             )
AMAZON.COM, INC., AND HU XI   )
JIE.                         )
               *************************************
               ORAL AND VIDEOTAPED DEPOSITION OF
                     CAREY JAMES GARTNER
                       APRIL 16, 2019
               *************************************

ORAL AND VIDEOTAPED DEPOSITION OF CAREY JAMES GARTNER, produced as a witness at the instance of the Defendant Amazon.com, Inc., and duly sworn, was taken in the above-styled and numbered cause on April 16, 2019, from 10:08 a.m. until 11:45 a.m., before Denise Ganz Byers, CSR, RPR, CRR, RMR, in and for the State of Texas, reported by machine shorthand, at the offices of Munsch Hardt Kopf & Harr, PC, 700 Milam, Suite 2700, Houston, Texas, pursuant to the Federal Rules of Civil Procedure.

DEFENDANT'S EXHIBIT A

A P P E A R A N C E S


FOR THE PLAINTIFFS:
     Jeff M. Meyerson
     THE MEYERSON LAW FIRM, P.C.
     2224 Walsh Tarlton Lane
     Austin, Texas 78746
     512.330.9001
     Jeffm@meyersonfirm.com


FOR THE DEFENDANT AMAZON.COM:
     Clifford L. Harrison
     MUNSCH HARDT KOPF & HARR, PC
     700 Milam, Suite 2700
     Houston, Texas 77002
     713.222.1470
     713.222.1475
     charrison@munsch.com

          -and-

     Monique Wirrick
     PERKINS COIE
     1201 Third Ave., Suite 4900
     Seattle, Washington 98101
     206.359.8000
     206.359.9000


VIDEOGRAPHER:
     Jim Dunham

```
                           INDEX
              ORAL AND VIDEOTAPED DEPOSITION OF
                    CAREY JAMES GARTNER
                     APRIL 16, 2019
                                                    PAGE
     Examination by Mr. Harrison                    4


     Appearances                                    2
     Changes and Signature                          72
     Certificate                                    73




                     NO EXHIBITS
```

THE VIDEOGRAPHER:  We are on the record on Disc 1.  It is Tuesday, April 16th, 2019, at 10:08 a.m., and the witness is Carey Gartner.

CAREY GARTNER

was called as a witness by the Defendant Amazon.com, Inc., and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HARRISON:

Q.   Tell us your name, please, sir.

A.   Carey James Gartner.

Q.   And where do you live?

A.   27 Hinterwood Way.

Q.   In The Woodlands?

A.   The Woodlands or Tomball, Texas.

Q.   Hinterwood Way?

A.   Yes, sir.

Q.   All right.  How long have you lived there?

A.   I've lived there since May of 2016.

Q.   And what do you do?  What kind of work do you do?

A.   I work in the hotel industry.

Q.   Doing what?

A.   I'm a sales manager.

Q.   For who?

Carey James Gartner                                                5

A.    I work for an independent resort up there called The Woodlands Resort.

Q.    Okay.  How long have you been doing that?

A.    I've been doing that for three years in May.

Q.    What other kind of work have you done?

A.    Only hospitality, so hotel industry.

Q.    Did you go to the University of Houston?

A.    Yes, sir, I did.

Q.    They've got a -- one of the best programs in the country for that, don't they?

A.    Yes.

Q.    That's what I've been told.  I don't know.

When did you graduate?

A.    I graduated in 2009.

Q.    Now, are you currently married?

A.    Yes, sir.

Q.    And what's your wife's name?

A.    Morgan.

Q.    And what's Morgan's last name?

A.    McMillan.

Q.    Okay.  Why did she change that?  Was that changed, or has she always --

A.    So --

Q.    -- kept that name?

A.    She has kept that name because she's a real

estate agent and it's always been her -- the real

estate -- her name in real estate.

Q.   Okay.  Is that her maiden name?

A.   No.

Q.   Okay.  A previous marriage name?

A.   Correct.

Q.   So that's the name she's known by in her

business?

A.   Yes.

Q.   All right.  How long have you-all been married?

A.   We've been married since -- well, officially

our wedding ceremony was August of this past year,

actually, of 2018.

Q.   Okay.  I was wondering why -- I just saw one of

your wedding pictures and your little girl is in the

wedding pictures.

A.   (Moving head up and down.)

Q.   So you-all, I guess, had been for a while

together before that.

A.   Yes.

Q.   How long have you-all been together?

A.   We've been together since summer -- I met her

in the summer of 2015.

Q.   And two kids?

A.   Yes.

Q. What's the oldest one's name?

A. Kaden.

Q. How do you spell that?

A. K-A-D-E-N.

Q. Girl, I guess?

A. It's a boy.

Q. Oh, boy. Okay. And how old is Kaden?

A. He is 12.

Q. When did you say you graduated from the University of Houston?

A. 2009.

Q. Any other schooling after high school?

A. I did go to the -- I don't bel -- actually believe it's around anymore, but it was Texas Culinary Academy at the time, also known as Le Cordon Bleu College of Culinary Arts in Austin, Texas.

Q. When did you go there?

A. I went there from about 2002 to 2005.

Q. Where did you go to high school?

A. I went to high school at St. Thomas just around the corner.

Q. There's two St. Thomases. There's St. Thomas Episcopal and there's a St. Thomas on Shepherd and Memorial. That's the one you went to?

A. That's the one, correct.

Q.   I got you.  And when did you graduate from high school?

A.   1999.

Q.   Now, I was given some pictures just before the deposition, but I also saw in an expert designation a day or two ago that you-all also have some videos of your little girl gagging or spitting up food.  Is that right?

A.   Yes.

Q.   Tell me what you've got; how many videos, what's going on in the videos, that sort of thing.

A.   Well, I would actually need to consult with my wife --

Q.   Oh, okay.

A.   -- because she has taken the -- most of the videos I know of.

Q.   Have you seen any of these videos?

A.   Yes.

Q.   How many have you seen?

A.   I've been present with -- when the -- many of the accidents occurred or the incidents occurred.

Q.   When you say "many of them," how many have occurred?

A.   To my knowledge, that I'm aware of, three --

Q.   And --

A.   -- I think.

Q.   -- when have they occurred?

A.   I couldn't pinpoint a date.  I know over like the past year.

Q.   When was the most recent one?  If you can't pinpoint a date, give me a ballpark on how long ago it was.  Last week, three months ago, a year ago?

A.   Actually, the last one was -- was relatively recently.  It was about last week and she was eating a banana.

Q.   What happened?

A.   She gagged.

Q.   When you say "gagged," what exactly are you talking about?

A.   She made a sound and she started reaching for her throat and the food came out and she quit eating at that point.  (Indicating.)

Q.   Was she ever in any kind of danger?  Did you feel that she was ever in any kind of danger?

A.   Like --  Could you rephrase the question?

Q.   Of choking, I mean.

A.   No, sir, because we have -- we cut the fruit in small pieces.

Q.   And you're aware of episodes like this happening about, what, three times?

Carey James Gartner                                                    10

A.    Relatively speaking, three times that I'm aware of.

Q.    Since the date of the battery ingestion, you mean?

A.    Yes.

Q.    Was this last episode videoed?

A.    It actually was not videoed.

Q.    Tell me about the times that were videoed; what happened, when was it, what she was she eating, those sorts of things.

A.    I would say the first time this happened it was over a potato chip.  And she, again, similar circumstances, points at her throat, spits up the food, saliva and whatnot, regurgitation comes up. (Indicating.)

Q.    Uh-huh.

A.    And then she just quits eating, which occurs every time.  She just -- she's finished eating for however long.

Q.    Now, when was that incident?

A.    That one was -- I couldn't give you an exact month.  It was after the incident I would say a few months, maybe, because she was on a soft food diet.  So maybe even past that.  Maybe six months, perhaps.

Q.    Six months, give or take, after she swallowed

the battery?

A.    Maybe a little bit more.  Because, again, she was on a soft food diet and she actually had a feeding tube for some time.

Q.    Were you concerned that she was choking at the time?

A.    The first time I was.

Q.    Was that the first time?

A.    That I can -- that I can recall, correct.

Q.    Was this time, the potato chip episode, was it videoed?

A.    I believe it was.

Q.    Who took the video?

A.    That would have been my wife.

Q.    Was anyone doing anything to try and dislodge the food while the video was being taken?

A.    I know I've -- I've patted her on the back before, but normally it just -- it comes out.  It -- the food, it's -- it's almost like it doesn't -- it goes down and then it comes right out.  (Indicating.)

Q.    And somebody had the -- was able to grab a cell phone and video it with --

A.    We have our phones handy, correct.

Q.    All right.  If it goes down and comes right out, how much were you able to get on the video?

A.    Well, a lot of times it's the after-effect that's on the video, the -- of her.  Because once it happens, she still is letting us know that she is either being uncomfortable or in pain, which obviously I don't know.  She doesn't -- she's not able to communicate that to me.  But, still, it has a traumatic effect afterwards.

Q.    When was the last time she saw a doctor?

A.    Last time she saw a doctor was March 28th.

Q.    Of 2019?

A.    Yes.

Q.    And what was that for?

A.    She went to see a speech lang -- language pathologist and she went to radiology, so that way -- she drinks a special liquid, I'm not sure what exactly it is, and they do an X-ray.  They watch her drink it and they do an X-ray.  (Indicating.)

Q.    And that was -- both of those doctors were in March?

A.    Correct.  Those are the names that I provided to Jeff here.

Q.    And give me your daughter's full name.

A.    Everly.

Q.    Everly?

A.    Everly Grace Gartner.

MR. HARRISON:  I just thought of this, but I mean, should -- do you want me to refer to the children by their initials or is it okay to use their names?

MR. MEYERSON:  For the deposition, let's just use the name.  That's easier.

MR. HARRISON:  Okay.  All right.

MR. MEYERSON:  I mean, if we have to use excerpts in a motion that's filed, we'll just switch to initials.

MR. HARRISON:  Okay.

MR. MEYERSON:  It's whatever is best for you.

MR. HARRISON:  Okay.  Good.  I'm happy to do whichever.

MR. MEYERSON:  It's more natural, the flow of things.

MR. HARRISON:  It is.

Q.    (By Mr. Harrison)  All right.  Tell me the speech-language pathologist's name --

A.    Her name is --

Q.    -- if you remember.

A.    -- is Anias Cook.

MR. MEYERSON:  That's A-N-I-A-S.

Q.    (By Mr. Harrison)  C-O-O-K-E or --

A.    No E.

Q.    And how did you hear about Dr. Cook?

A.    Dr. Cook was a referral from Everly's GI, gastrointestinal doctor, who is Dr. Chu, C-H-U.

Q.    When did he refer you-all to Dr. Cook?

A.    It would have been towards the beginning of the year when she saw Dr. Chu as a follow-up appointment. That was the next step in the process.

Q.    Okay.  So at this follow-up appointment, were there any specific concerns or problems that you-all perceived that Everly was having that you felt needed to be followed up, or was this just a standard follow-up?

A.    As far as I know, it was a -- it was following up to see what the -- the damage -- the healing process, how that was going, as well as her swallowing ability.

I was not present at the appointment.  I was at work.  So my -- my wife would actually have a better idea of exactly what they -- they told her.

Q.    And Dr. Chu has been her gastroenterologist since the incident?

A.    That is correct.

Q.    Has he referred you-all to any other doctors besides the speech pathologist and the radiologist?

A.    Not at this time.

Q.    When you say "not at this time," what do you --

what do you mean?

A.   He had mentioned it would be an ongoing process with stages, but did not lay out the various stages. Just said there would be appointments, and obviously that was coming to do a -- I believe it was a swallow study.

Q.   And this swallow study, that's what Dr. Cook and the radiologist did?

A.   Correct.

Q.   What's the name of the radiologist?  Do you remember?

A.   Marla Scammer.

Q.   And are both of these doctors up in The Woodlands?

A.   They are both in The Woodlands and with Texas Children's Hospital.

Q.   What do you know about the swallow study that they just did?  Have you seen any results or consulted with the doctors about the results of the swallow study?

A.   Again, I was not present during that, so my wife would have further information.

         Generally speaking, I was told that it could -- it could be a long process.

Q.   What could be a long process?

A.   The healing process for her.

Q.   What has been explained to you about the healing process; what it involves, how long it takes, that sort of thing?

A.   At this point, it's obviously unknown because there's -- they haven't had a lot of cases at this hospital.  It's a relatively newer hospital, but they have experienced doctors from the Texas Medical Center.

But that hospital in particular, I don't know.  They just mentioned just the cases in general, that it's a long road to recovery, because the battery caused the damage of, I guess, eroding the tissue. (Indicating.)

Q.   What residual effects have you observed that that has had?

A.   Actually, in my opinion, it affects the way she eats.  And, unfortunately, I feel that she's going to have some sort of a mental relation with eating.

And when this occurs, she just quits eating.  So my fear is that she's not going to have enough food.  I mean, that's my fear, though, that she's not going to be able to eat enough food because she'll try eating, and if this happens, she just stops eating altogether.

Q.   Well, stops for how long?  Just for that meal?

A.   For that meal.  I mean, it varies however long.

That meal for sure.  She's -- she's finished.

Q.   And this has happened, what, about three times that you're aware of?

A.   Po -- potentially -- probably more than that, but that I've been present.

Q.   When did she start eating solid foods again?

A.   "Solid foods" meaning?

Q.   Walk me through the process of recovery in terms of her eating.

A.   Okay.  She had a feeding tube for some time where there was a -- I believe it was Similac formula that I had to pour into these IV bags that were connected to her along with a pole that she had to walk around our house with for some months.

After that, the next phase was softer foods such as Apple sauce, yogurt without any fruit in it, pretty much anything of that nature.  And, that, again, likely for a few months.

Q.   Was she able to swallow the softer foods?

A.   At first I feel like it was a little -- it was -- it felt newer to her because it was difficult. We still gave her formula because it was just easier for her to ingest after the feeding tube was removed.  But eventually she would start eating that, correct.

Q.   And how long was she on the softer foods before

she developed into more solid food?

A.   I -- that, I -- I don't even recall.

Q.   Is there anything now that she cannot or will not eat that you attribute to this?

I'm not talking about, you know, kids don't eat broccoli, that sort of thing.  But is there something that you attribute to this battery ingestion that you think she cannot eat?

A.   I -- I would say -- and I can't -- I can just describe it, but I don't know how to say it.

Foods that are slimy, such as most recently she had cut-up banana's with whipped cream, and she had a problem with that.  Even though one would think it would go down easy, she had issues with that. A time before that she had an issue with strawberries cut up finely.

Q.   Well, when you say "issues," I mean, that could mean anything.  I mean --

A.   Problems swallowing, the same problem. (Indicating.)

Q.   Does it make sense that she would have a problem actually swallowing a banana with whipped cream when she can swallow more solid foods?

A.   I --

MR. MEYERSON:  Objection.  That's

ambiguous.

MR. HARRISON:  It is.

Q.  (By Mr. Harrison)  But what I'm trying to get a feel for is, how do you know it's just something she didn't like because it's slimy?  Do you see what I mean?

A.  I would say because it's not every single time. She's had strawberries before, perhaps, and she -- she likes -- she loves strawberries.

Q.  Well, when she had them before, you mean before the battery ingestion, or has she had them in the recovery period where she has been able to swallow?

A.  In the recovery period where she's been able to swallow them.

Q.  Okay.  So on at least one occasion she was not able to swallow the strawberries?

A.  That I'm aware of, correct.

Q.  Do you remember when that was?

A.  I don't remember a specific date.  I know it was after the recovery processes, past the soft food process.

Q.  Overall, how do you feel she's doing now?

A.  I'm not a medical doctor by any means.  I feel like -- there's times where I feel like she's doing better.

But when an incident like what happened

with the bananas and the whipped cream or Cool Whip occurs, it just sets me back that she is having problems and makes me aware of and actually brings me back to the time, the situation that I don't even like talking about or thinking about ever.

Q.   So this last appointment with Dr. Chu, is it, was in like January?

A.   I believe it was January or it was the end of December, and then there was a follow-up within three months.

Q.   Do you have a standing appointment with Dr. Chu to follow up with him?

A.   I would have to confer with my wife on that, but that would be the next step, would be following up with him.

Q.   All right.  But at this last appointment when your wife took your daughter in to see Dr. Chu, that's when the referral was made to the radiologist and the speech-language pathologist; is that right?

A.   Correct.

Q.   For the -- it's your understanding a swallow study was done?

A.   Yes.

Q.   What did you understand that to mean, "a swallow study"?

A.    Generally speaking, to measure -- see how she is swallowing.

Again, I wasn't there -- present there, but my understanding was to see what -- how she was swallowing, see -- to test -- do the testing with the pink liquid, I believe, that's what I call it, and then doing an ultrasound or X-ray to watch it go down.

Q.    Do you know if the results of that study were discussed with your wife at the time, or was it another follow-up where you had to go in and talk about it?

A.    I believe they were discussed at the time, because it's -- I've been there before for one of the studies with the pink liquid and I was shown, "Here is the" -- however they want to say it -- "ulcer," or whatever they call it, from it, that they can tell from the liquid.

Q.    So will there be another one of those studies?

A.    Likely, yes.

Q.    What has Dr. Chu or any other doctor told you? You said earlier that you expect it to be a long process.  What does that mean?  What do you mean?

A.    My understanding, after conferring with Morgan, was that she was eventually -- they were going to have to do a study where they stick a -- some kind of instrument down her throat again, but this -- this time

she would have to be awake for it.

So that would have to be probably later on when she's older, because at this time with her age children of that age have a tendency to try to pull -- pull it out and not let them, you know, continue with it, and I guess have her talk and speak while they do the study.  (Indicating.)

Q.   Has -- do you think that this incident with the battery has had any effect on her ability to talk or speak or her development in speech?

A.   I'm not an expert on that.

Q.   Well, where is she now in terms of talking?

A.   I think she talks fairly well.

Q.   For her age?

A.   For her age.  Obviously, she says -- she says words.  I don't hear her speaking complete sentences, plural, thoroughly.

I do know at times that she has pointed to her throat or made movements toward her throat even when she's not eating food.

Q.   How old is she now?

A.   2-1/2.

Q.   Yeah.  2-1/2?

A.   (Moving head up and down.)

Q.   Is -- has her development in terms of speech,

has it been similar to what Kaden's was?

A.    I wouldn't be able to -- to let you know on that one.  I wasn't -- I'm -- I'm Kaden's stepfather.

Q.    Oh, okay.

A.    So when I met him, he was approximately 8 years old.

Q.    All right.  So he was talking pretty good by then?

A.    Yes.  Correct.

Q.    Okay.  Tell me about other -- let's talk about other developmental-type issues with Everly.

Do you remember when she first walked, for instance?  How old was she?

A.    I'm trying to think.  I couldn't put a time stamp on it.  Perhaps she was a little bit later on, so maybe 1.

Q.    She was walking at the time of this incident, apparently?

A.    Yes.

Q.    Describe her at about the time of this incident in terms of what she was able to do; walk, climb, run, balance, those sorts of things.

A.    I would say at this time she was able to walk -- walk around.  I don't believe she was running at this point that I can recall.  Obviously crawl, can

crawl -- could crawl at the time.

Q.   How about climbing up on things, climbing out of things?  Was she sleeping in a crib?

A.   She was not sleeping in a crib.

Q.   Where was she sleeping at the time of this?

A.   During nights she would sleep with us.

Q.   Okay.  During the day when she napped, where would she sleep?

A.   I would have to -- I would have to confer with Morgan on that, because she's with her at home while I'm at work.  Various --

Q.   Does she have her own room?

A.   She does.

Q.   Did she have her own room at the time of the incident?

A.   Yes.

Q.   What kind of bed is -- does it have?

A.   So we did have a crib for initially.  She didn't sleep in it too well.  I've seen her nap in it before.  But for the most part she would sleep with us.

That crib became a toddler bed.  So that's essentially what she has now, the same.

Q.   All right.  What else is in her room besides the crib and toddler bed?  I assume there was a changing table.

A.    At the time, correct.

Q.    What else?  Any TVs?

A.    A smaller TV; toys, obviously; toy storage.

Q.    At the time of this incident, what TV was kept in her room, if any?

A.    There was a small -- smaller TV, I'd say a little bigger than this laptop, that's still in there. (Indicating.)

Q.    Did it have a remote?

A.    The actual TV?

Q.    Yes, sir.

A.    TV?  Yes.

Q.    And was it kept in the room?

A.    Yes.

Q.    Was it the remote involved in this incident?

A.    No.

Q.    The remote that was in -- that did go with that smaller TV, where was it kept in her room?

A.    At -- typically it was kept up above where she has her toy storage.  (Indicating.)

But typically we -- we'd use it sometimes to turn it off, but sometimes we would use it manually, hit the TV on.

Q.    But typically it was kept up out of her reach?

A.    Yes.

Q.    Any particular reason?

A.    No.    Just -- just, I guess, keeping it by the television set.

Q.    She was 19 months at the time of this incident; right?

A.    April 2018.    I believe so, yes.

Q.    And had she used a remote control before?

A.    No.

Q.    Had she ever played with a remote control, any remote control before?

A.    Not that I'm aware of.

Q.    At that time, was she at an age -- at 19 months was she watching any TV programs?

A.    Yes.    She had some TV programs.

Q.    And did she know how to turn the TV on and off?

A.    No.

Q.    And you had never known her to attempt to manipulate a remote control, play with it?

A.    Not that I'm aware of, no.    We -- we would all -- and even to this day she doesn't turn the television on or off.    We -- we -- we do that for her.

Q.    Well, tell me about the Apple remote involved in this incident.    What TV did it go to?    What TV was it paired with?

A.    The Apple remote wasn't actually paired with a

television set.

Q.    It wasn't.  What was it paired -- what was it used for?

A.    I believe it was a Generation 2 Apple TV little box, square box, that you connect to a TV via an HDMI cable.  (Indicating.)

Q.    Okay.  But that TV was not in Everly's room?

A.    With -- the Apple TV portion?

Q.    Yes.

A.    Yes, it -- it was.

Q.    Oh, okay.  So --

A.    It's paired -- it's hooked to her -- it -- the remote doesn't control -- directly control the television set.  It controls the box that's connected to the television set.

Q.    All right.  And was the box in her room --

A.    Yes.

Q.    -- at the time of the incident?

A.    Yes.

Q.    Did that box control only this TV or did it control other things?

A.    It controlled this television set in particular.  I've had the box for a year or so before this, and I used it personally.

Q.    What does it do?

Carey James Gartner                                    28

A.    You can watch shows through Netflix, Amazon Prime, things of that nature, but you can child lock the programming.

Q.    Well, you had had the box for about a year before the incident, you say?

A.    Yes.

Q.    Did you buy the box at the same time you bought the remote?

A.    No.

Q.    Which one did you buy first?

A.    The Apple TV box.

(Someone entered room and handed item to Mr. Harrison.)

MR. HARRISON:  Oh.  Thank you.  Cool.

Q.    (By Mr. Harrison)  When you bought the Apple TV box, did it come with a remote?  Did you buy a remote with it?

A.    It came with a remote.

Q.    And was that remote unsatisfactory in some way?

A.    The remote was not.  I just wasn't able to find it in -- in moving into the house, so --

Q.    All right.

A.    -- lost the remote.

Q.    All right.  So the remote that the box came with got lost somehow?

A.    Yes.

Q.    And so you needed a new remote?

A.    Yes.

Q.    Tell me what you did.

            MR. MEYERSON:  Objection --

Q.    (By Mr. Harrison)  In terms of --

            MR. MEYERSON:  -- ambiguous.

Q.    (By Mr. Harrison)  In terms of buying decisions that you made, what to buy, how to buy it, what you needed, it's pretty broad, but I want to get --

            MR. MEYERSON:  I'm going to have to object to that.

            MR. HARRISON:  Well --

            MR. MEYERSON:  Do you want to do them one at a time or --

            MR. HARRISON:  -- sustained.  It's a good objection.

Q.    (By Mr. Harrison)  But I want -- I want to get you to walk me through the process of how you came to decide on this remote.

A.    This remote in particular, I needed a remote. I've used Amazon Prime services before, so I went on Amazon.

            Plus, they have a review system.  So each product has reviews rated by stars.  And this product

Carey James Gartner                                                    30

actually had good ratings, good reviews by, I guess, buyers or I guess people that had experiences with the remote. So that's primarily what I based my buying decision on.

Q. Do you remember anything specific about any of the reviews that you head, anything that jumps out in your memory? Easy to handle or -- anything?

A. I don't recall that. I just remember seeing the star -- the star rating, and it was high.

Q. Did you compare -- did you look at other remotes?

A. I did. I actually looked at the original Apple remote and seeing if I could get a replacement.

Q. Why didn't you -- why did you choose to not buy the original Apple remote?

A. I chose based on primarily price. And essentially my understanding was it was doing the exact same thing as the original Apple remote was doing, just at a lower price point.

Q. At the time you bought this remote, how old was Everly?

A. Let's see --

Q. About eight months, give or take? Probably younger. Six or seven months?

A. Six, seven months.

Q.    Did you understand when you bought the remote that it was -- who was actually selling it to you?

A.    My understanding was that I was buying the remote from Amazon because it was Amazon Prime services.

Q.    So you assumed that Amazon was the seller?

A.    Yes.

Q.    Does anything else -- did you read anything else about this remote when you were deciding to buy this particular remote?

A.    I looked at the reviews.  I looked at what pictures they had on -- obviously, what it looks like. To me, it looked very similar to the original remote, although it was black instead of silver.

But it didn't have anything on there, an indication of, perhaps, a warning.  And if it would have had something on that, I would have purchased something else.

Q.    You didn't see any indication of a warning where?  On the -- on the page, the website page?

A.    Correct.

Q.    Did you look for that?

A.    I did.

Q.    You looked for -- to see if there was a warning of some sort?

A.    At the time, I was a helicopter father.  I had

Carey James Gartner                                                            32

a few baby gates.  I was -- her safety was my number one concern.

Q.    And you had that in mind when you bought this remote?

A.    Anything that I would purchase for a house, I would have that in mind.

Q.    What kind of warning were you looking for?

A.    I wouldn't -- I wouldn't know -- if there was a warning that said something if -- not recommended for, you know, children under said age or not recommended for -- for toddlers.

Q.    Okay.  If it had said not recommended for toddlers, would you have bought it?

A.    No.

Q.    Why not?

A.    Because I feel like that she was young enough that -- her transition to toddlerhood, why would I purchase something that I'd have to -- I'd have a year -- year span or so before she's a toddler.

Q.    Well, being a helicopter dad, couldn't you have just bought it and, even though it's not recommended for toddlers, put it on the shelf like you had the other remote?

A.    No.

Q.    No?

Carey James Gartner                                                        33

A.    No.

Q.    Is there a remote in her room now?

A.    There actually is.

Q.    And it's up on the shelf?

A.    Currently, it is.

Q.    All right.  Did you keep this particular remote in her room before the incident?

A.    The -- this remote was -- was always essentially with the Apple TV set.  So when I moved the Apple TV set into her room, I did -- that's essentially the time that I looked at getting the remote, was when I determined that I couldn't find the original remote, so I decided to buy that remote.

Q.    Well, my understanding is that you bought this remote about 13 months before the incident?

A.    Yes.

Q.    Okay.  So you owned it for about 13 months?

A.    Yes.

Q.    Was it kept in her room the entire time?

A.    No.

Q.    Where else was it kept?

A.    It was kept in -- I have to try to think.  I believe I had it in several places.

        I have a 1-1/2-story house, so we have a media room upstairs.  I believe at one point I had it

Carey James Gartner                                34

connected to -- to that television set there.

Q.    How long had -- had this remote been in Everly's room?

A.    I -- I don't even recall when I moved it into her room.  I would say maybe a few months.

Q.    And when it was in her room for a few months, where was it kept?

A.    It was kept next to the other remote.

Q.    Up on -- out of her reach?

A.    Yes.

Q.    And why is that?

A.    Just keeping the remotes together for org -- being organized.

Q.    Were you consciously trying to keep the remotes out of her reach?

A.    At the time I would say anything I would keep out of her reach.

Q.    Why?

A.    Because she's too young and she wouldn't know how to use the item to begin with.

Q.    You said earlier that if there had been some kind of warning about not suitable for use by toddlers or young children that you wouldn't have bought it?

A.    Correct.

Q.    Don't you have many other items in your home

that are not suitable for use by toddlers?

A.    But inside of her room.

Q.    Well, do you have items in her room that are not suitable for use by toddlers?

A.    Not that I can even think of.  Everything is baby-proofed essentially.

Q.    Is that -- is keeping something out of a toddler's reach a way of basically baby-proofing?

A.    That can be a way.

Q.    And that's something that I gather a parent should do; right?

A.    Yes.

Q.    And, in fact, you do that as much as you can?

A.    Yes.

Q.    Give me some example of baby-proofing, toddler-proofing that you've done in you-all's home.

A.    So her television set is actually anchored into a stud in the wall.

Q.    Uh-huh.

A.    So it's on top of a -- like a bin for her toys. Those are also anchored into the wall.

Q.    So she can't pull them over?

A.    She can't pull them over.  If she tried to climb on them, they would just go maybe a few inches out and they would hold themself -- the studs and anchors

would hold out.  So those were done.

Q.    Good.  Can you think of anything else offhand?

A.    We have outlet plugs, and all of her rooms [sic] are covered.

Q.    The covers, the outlet covers?

A.    Correct.

Q.    With the plastic covers?

A.    Yes.

Q.    Can you think of anything else?  Window blind cords, for instance.

A.    We have those -- we have those tucked away. She -- she couldn't reach those.  They're -- the TV and such is in front of the windows and they're tucked away. (Indicating.)

Q.    Was -- tucking away window blind cords, was that something that you were doing even before this incident?

A.    Generally speaking, yes.

Q.    Before this incident, what other baby-proofing or toddler-proofing had you undertaken in your home?

A.    Oven knobs.  They're -- we still have them on there, special covers where, you know, the baby cannot turn on the gas.  (Indicating.)

Q.    Uh-huh.

A.    We had doorknob, whatever they call -- they

cover the doorknob where the toddler can't -- the baby can't open a door.  (Indicating.)

Baby gates.

Q.   Were you utilizing these doorknob covers and baby gates back at the time of this incident?

A.   Yes.

Q.   How did you know to do those sorts of things? Had you read books, read articles, gone to classes, talked with a pediatrician?

A.   Actually, I read articles approximately before Everly was born, leading up to when she was born of like how to -- you know, parenting techniques, things of that nature and, you know, safety.  And you read a lot about different things, and there's different ways, safety advices you can get to be preventive.

Q.   Had you read any of the literature about the dangers of swallowing a battery like this?

A.   No.

Q.   Did you know anything about the dangers of swallowing a lithium battery --

A.   No.

Q.   -- or a button battery of any type?

A.   No.

Q.   Did you know about, whether it's just common sense or you read any articles about it, did you know

Carey James Gartner                                                        38

about dangers of swallowing pocket change, coins, small things like that?

A.    Change, not so much.  But small things, yes. Small plastic.  Obviously like a Lego or something, yes. (Indicating.)

Q.    For safety reasons when she was 19 months old, would you keep small things out of her reach?

A.    Yes.

Q.    Because of the danger of swallowing them?

A.    Yes.

Q.    Now, on the day this incident happened --

Well, let's back up a second.  What time of day did this happen?

A.    It was 3 p.m. or so in the afternoon.

Q.    Was that nap time, typically?

A.    Her nap times varied at the time, but typically wind-down time.

Q.    And what was going on at about 3:00 in the afternoon?

A.    I actually was at work, so I wasn't present when -- I didn't -- I wasn't present until about 5 p.m. when I came home from work.

Q.    Who was home with her?

A.    Morgan.

Q.    Anyone else in the house?

A.    Kaden came home from school approximately 4:30.

MR. MEYERSON:  Excuse me.

Q.    (By Mr. Harrison)  When you got home, had this incident already happened?

A.    When I got home, she was acting a little different.  She was --

Q.    Everly was?

A.    Everly was.

Q.    In what way?

A.    She was crying.

Q.    Okay.  How -- how was that different?  I mean, a 19-month old may cry, so --

A.    Constantly crying.  And Morgan had let me know, you know, 4:00 p.m., 4:30 or so, that this was going on, that she kept -- she was crying all afternoon just nonstop.

Q.    And you-all couldn't figure out what was wrong?

A.    At the time, I couldn't.  I just came home from work.  I excused myself and I came home immediately to see what -- what was going on.

Q.    Oh, did -- did she call you?  Did your wife call you?

A.    She did call me.

Q.    And said, "Something is wrong with Everly, she won't stop crying"?

A.   "She's been crying all afternoon."

Q.   So you came home early?

A.   I left a bit earlier than usual.

Q.   So what happened?

A.   I came home, obviously saw her crying as well.

At the time a calming technique for her was her taking a bath.  So I readied a bath for her, put her in the bathtub, and noticed that -- that she did not stop crying at that time.

And at the time I -- the year before that, 2017, I lost my father to cancer.  So I decided that I didn't want to take any chances.  I wanted to make sure that we can -- go take her to an emergency room.

Q.   All right.  Some of this might be a little tough for you.

A.   Yeah.

Q.   I'm sure you've been explained the rules of a depo, and one of those rules is you can take a break any time you want to.  Okay?  So I'm just reminding you of that.  Any time you feel like you want to take a break, let us know --

A.   Appreciate it.

Q.   -- and we'll take a break.

So you couldn't get her calmed down with the bath.  What happened next?

A.    At the time, I don't -- I don't really recall. I just remember getting her out of the bathtub and getting her dressed and wanting to get her to the hospital.

Q.    Okay.  Because you were, I guess, alarmed enough that she was crying more than normal?

A.    Yes.

Q.    Maybe something is wrong?

A.    Yes.

Q.    Let's get her to the hospital?

A.    Yes.

Q.    Got her out of the bath and off you went.  Just you and her, or did your wife go with you?

A.    No.  Just Everly and myself.

Q.    Okay.  Any reason why your wife didn't go?

A.    I wanted her to stay home with -- with Kaden.

Q.    Uh-huh.  Okay.  So did you have any idea at this time that Everly had swallowed the battery?

A.    My -- my wife had called me when I was in route and she mentioned she could have swallowed something. And they noticed that there was a remote on the floor, I believe it was the floor of her room, and the back -- and the back was off and there was no battery in it.  I believe she told me she thought maybe the dog had eaten the battery.  And at that point I wanted to just make

sure she got an X-ray.

Q.   Now, the first you heard this was on your way to the hospital, or did your wife tell you that before you left?

A.   I -- I don't recall.  I'm sorry.  It was a traumatic experience.  I don't recall if it was on the phone in the car or before, but it -- it was definitely that was my -- my end game was getting her to the hospital and having an X-ray --

Q.   Got you.

A.   -- having a doctor look at her.

Q.   Do you remember, before -- whether or not before you left to go to the hospital, did you look around her room to see if maybe there was some evidence of something she might have gotten into or swallowed or anything like that?

A.   I believe I peeked in there at the time, but I don't believe I -- my -- my concern was just getting her to someplace I could -- that would -- that I would know for sure take care of her, because she was -- I had never seen her cry like this before.

Q.   Okay.  So when you looked in her room, you didn't see -- you don't remember seeing the remote on the floor?

A.   I don't remember seeing -- I remember just

picking her up and putting her in the car and taking her to the hospital.

Q.    How did she get the remote?  Do you know?

A.    I don't know.  I was at work.

Q.    Could she have gotten it off of the shelf where the TV was kept?

A.    Again, I -- I don't know.

Q.    I mean, was it possible to climb up that high?

A.    At the time she wasn't climbing, though.

Q.    Yeah.  How high was this TV?

A.    I don't know exactly on measurements, but maybe this high off the ground.  (Indicating.)

Q.    All right.  Looks like about 4 feet or so?

A.    Perhaps.

Q.    Give or take.  And, I mean, there's no -- there's no -- there's not a ladder or anything going up to it, I -- I assume.

A.    No.

Q.    So about 4 feet off the ground is where the TV and the remotes were kept --

A.    Yes.

Q.    -- normally?

        Did you ever lay the remote down in the floor --

A.    No.

Carey James Gartner                                                                    44

Q.    -- or on a chair or anything like that?

A.    No, I didn't.

Q.    Now, this -- did your wife say anything about Everly had been in her room or was taking a nap or was playing or -- or anything like that when she started crying?

A.    She was in her winding-down phase, and I believe she maybe had the TV on and was watching one of her shows at the time.  It was the "BabyFirst" television series.

Q.    All right.  Well, in the winding-down phase, does she typically -- or did she typically watch a TV show?

A.    Typically, yes.

Q.    Did that typically put her to sleep?

A.    It would help, because it had music with it.

Q.    So is it your understanding -- I know you weren't there, but is it your understanding that before she swallowed this battery that she was in her room and the TV was on at some point?

A.    That would be my understanding, correct, yes.

Q.    But you don't have any idea how she got the remote?

A.    No.

Q.    Now, you had had the remote for about 13

months; is that right?

A.   Give or take, yes.

Q.   Give or take.  And you would sometimes move it to a different room?  You would have to move the box, too, I guess.

A.   Yes.

Q.   And you would move the whole system up to a different room and watch, you know, Netflix or something in the entertainment room?

A.   Yes.

Q.   How often would that happen, that you would move it around?

A.   I moved it around until actually I purchased some Fire TV devices.  The Apple TV had a lot of my -- had my iTunes account and it had movies saved to it. So, for me, I was able to watch my movies on -- on my big screen upstairs, so I was able to move it to there, or into my master bedroom to watch TVs [sic] that I've already purchased -- movies that I've already purchased --

Q.   I see.

A.   -- through Apple.

Q.   Okay.  Were you doing that frequently?

A.   Probably not as -- not as much, because I had seen the movies before.  But once in a while I would

watch -- I would watch a movie that I had purchased, yes.

Q.    And so you had used this remote before?

A.    I'd used it before, yes.

Q.    Many times, every day?

A.    Not every day.

Q.    Once a week?  Any idea?

A.    On weekends, maybe.  Like once -- once a week, on the weekends, perhaps.

Q.    Any problems you noticed with the remote?

A.    No problems.

Q.    Had the battery compartment cover ever come off?

A.    Never.

Q.    Never?

A.    No.

Q.    It was always, in your mind, secure on the back?

A.    It looked pretty secure to me.

Q.    Okay.  You had never experienced the battery cover coming off --

A.    No.

Q.    -- or the battery falling out?

A.    No.

Q.    Had the battery ever been changed?

A.   Not that I can recall.  I don't -- I don't recall.

Q.   Have you purchased button batteries before?

A.   I have, yes.

Q.   For what?  Cameras, things like that?  I guess they go in all sorts of things.

A.   Small items like a watch, a key -- a key fob for a vehicle.

Q.   And when you purchased those button batteries, did you ever read any of the warnings that came with them?

A.   I didn't really notice warnings on them at the time when I purchased them.  The one thing I would notice would be the key fobs or a watch, it would be -- it would be extremely to difficult to get off, to get open, for example.

Q.   Well, did you ever store button batteries anywhere?

A.   At the time -- at the time, yes.

Q.   Where?

A.   I stored it in our office in a se -- in a drawer.

Q.   Out of the reach of the kids?

A.   Yes.

Q.   Any particular reason why they were kept out of

Carey James Gartner                                     48

the reach of kids?

    A.    All of the batteries are kind of organized together in a special container.  One of it had a little part where you could store those types of batteries in the back.

    Q.    Okay.  Even the used ones?  Do you dispose of them in a certain way?

    A.    I just dispose of them just garbage.

    Q.    But you did keep in your home spare batteries of all different shapes and sizes?

    A.    Yes.  Primarily AAAs or AAs.  Those are a little more expensive, so I usually would buy those as needed.

    Q.    "Those" being the --

    A.    Button --

    Q.    -- button --

    A.    -- batteries.

    Q.    -- batteries.  But had you kept new button batteries in your home before?

    A.    I probably --

            MR. MEYERSON:  Objection.  That's ambiguous.

            MR. HARRISON:  Okay.  How do you want me to ask it?

            MR. MEYERSON:  Are you talking about like

kept in, like, storage where it wasn't in a device --

MR. HARRISON:  Yes.

MR. MEYERSON.  -- or --

MR. HARRISON:  That's what --

MR. MEYERSON:  Okay.

MR. HARRISON:  Okay.  I understand.

Q.    (By Mr. Harrison)  Had you purchased button batteries from the store and then saved them in your home for when you needed them?

A.    Yes.

Q.    And at any time had you ever read any of the warnings on any of the button batteries that you bought?

A.    No.

Q.    And I think I asked you this earlier.  At any time had you ever read any of the literature on the dangers of swallowing button batteries?

A.    No.

Q.    Would you have ever allowed Everly at -- when she was 19 months old to play with a button battery?

A.    No.

Q.    And why not?

A.    It's not a toy.

Q.    Because of the danger of swallowing it?

A.    You mean like now or back then?

Q.    Back then.

A.    I would say it's small enough to be considered, yes, a danger of swallowing it.

MR. MEYERSON:  Do you-all mind if I take a break for a restroom break?

MR. HARRISON:  I was about to --

MR. MEYERSON:  Do you want --

MR. HARRISON:  -- say that.

MR. MEYERSON:  -- a couple more --

MR. HARRISON:  No.  No.  We can do one now and --

Let's go off the record.

THE VIDEOGRAPHER:  Off the record at 11:05 a.m.

(Recess from 11:05 until 11:16.)

THE VIDEOGRAPHER:  We're back on the record on Disk 2 at 11:16 a.m.

Q.    (By Mr. Harrison)  What time did you say Kaden usually got home from school?

A.    Roughly 4:30-ish.

Q.    All right.  So Everly would have already swallowed the battery by then, do you think, or not?

A.    Yes.

Q.    Did they share a room?

A.    No.

Q.    Did he ever go in her room to watch TV?

A.    Yes.

Q.    Did he -- I guess he had access to the remote?

A.    Yes.

Q.    Did he ever leave it on the floor or within reach of Everly?

A.    Not that I can recall, but I know Morgan would -- is like myself where we would, if we saw it anywhere else, we would make sure that the remotes are together.

Q.    You understood that the remote was not a toy?

A.    Yes.

Q.    And it was not intended for use by toddlers?

MR. MEYERSON:  Objection.  That's ambiguous.

Q.    (By Mr. Harrison)  Did you understand that at the time, that the remote was not intended for use by toddlers?

A.    It's not a toy.

Q.    Okay.  So that it's not suitable for use by toddlers?

A.    Yes.

Q.    And you understood that then?

A.    Yes.

Q.    So this warning that you say would have made a difference was something you already knew, wasn't it?

A.    Can you describe --

MR. MEYERSON:  Objection.  That's ambiguous.

Q.    (By Mr. Harrison)  Well, you said that if there was a warning on the web page that said "not suitable for use by toddlers" you wouldn't have bought it, but you -- didn't you already know that?

A.    Meaning?

Q.    That the remote was not suitable for use by toddlers.

A.    It's -- it's not a toy.  It's -- I'm not going to -- I would not put that with her -- like with her crib and her doll or like a stuffed animal, no.

Q.    Because it's not suitable for use by toddlers?

MR. MEYERSON:  Objection.

A.    It's not a toy.

MR. MEYERSON:  It's ambiguous.

Q.    (By Mr. Harrison)  Well, why would it have made a difference to you if you had seen language on the website that said "not suitable for use by toddlers"?

A.    I would say being more aware because I was a new father.

Q.    Well, you had other remotes in the home, I assume?

A.    Yes.

Carey James Gartner                                           53

Q.    Would you have not bought any remote that said "not suitable for use by toddlers"?

A.    I would say anything that I would purchase that's like an electronic item or it's an item, I would have noticed something of that nature.

Q.    But what precautions would you --

Would you have purchased it anyway and just taken precautions?

A.    At the time I was more, I guess you would say, cautious of what I was buying and I just was more aware of -- if there was a warning out there, if there was any warnings, I would notice it.

Q.    If there were any warnings you would have noticed it?

A.    If there was warnings for a particular product or device, I -- yes.

Q.    Are you typically the kind of person that reads things like warnings and literature that comes with products?

A.    I would say if there's a warning on a particular product I would take notice of it, yes.

Q.    Do you read -- have you read warnings on her car seat, for instance?

A.    When I install it correct -- yes, because you have to install it correctly.

Carey James Gartner                                                54

Q.   Did you read any literature that came with the car seat?

A.   Like an instruction manual?

Q.   Anything.

A.   I read it while I was -- to install it correct, yes.

Q.   Do you remember specifically any particular warning that you read when you were installing the car seat?

A.   How to install it correctly and -- versus incorrectly.  Like, for example, facing -- baby facing forward versus it facing this way, and connecting with the latches on the vehicle.  (Indicating.)

Q.   What about warnings on a stroller?  Have you read warnings on her stroller?

A.   I would say no.

Q.   Do you know if there are any warnings on her stroller?

A.   I don't know if there's any.

Q.   What about other childhood products that have warnings?  Do you -- can you think of any offhand that you have in your home?

A.   Not that I -- not that I can think of.  The only thing that comes to mind is maybe like a hair dryer, right, where it says do not keep plugged in or if

it falls in a bathtub, that's a warning.  (Indicating.)

Q.   Okay.  The other remote that you have for this TV, how is the battery compartment secured?

A.   It's secured -- it has a clicking mechanism.  I don't know if you have like Xfinity or AT&T cable, but it has like a -- I don't know what to call it -- a special latch that you have to put your fingernail under to open it.  (Indicating.)

Q.   Have you seen remotes that had like a -- where you needed something like a coin to put in it and turn it to access the battery?

A.   Yes.

Q.   Do you have any of those?

A.   Yes.

Q.   Did this Apple remote that you bought have anything like that securing the battery compartment?

A.   No.

Q.   Did you notice that at the time?

A.   I did not notice it at the time.

Q.   Did you think about it one way or the other?

A.   I did not, no.

Q.   Had you read on the website some language such as any remote that's not secured, that the battery compartment is not secured by something like a coin, a screw device should not be used by children, what would

Carey James Gartner                                        56

you have done?

A.   Well, I didn't even know what the reason was for using the coin to open it like a remote other than it keeps the battery in or maybe that, once in, I mean, it closes it.

Does that answer the question?

Q.   I don't know.  Did you see any warning like that on this website?

A.   No.

Q.   Did you see any language that indicated that this is not to be used by children?

A.   No.

Q.   Did you look for it?

A.   I -- I looked at the product description and I did not see it in there.

Q.   You mentioned your dog earlier.  What kind of dog?  How big?

A.   A small toy poodle.  (Indicating.)

Q.   Had he ever gotten the remote before?

A.   No, not that I'm aware of.

Q.   You mentioned you think you recall your wife saying, "Well, maybe the dog got the remote and got the battery compartment open."

Is that what you recall her telling you?

A.   No.  I recall her telling me that when she

found the battery -- or the remote with the back off of it and there was no battery inside of it that perhaps the dog had -- had maybe eaten the battery.

Q.    Okay.    Had the dog ever chewed on the remote --

A.    No.

Q.    -- or any remote like that?

A.    No.

Q.    And, to your knowledge, that battery compartment cover was secure enough that it had never come off before?

A.    Yes.

Q.    Had you ever dropped the remote before?

A.    Have I ever dropped it?

Q.    Yeah.

A.    No.

Q.    Was the battery included with the remote when you bought it?

A.    I -- to be honest with you, I don't even recall.

Q.    Between you and your wife, who would you consider to be the main caregiver for Everly, if there is a main care -- primary caregiver?

            MR. MEYERSON:    Objection; ambiguous.

Q.    (By Mr. Harrison)    Can you answer that or not? I mean, do you-all share roles equally?

She's got the type of job where sometimes she's home, sometimes she's not.  I assume you're flexible enough that you come home.  Is it fairly equal?  Is it -- does -- who takes care of her more?

A.    I would -- I would say that she has the flexibility to be with her at home during the day.

Q.    Okay.  Your wife is a Realtor.  What kind of a Realtor?  Is she a buyer's agent or is she a listing agent?

A.    No.  She's a listing agent.

Q.    Does she do a lot of her work from the home?

A.    She -- she has.  She hasn't as of recently.

Q.    But as a listing agent, are you -- is she more flexible, she can meet with people who want to list their homes at night?

A.    Well, that was --  Correct, yes.

Q.    At the -- during the time frame this happened, was that typically the arrangement?  Would she be home primarily during the day while you were working at the resort and then you would come home and then she would go out and meet with clients or whatever?

A.    If she had any clients to meet, she would see them after hours, yes.

Q.    I've got you.  Well, during this time frame, April a year ago, were there any other caregivers?  Did

you have a nanny that would come from time to time, babysitters, family members?

A.   No.

Q.   It was just the two of you-all?

A.   Yes.

Q.   Was there anything that you noticed that was at all unusual about Everly's development?  Walking late?  Did all that -- things like walking seemed to come on time?

A.   It was such a broad time frame.  I do recall maybe a friend of ours, that their child started walking at like six months -- years old -- six months, which was really early.

Q.   Yeah, that's really early.

A.   And, you know, at that time Everly was crawling.  But, no, not at all.  No.  Normal.

Q.   Okay.  In terms of feeding herself, normal?

A.   Normal.

Q.   Speech, learning to use different words, pretty normal development?

A.   Yes.  At that time, she didn't really speak much.

Q.   Well, but even since that time, fairly normal development?

A.   She has words and she has a vocabulary, so I

would say yes.

Q.   In terms of attention, being able to understand, follow simple commands, orders, rules, able to do that, consistent with her age?

A.   Yes, but she is 2, so --

Q.   Well, what I'm really trying to find out is if you've noticed anything abnormal in her development at all.

A.   As -- as far as that goes, like -- meaning like her being social or --

Q.   Yeah.

A.   Not that I -- not that I'm aware of, no.

Q.   Interacts with other people, children, adults, appropriate for her age, you think?

A.   Yes.

Q.   Have you -- have you-all ever had her in a daycare facility?

A.   No.

Q.   I guess she's too young for any kind of preschooling.  She's not in any kind of preschool, is she?

A.   No.

Q.   Had she ever had to go to the emergency room before this?

A.   No.

Q.   Oh, I know.  Do you know the name of her pediatrician?

A.   Like her regular --

Q.   Yeah, regular care pediatrician.

A.   Not his first name.  His last name is Abusharr.

Q.   Abusharr?

A.   Shar.  S-H-A-R, I -- I believe.

Q.   And is he affiliated with a group like Texas Children's Pediatrics or anybody like that?

A.   He may be affiliated with Memorial Hermann.

Q.   Had you ever been to any check-ups, well check visits, whatever they call them?

A.   With her and seeing him?

Q.   Yes.

A.   I have.

Q.   Do you remember -- has he ever, or his office, given you any kind of handouts on child safety of any sort, any time?

A.   No.

Q.   Or has he ever discussed with you any children safety issues, some of the things we've been talking about, car seats, cribs, window cords --

A.   No.

Q.   -- dangers around water, for instance?

A.   No.  It's always been just her health and

check-ups.

Q.   All right.  What other -- what kinds of literature have you read about child safety?  Any kind of child safety.  Child-proofing the home, for instance.

A.   I would say just maybe using Google as a search.  I have an older brother and he has two daughters, young ones, and so I've seen how like he's had his house with baby gates and things of that nature.

Q.   Where did you have the baby gates in your home a year ago, in April of 2018?

A.   The bottom of the stairs.  I had one in her room.

Q.   Is her room upstairs or downstairs?

A.   Downstairs.

Q.   And you had a baby gate at her door?

A.   Yes, sir.

Q.   And was that used during her winding-down time?

A.   Yes, sir.

Q.   Have you asked your wife if she knows where the remote was during that winding-down time?

A.   Have I asked her --

Q.   Yes.

A.   -- where it was?

Q.   Yeah.

A.   I -- I haven't asked her and she maybe had

mentioned it to me, but I don't even recall.

Q. Have you asked her if she knows how Everly came to get hold of the remote?

A. No. She -- I've asked her, but she -- she did not know, like if she got it from --

Q. Yeah.

A. No. I --

Q. When was the last time you used -- before this happened, when was the last time you used the remote? Any idea?

A. No idea.

Q. When you would use it in Everly's room, would you always put it back on the shelf next to the TV?

A. Normally, yes. I would click a show on and I would put it there, because with Apple TV the shows just loop. (Indicating.)

Q. Would you ever leave it within Everly's reach?

A. No.

Q. What about cabinet latches in the kitchen or in the bathroom? Do you have -- do you use cabinet latches?

A. Yes. The house came with them. Previous owner.

Q. Was this bed that was in Everly's room at the time of this incident in April of 2018, had it already

been converted from a crib to a toddler bed?

A.    Yes.   It was a single mattress actually, so toddler bed and a single mattress, yes.

Q.    So it was easy enough for her to get in and out of?   If she woke up from a nap, she could get up and --

A.    At that --

Q.    -- get out of bed?

A.    At that time it was maybe a little bit difficult for her because she'd have to climb a little bit and use some of her muscles, yeah.

Q.    What would she have to climb?

A.    It's a -- it's like a carriage bed.   It looks like a Cinderella pumpkin.   So she climbs one of the wheels to get in.   It has like step -- bars to get up.

Q.    Well, if she's in her room taking a nap in that bed and the baby gate is closed, how do you-all know she's up?

A.    Like how do we know she's up and moving around?

Q.    Yes.

A.    We have --

Q.    When she wakes up.   How do you know when she wakes up?

A.    We have a camera.

Q.    And the camera in her room views what?   What -- does it show the bed primarily?

Carey James Gartner                                                    65

A.   It shows the bed primarily and a little --
yeah.

Q.   Well, how do you know that she's up?  Do you
just -- do you check the monitor every ten minutes or
what?

A.   Usually we'll hear like a noise or her making
sounds at the time, laughing or whatnot, and then we
would check the camera.

Q.   Where is the camera?  Where is the monitor?

A.   It's -- it's an IP camera, so it doesn't re --
it's live only.  But it's above on the cabinet there,
next to the TV.

Q.   Well, that's where the camera is, but where do
you --

A.   Yes.

Q.   -- look at it?  Where's the monitor that you --

A.   You can have an application on your phone or
tablet that you can --

Q.   So you can look at it anywhere?

A.   Yes.  Yes, sir.

Q.   So you might hear something in her room and you
would just pull out your phone and look at it --

A.   Yes.

Q.   -- click on the app and you could see what's
going on in her room?

A.   Yes, sir.

Q.   Does that camera in her room, does it show the entire room?

A.   Not the entire room.

Q.   It's -- it's -- where is it mounted again?

A.   It's -- it's on the dresser or the shelving unit where the TV is on, and there's a unit next to it and it's on that one.  (Indicating.)

Q.   Did you-all have that at the time of this incident, in April of 2018?

A.   I'm not -- I'm not sure about that.  I --

Q.   Did you purchase that because of this incident?

A.   No.

Q.   Okay.  You just don't remember whether you had it or not at the time?

A.   Correct.  She had -- we had one before -- I had two.  One of them actually went out, stopped working, and so I acquired a different one.  And I don't know when I put -- I don't know if the other one was in there at the time.

Q.   Okay.  But was a camera in her room at the time?

A.   I believe so, yes.

Q.   That worked?

A.   Yes.

Q.   How long had she been using her room for like downtime, winding-down time or naps?

A.   Maybe anywhere between two to three months.

Q.   Before that, was she sleeping primarily in you-all's bed?

A.   Yes, sir.

Q.   Even at like nap time in the afternoons?

A.   Depending.  Either our bed or maybe the couch.

Q.   Do you know if there was anything unusual going on that afternoon, anything out of the ordinary, or was it just a regular afternoon as far as you know?

A.   It was a regular afternoon as far as I knew.

Q.   So typically in the afternoon your wife would be home with Everly?

A.   Yes, sir.

Q.   And typically at that time Kaden would be at school and you would be at work?

A.   Yes, sir.

Q.   And your wife, while Everly was in her room, where was your wife?  Would she have been in the kitchen, in the office, different places?

A.   Different places.

Q.   Would she -- I think I asked you this earlier as well.  Would she sometimes work from home, get on the computer and do some things at home?

A.    Yes, sir.

Q.    Where, in relationship to Everly's room, would your wife work when she worked?

A.    Well, if she works in the living room, it was almost immediately outside of Everly's room.  If she worked in the office, it was next to the living room, so 20 feet, 25, (Indicating.)

Q.    All right.  Do you know if Everly has seen Dr. --

      The pediatrician, I can't remember his name.

A.    Abusharr.

Q.    -- Abusharr, if Everly has seen Dr. Abusharr since this incident?

A.    She has.

Q.    Any idea how many times?

A.    For regular follow-ups, so maybe -- a couple times a year, maybe.

Q.    And when you say regular follow-ups, you mean regular like check-ups and shots and things?

A.    Correct.  Regular check-ups.

Q.    Okay.  Dr. Abusharr has not treated her for these esophageal injuries, has he?

A.    No.

Q.    Has she received all of her treatment for the

Carey James Gartner                                                    69

injuries resulting from the battery from -- at Texas Children's?

A.    Yes, sir.

Q.    And the doctors affiliated with Texas Children's?

A.    Yes, sir.

Q.    Does she have any appointments now to see anybody that you know of?

A.    Not -- not that I know of.

Q.    All right.  You mentioned -- we were talking about the types of foods she eats and doesn't eat, and I think you mentioned she didn't care for the slimy bananas, but she -- and she had a problem with strawberries on one occasion.

But is there any type of food she does not eat, cannot eat because of -- that you attribute to this injury?

A.    I would say anything that maybe is not broken down for her.  Like if it's -- if it's meat, maybe if it's not cut up finely for her.

Q.    Okay.  But in terms of the different types of food, there's really nothing that she's prohibited from eating or cannot eat?

A.    No, sir.

Q.    Does -- is she on any kind of medications that

you know of?

A.   I do know she was taking, I believe, Nexium.

Q.   Do you know if she still is?

A.   Not currently, no.

Q.   When did she stop taking it?

A.   I -- I -- you know, I don't recall.  I would say when she stopped liking the taste for it.

Q.   Has any of her treating doctors talked to you about what kind of future procedures she might need?

A.   They -- well, Morgan has been there as -- for follow-ups for the most recent ones, so she would have a better idea.

But, again, the -- when she gets older, of them having to put a tube and do testing that way while she's awake, I'm aware of that one.  (Indicating.)

Q.   And the purpose of that is just to see how the esophagus is progressing?

A.   Yes.

Q.   When you say "older," what's your understanding of what that means?  Age 4, 5?

A.   Not really -- when she's not going to pull it out, when she -- when she understands that she's there.  So it's not really a set number.  Just when she's likely mature enough not to pull anything out of her throat.  She has to be awake for it.

Q.    All right.    That's all I can think of.    I think that's all I've got for you.    Thank you very much.

MR. MEYERSON:    No questions.

THE VIDEOGRAPHER:    Off the record at 11:45 a.m.

(Deposition concluded at 11:45 a.m.)

CHANGES AND SIGNATURE

CAREY JAMES GARTNER                    APRIL 16, 2019

PAGE LINE CHANGE                              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

    I declare under penalty of perjury that the

foregoing is true and correct.


            _____

            CAREY JAMES GARTNER

THE STATE OF TEXAS:

COUNTY OF HARRIS:

I, Denise Ganz Byers, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the facts stated by me in the caption hereto are true; that the foregoing deposition of CAREY JAMES GARTNER, the witness hereinbefore named, was taken by me in machine shorthand, the said witness having been by me first duly cautioned and sworn to tell the truth, the whole truth and nothing but the truth, and later transcribed from machine shorthand to typewritten form by me.

I further certify that the above and foregoing deposition, as set forth in typewriting, is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that charges for the preparation of the foregoing completed deposition were $_____ for the original thereof, charged to Attorney(s) for the Defendant Amazon.com, Inc.

GIVEN under my hand and seal of office on this, the 18th day of April, 2019.

_____
Denise Ganz Byers, CSR, RPR, RMR, CRR
Texas CSR No. 2037
Expiration Date: 12/31/20
Lexitas - Firm Registration No. 539
13101 Northwest Freeway, Suite 210
Houston, Texas 77040
281.469.5580

Carey James Gartner                                                          1

WORD INDEX

< 1 >
1    4:2    23:16
10:08    1:15    4:2
1-1    33:24
11:05    50:13, 14
11:16    50:14, 16
11:45    1:15    71:5, 6
12    7:8    74:11
1201    2:13
13    33:15, 17    44:25
13101    74:12
16    1:9, 14    3:2    72:2
16th    4:2
18th    74:6
19    26:4, 12    38:6
49:19
1999    8:3
19-month    39:12

< 2 >
2    3:5    22:22, 23
27:4    50:16    60:5
20    68:7    74:11
2002    7:18
2005    7:18
2009    5:14    7:11
2015    6:23
2016    4:19
2017    40:11
2018    6:13    26:6
62:10    63:25    66:10
2019    1:9, 14    3:2
4:2    12:10    72:2    74:6
2037    74:10
206.359.8000    2:14
206.359.9000    2:15
2-1    22:22, 23
210    74:12
2224    2:4
25    68:7
27    4:13
2700    1:18    2:8
281.469.5580    74:13
28th    12:9
2-story    33:24

< 3 >
3    38:14
3:00    38:18
31    74:11

< 4 >
4    3:3    43:13, 19
70:20
4:00    39:14
4:18-CV-02242    1:5
4:30    39:1, 14
4:30-ish    50:19

4900    2:13

< 5 >
5    38:21    70:20
512.330.9001    2:5
539    74:11

< 7 >
700    1:18    2:8
713.222.1470    2:9
713.222.1475    2:10
72    3:5
73    3:6
77002    2:9
77040    74:12
78746    2:4

< 8 >
8    23:5

< 9 >
98101    2:14

< A >
a.m    1:15, 15    4:2
50:13, 16    71:5, 6
AAAs    48:11
AAs    48:11
ability    14:15    22:9
able    11:21, 25    12:5
16:21    17:19    19:11,
12, 15    23:2, 21, 23
28:20    45:16, 17    60:2,
3
abnormal    60:7
above-styled    1:14
Abusharr    61:5, 6
68:12, 13, 13, 22
Academy    7:15
access    51:2    55:11
accidents    8:21
account    45:15
acquired    66:18
acting    39:5
ACTION    1:5    73:20, 24
actual    25:10
adults    60:13
advices    37:15
affiliated    61:8, 10
69:4
after-effect    12:1
afternoon    38:14, 19
39:15    40:1    67:10, 11,
12, 13
afternoons    67:7
age    22:3, 4, 14, 15
26:12    32:10    60:4, 14
70:20
agent    6:1    58:8, 9, 10,
13

ago    8:6    9:6, 7, 7
58:25    62:10
alarmed    41:5
allowed    49:18
altogether    16:23
Amazon    28:1    29:22, 23
31:4, 4, 5
AMAZON.COM    1:6, 13
2:7    4:5    74:4
ambiguous    19:1    29:7
48:22    51:14    52:3, 17
57:23
anchored    35:17, 21
anchors    35:25
Anias    13:23
A-N-I-A-S    13:24
animal    52:13
answer    56:6    57:24
anybody    61:9    69:8
anymore    7:14
anyway    53:7
app    65:24
apparently    23:18
Appearances    3:5
Apple    17:16    26:22, 25
27:4, 8    28:11, 15
30:12, 15, 18    33:9, 10
45:14, 22    55:15    63:15
application    65:17
appointment    14:7, 9, 16
20:6, 11, 16
appointments    15:4    69:7
Appreciate    40:22
appropriate    60:14
approximately    23:5
37:10    39:1
APRIL    1:9, 14    3:2
4:2    26:6    58:25
62:10    63:25    66:10
72:2    74:6
arrangement    58:18
articles    37:8, 10, 25
Arts    7:16
asked    49:14    62:19, 21,
25    63:2, 4    67:23
assume    24:24    43:17
52:24    58:2
assumed    31:5
attempt    26:17
attention    60:2
attorney    73:19, 22
74:4
attribute    18:4, 7
69:16
August    6:12
Austin    2:4    7:16
Ave    2:13
awake    22:1    70:15, 25
aware    8:24    9:24
10:1    17:3    19:16
20:3    26:11, 19    52:21

53:10    56:20    60:12
70:15

< B >
baby    32:1    36:22
37:1, 3, 5    54:11
62:8, 9, 15    64:16
BabyFirst    44:9
baby-proofed    35:6
baby-proofing    35:8, 15
36:19
babysitters    59:2
back    11:17    20:2, 3
37:5    38:12    41:22, 23
46:18    48:5    49:24, 25
50:15    57:1    63:13
bags    17:12
balance    23:22
ballpark    9:6
banana    9:10    18:22
bananas    20:1    69:13
banana's    18:12
bars    64:14
based    30:3, 16
basically    35:8
bath    40:7, 7, 25    41:12
bathroom    63:20
bathtub    40:8    41:2
55:1
batteries    47:3, 9, 17
48:2, 4, 9, 17, 18, 19
49:8, 12, 16
battery    10:3    11:1
16:10    18:7    19:10
22:9    37:17, 20, 22
41:18, 23, 25    44:19
46:12, 20, 23, 25
49:19    50:21    55:3, 11,
16, 23    56:4, 23    57:1,
2, 3, 8, 16    69:1
bed    24:17, 21, 24
63:24    64:1, 3, 7, 12,
16, 25    65:1    67:5, 8
bedroom    45:18
beginning    14:6
bel    7:13
believe    7:14    11:12
15:5    17:11    20:8
21:6, 11    23:24    26:6
27:4    33:23, 25    41:22,
24    42:17, 18    44:8
61:7    66:23    70:2
best    5:9    13:12
better    14:18    19:24
70:12
big    45:17    56:17
bigger    25:7
bin    35:20
bit    11:2    23:15    40:3
64:8, 10

black    31:13
Bleu    7:15
blind    36:9, 15
books    37:8
born    37:11, 11
bottom    62:11
bought    28:7, 15    30:20
31:1    32:3, 13, 21
33:14    34:23    49:12
52:6    53:1    55:15
57:17
box    27:5, 5, 14, 16, 20,
23    28:4, 7, 11, 16, 24
45:4
boy    7:6, 7
break    40:18, 20, 23
50:4, 4
brings    20:3
broad    29:10    59:10
broccoli    18:6
broken    69:18
brother    62:6
business    6:8
button    37:22    47:3, 9,
17    48:15, 16, 18    49:7,
12, 16, 19
buy    28:7, 10, 16    29:9,
9    30:14    31:8    33:13
48:12
buyers    30:2
buyer's    58:8
buying    29:8    30:3
31:3    53:10
Byers    1:16    73:4
74:10

< C >
C    2:1
cabinet    63:19, 20
65:11
cable    27:6    55:5
call    21:6, 15    36:25
39:21, 22, 23    55:6
61:12
called    4:5    5:2    41:19
calmed    40:24
calming    40:6
camera    64:23, 24    65:8,
9, 10, 13    66:2, 21
Cameras    47:5
cancer    40:11
caption    73:6
car    42:7    43:1    53:23
54:2, 8    61:22
care    42:20    57:22
58:4    61:4    69:12
caregiver    57:21, 22
caregivers    58:25
CAREY    1:8, 11    3:2
4:3, 4, 11    72:2, 24

73:7
carriage    64:12
cases    16:5, 9
cause    1:14
caused    16:11
cautioned    73:10
cautious    53:10
cell    11:21
Center    16:7
ceremony    6:12
certain    48:7
Certificate    3:6
Certified    73:4
certify    73:6, 14, 18
74:1
chair    44:1
chances    40:12
change    5:21    38:1, 3
72:3
changed    5:22    46:25
Changes    3:5    72:1
changing    24:24
charged    74:3
charges    74:1
charrison@munsch.com
2:10
check    61:11    65:4, 8
check-ups    61:11    62:1
68:20, 21
chewed    57:4
CHILD    1:4    28:2
59:11    61:17    62:3, 4
childhood    54:20
Child-proofing    62:4
children    13:3    22:4
32:10    34:23    55:25
56:11    60:13    61:20
Children's    15:16    61:9
69:2, 5
chip    10:12    11:10
choking    9:21    11:5
choose    30:14
chose    30:16
Chu    14:4, 7, 19    20:6,
11, 17    21:19
C-H-U    14:4
Cinderella    64:13
circumstances    10:13
CIVIL    1:5, 19
classes    37:8
click    63:14    65:24
clicking    55:4
clients    58:21, 22
Clifford    2:7
climb    23:21    35:24
43:8    64:9, 11
climbing    24:2, 2    43:9
climbs    64:13
closed    64:16
closes    56:5

Carey James Gartner                                                          3

COIE    2:13
coin    55:10, 24    56:3
coins    38:1
College    7:16
come    28:16    46:12
 57:10    58:3, 20    59:1,
8
comes    10:14    11:18, 20,
24    53:18    54:24
coming    15:5    46:21
commands    60:3
common    37:24
communicate    12:5
compare    30:10
compartment    46:12
 55:3, 16, 24    56:23
 57:9
complete    22:16
completed    74:2
computer    67:25
concern    32:2    42:18
concerned    11:5
concerns    14:10
concluded    71:6
confer    20:13    24:9
conferring    21:22
connect    27:5
connected    17:13    27:14
 34:1
connecting    54:12
consciously    34:14
consider    57:21
considered    50:1
consistent    60:4
Constantly    39:13
consult    8:12
consulted    15:18
container    48:3
continue    22:5
control    26:7, 9, 10, 18
 27:13, 13, 20, 21
controlled    27:22
controls    27:14
converted    64:1
Cook    13:23    14:2, 3, 5
 15:7
C-O-O-K-E    13:25
Cool    20:1    28:14
Cordon    7:15
cords    36:10, 15    61:22
corner    7:21
Correct    6:6    7:25
 11:9, 23    12:20    14:21
 15:9    17:24    19:16
 20:20    23:9    25:1
 31:20    34:24    36:6
 44:21    53:24    54:5
 58:16    66:16    68:21
 72:21    73:16
correctly    53:25    54:10

couch    67:8
counsel    73:19, 22
country    5:10
COUNTY    73:2
couple    50:8    68:17
COURT    1:1
cover    37:1    46:12, 21
 57:9
covered    36:4
covers    36:5, 5, 7, 22
 37:4
crawl    23:25    24:1, 1
crawling    59:16
cream    18:12, 22    20:1
crib    24:3, 4, 18, 21,
24    52:13    64:1
cribs    61:22
CRR    1:16    74:10
cry    39:12    42:21
crying    39:10, 13, 15,
25    40:1, 5, 9    41:6
 44:6
CSR    1:16    74:10, 10
Culinary    7:14, 16
currently    5:15    33:5
 70:4
cut    9:22    18:16    69:20
cut-up    18:12

< D >
dad    32:20
damage    14:14    16:11
danger    9:18, 19    38:9
 49:23    50:2
dangers    37:17, 19
 38:1    49:16    61:24
date    9:3, 6    10:3
 19:18    74:11
daughter    20:17
daughters    62:7
daughter's    12:22
day    8:6    24:7    26:20
 38:11, 13    46:5, 6
 58:6, 19    74:6
daycare    60:17
December    20:9
decide    29:20
decided    33:13    40:11
deciding    31:8
decision    30:4
decisions    29:8
declare    72:20
Defendant    1:13    2:7
 4:5    74:4
definitely    42:7
Denise    1:15    73:4
 74:10
Depending    67:8
depo    40:18

DEPOSITION    1:8, 11
 3:1    8:5    13:5    71:6
 73:7, 15, 17, 21    74:2
describe    18:10    23:20
 52:1
description    56:14
designation    8:5
determined    33:12
developed    18:1
development    22:10, 25
 59:7, 20, 24    60:7
developmental-type    23:11
device    49:1    53:16
 55:25
devices    45:14
diet    10:23    11:3
difference    51:25    52:19
different    37:14, 14
 39:6, 11    45:4, 8
 48:10    59:19    66:18
 67:21, 22    69:21
difficult    17:21    47:15
 64:9
directly    27:13
Disc    4:2
discussed    21:9, 11
 61:20
Disk    50:16
dislodge    11:15
dispose    48:6, 8
DISTRICT    1:1, 1
DIVISION    1:2
doctor    12:8, 9    14:4
 19:22    21:19    42:11
doctors    12:18    14:22
 15:13, 19    16:7    69:4
 70:8
dog    41:24    56:16, 17,
22    57:3, 4
Doing    4:23    5:3, 4
 11:15    19:21, 23    21:7
 30:17, 18    36:16    45:23
doll    52:13
door    37:2    62:15
doorknob    36:25    37:1, 4
downstairs    62:13, 14
downtime    67:2
Dr    14:2, 3, 4, 5, 7, 19
 15:7    20:6, 11, 17
 21:19    68:9, 13, 22
drawer    47:22
dressed    41:3
dresser    66:6
drink    12:16
drinks    12:15
dropped    57:12, 13
dryer    54:25
duly    1:13    4:6    73:10
Dunham    2:17

< E >
E   2:1, 1   14:1
E.G   1:3
earlier   21:20   34:21
  40:3   49:14   56:16
  67:23
early   40:2   59:13, 14
easier   13:6   17:22
easy   18:14   30:7   64:4
eat   16:21   18:4, 6, 8
  69:11, 16, 16, 23
eaten   41:24   57:3
eating   9:9, 16   10:9,
  17, 18   16:17, 19, 22,
  22   17:6, 9, 24   22:20
  69:23
eats   16:16   69:11
effect   12:6   22:9
effects   16:13
eight   30:23
either   12:3   67:8
electronic   53:4
emergency   40:13   60:23
employed   73:19, 23
employee   73:22
entered   28:12
entertainment   45:9
entire   33:19   66:3, 4
Episcopal   7:23
episode   10:6   11:10
episodes   9:24
equal   58:3
equally   57:25
eroding   16:11
esophageal   68:23
esophagus   70:17
essentially   24:22
  30:17   33:9, 10   35:6
estate   6:1, 2, 2
eventually   17:24   21:23
Everly   12:23, 24, 25
  14:11   23:11   30:21
  37:11   39:7, 8, 24
  41:14, 18   44:4   49:18
  50:20   51:5   57:21
  59:15   63:2   67:14, 19
  68:8, 13
Everly's   14:3   27:7
  34:3   59:7   63:12, 17,
  24   68:2, 5
evidence   42:14
exact   10:21   30:17
exactly   9:13   12:15
  14:18   43:11
Examination   3:3   4:8
examined   4:6
example   35:15   47:16
  54:11
excerpts   13:9
Excuse   39:2

excused   39:19
EXHIBITS   3:9
expect   21:20
expensive   48:12
experience   42:6
experienced   16:7   46:20
experiences   30:2
expert   8:5   22:11
Expiration   74:11
explained   16:1   40:17
extremely   47:15


< F >
facility   60:17
facing   54:11, 11, 12
fact   35:13
facts   73:6
fairly   22:13   58:3
  59:23
falling   46:23
falls   55:1
family   59:2
far   14:13   60:9
  67:11, 12
father   31:25   40:11
  52:22
fear   16:19, 20
Federal   1:19
feeding   11:3   17:10,
  23   59:17
feel   9:19   16:16
  17:20   19:4, 21, 22, 23
  32:16   40:20
feet   43:13, 19   68:7
felt   14:11   17:21
figure   39:17
filed   13:9
financially   73:23
find   28:20   33:12
  60:6
finely   18:16   69:20
fingernail   55:7
finished   10:18   17:1
Fire   45:14
FIRM   2:3   74:11
first   4:6   10:11
  11:7, 8   17:20   23:12
  28:10   42:2   61:5
  73:10
flexibility   58:6
flexible   58:3, 14
floor   41:21, 22   42:24
  43:24   51:4
flow   13:16
fob   47:7
fobs   47:14
follow   20:12   60:3
followed   14:12
following   14:13   20:14
follows   4:7

follow-up   14:7, 9, 12
  20:9   21:10
follow-ups   68:17, 19
  70:11
food   8:7   9:16   10:13,
  23   11:3, 16, 19   16:20,
  21   18:1   19:19   22:20
  69:15, 22
foods   17:6, 7, 16, 19,
  25   18:11, 23   69:11
foregoing   72:21   73:7,
  15   74:2
form   73:12
formula   17:11, 22
forth   73:15
forward   54:12
found   57:1
frame   58:17, 24   59:10
Freeway   74:12
frequently   45:23
FRIEND   1:3   59:11
front   36:13
fruit   9:22   17:16
full   12:22   73:16
further   15:21   73:14,
  18, 21   74:1
future   70:9

< G >
gagged   9:12
gagged,   9:13
gagging   8:7
game   42:8
Ganz   1:15   73:4   74:10
garbage   48:8
GARTNER   1:3, 8, 12
  3:2   4:3, 4, 11   12:25
  72:2, 24   73:8
gas   36:23
gastroenterologist   14:19
gastrointestinal   14:4
gate   62:15   64:16
gates   32:1   37:3, 5
  62:8, 9
gather   35:10
general   16:9
Generally   15:22   21:1
  36:18
Generation   27:4
getting   33:11   41:2, 3
  42:8, 18
GI   14:3
girl   6:15   7:5   8:7
give   9:6   10:21, 25
  12:22   30:23   35:15
  43:15   45:2, 3
given   8:4   61:17   74:5
go   5:7   7:13, 17, 19
  18:14   21:7, 10   25:17
  26:23   35:24   40:13

Carey James Gartner    5

41:13, 15    42:13    47:6
50:11, 25    58:21    60:23
goes    11:19, 24    60:9
going    8:11    14:15
 16:16, 19, 21    21:23
 29:11    38:18    39:14,
 20    43:16    52:11
 65:25    67:9    70:21
Good    13:14    23:7
 29:16    30:1, 1    36:2
Google    62:5
gotten    42:15    43:5
 56:19
grab    11:21
Grace    12:25
graduate    5:13    8:1
graduated    5:14    7:9
ground    43:12, 19
group    61:8
guess    6:18    7:5
 16:11    22:6    26:2
 30:1, 2    41:5    45:5
 47:5    51:2    53:9
 60:19

< H >
hair    54:24
hand    74:5
handed    28:13
handle    30:7
handouts    61:17
handy    11:23
happen    38:13    45:11
happened    9:11    10:9,
 11    17:2    19:25    38:11
 39:4    40:4, 25    58:17
 63:9
happening    9:25
happens    12:3    16:22
happy    13:14
Hardt    1:18    2:8
Harr    1:18    2:8
HARRIS    73:2
Harrison    2:7    3:3
 4:9    13:1, 7, 11, 14,
 18, 19, 25    19:2, 3
 28:13, 14, 15    29:6, 8,
 13, 16, 18    39:3    48:23
 49:2, 4, 6, 7    50:5, 7,
 9, 17    51:15    52:4, 18
 57:24
HDMI    27:5
head    6:17    22:24    30:6
healing    14:14    15:25
 16:2
health    61:25
hear    14:2    22:16
 65:6, 21
heard    42:2
helicopter    31:25    32:20

help    44:16
hereinbefore    73:8
hereto    73:7, 23
Hermann    61:10
high    7:12, 19, 20    8:1
 30:9    43:8, 10, 12
Hinterwood    4:13, 16
hit    25:23
hold    35:25    36:1    63:3
home    24:10    34:25
 35:16    36:20    38:22,
 23    39:1, 3, 5, 18, 19
 40:2, 5    41:16    48:9,
 19    49:9    50:18    52:23
 54:22    58:2, 3, 6, 11,
 18, 20    62:4, 9    67:14,
 24, 25
homes    58:15
honest    57:18
hooked    27:12
Hospital    15:16    16:6,
 6, 8    41:4, 10    42:3, 9,
 13    43:2
hospitality    5:6
hotel    4:22    5:6
hours    58:23
house    17:14    28:21
 32:5    33:24    38:25
 62:8    63:22
HOUSTON    1:2, 19    2:9
 5:7    7:10    74:12
HU    1:6

< I >
idea    14:18    41:17
 44:22    46:7    63:10, 11
 68:16    70:12
immediately    39:19    68:5
inches    35:24
incident    10:20, 22
 14:20    19:25    22:8
 23:17, 20    24:15    25:4,
 15    26:4, 23    27:18
 28:5    33:7, 15    36:17,
 19    37:5    38:11    39:4
 63:25    66:10, 12    68:14
incidents    8:21
included    57:16
incorrectly    54:11
independent    5:1
INDEX    3:1
indicated    56:10
Indicating    9:17    10:15
 11:20    12:17    16:12
 18:20    22:7    25:8, 20
 27:6    36:14, 23    37:2
 38:5    43:12    54:13
 55:1, 8    56:18    63:16
 66:8    68:7    70:15
indication    31:15, 18

INDIVIDUALLY,    1:3
industry    4:22    5:6
information    15:21
ingest    17:23
ingestion    10:3    18:7
 19:10
initially    24:18
initials    13:3, 10
injuries    68:23    69:1
injury    69:17
inside    35:2    57:2
install    53:24, 25
 54:5, 10
installing    54:8
instance    1:12    23:13
 36:10    53:23    61:24
 62:4
instruction    54:3
instrument    21:25
intended    51:12, 16
Interacts    60:13
interested    73:24
involved    25:15    26:22
involves    16:2
IP    65:10
issue    18:15
issues    18:14    23:11
 61:21
issues,    18:17
item    28:13    34:20
 53:4, 4
items    34:25    35:3
 47:7
iTunes    45:15
IV    17:12

< J >
JAMES    1:8, 11    3:2
 4:11    72:2, 24    73:8
January    20:7, 8
Jeff    2:3    12:21
Jeffm@meyersonfirm.com
 2:5
JIE    1:7
Jim    2:17
job    58:1
jumps    30:6

< K >
Kaden    7:2, 7    39:1
 41:16    50:17    67:16
K-A-D-E-N    7:4
Kaden's    23:1, 3
keep    33:6    34:14, 16
 38:7    48:9    54:25
keeping    26:2    34:12
 35:7
keeps    56:4
kept    5:24, 25    25:4,
 13, 18, 19, 24    33:19,
 21, 22    34:7, 8    39:15

43:6, 20    47:25    48:18
49:1
key    47:7, 7, 14
kids    6:24    18:5
47:23    48:1
kind    4:20    5:5    9:18,
19    21:24    24:17    32:7
34:22    48:2    53:17
56:16    58:7    60:19, 20
61:17    62:3    69:25
70:9
kinds    62:2
kitchen    63:19    67:21
knew    51:25    67:12
knobs    36:21
know    5:12    8:16    9:3
11:17    12:3, 5    14:13
15:17    16:9    18:5, 10
19:4, 18    21:8    22:5,
18    23:2    26:15    32:8,
10    34:19    36:22    37:7,
12, 13, 19, 24, 25
39:13, 14    40:21
42:19    43:3, 4, 7, 11
44:17    45:8    51:6
52:7    54:17, 19    55:5,
6    56:2, 7    59:15
61:1, 1    63:5    64:16,
18, 21    65:3    66:18, 19
67:9, 11    68:8    69:8,
9    70:1, 2, 3, 6
knowledge    8:24    57:8
known    6:7    7:15    26:17
knows    62:19    63:2
Kopf    1:18    2:8

< L >
L    2:7
ladder    43:16
Lane    2:4
lang    12:13
language    12:13    52:19
55:22    56:10
laptop    25:7
latch    55:7
latches    54:13    63:19,
21
late    59:7
laughing    65:7
LAW    2:3
lay    15:3    43:23
Le    7:15
leading    37:11
learning    59:19
leave    51:4    63:17
left    40:3    42:4, 13
Lego    38:4
let's    13:5    23:10
30:22    38:12    41:10
50:11

letting    12:3
Lexitas    74:11
likes    19:8
liking    70:7
LINE    72:3
liquid    12:15    21:6, 13,
16
list    58:14
listing    58:8, 10, 13
literature    37:16
49:15    53:18    54:1
62:3
lithium    37:20
little    6:15    8:7
11:2    17:20    23:15
25:7    27:4    39:5
40:14    48:3, 12    64:8,
9    65:1
live    4:12    65:11
lived    4:18, 19
living    68:4, 6
lock    28:2
long    4:18    5:3    6:10,
21    9:6    10:19    15:23,
24    16:2, 10, 24, 25
17:25    21:20    34:2
67:1
look    30:10    31:21
42:11, 13    56:13
65:16, 19, 22
looked    30:12    31:10,
10, 12, 23    33:11
42:22    46:19    56:14
looking    32:7
looks    31:11    43:13
64:12
loop    63:16
lost    28:23, 25    40:11
lot    12:1    16:5    37:13
45:14    58:11
loves    19:8
lower    30:19

< M >
M    2:3
machine    1:17    73:9, 12
maiden    6:3
main    57:21, 22
making    65:6
manager    4:24
manipulate    26:18
manual    54:3
manually    25:22
March    12:9, 19
Marla    15:12
marriage    6:5
married    5:15    6:10, 11
master    45:18
mattress    64:2, 3
mature    70:24

McMillan    5:20
meal    16:24, 25    17:1
mean    9:21    10:4    13:2,
8    15:1    16:20, 25
18:17, 18, 18    19:5, 9
20:24    21:21, 21
39:11    43:8, 15    49:24
56:4    57:25    68:19
meaning    17:7    52:8
60:9
means    19:22    70:20
measure    21:1
measurements    43:11
meat    69:19
mechanism    55:4
media    33:25
Medical    16:7    19:22
medications    69:25
meet    58:14, 21, 22
members    59:2
Memorial    7:24    61:10
memory    30:7
mental    16:17
mentioned    15:2    16:9
41:20    56:16, 21    63:1
69:10, 12
met    6:22    23:5
Meyerson    2:3, 3    13:5,
8, 12, 16, 24    18:25
29:5, 7, 11, 14    39:2
48:21, 25    49:3, 5
50:3, 6, 8    51:13
52:2, 15, 17    57:23
71:3
Milam    1:18    2:8
mind    32:3, 6    46:17
50:3    54:24
MINOR    1:4
minutes    65:4
Monique    2:10
monitor    65:4, 9, 16
month    10:22
months    9:7    10:23, 24,
25    17:14, 18    20:10
26:4, 12    30:23, 24, 25
33:15, 17    34:5, 6
38:6    45:1    49:19
59:12, 12    67:3
MORGAN    1:3    5:18
21:22    24:10    38:24
39:13    51:6    70:10
Morgan's    5:19
motion    13:9
mounted    66:5
move    45:3, 4, 7, 12, 17
moved    33:9    34:4
45:13
movements    22:19
movie    46:1
movies    45:15, 16, 19, 25

Moving    6:17    22:24    28:21    64:18
Munsch    1:18    2:8
muscles    64:10
music    44:16

< N >
N    2:1
name    4:10    5:17, 19, 24, 25    6:2, 3, 5, 7    7:1    12:22    13:6, 20, 21    15:10    61:1, 5, 5    68:11
named    73:8
names    12:20    13:4
nanny    59:1
nap    24:19    38:15, 16    44:4    64:5, 15    67:7
napped    24:7
naps    67:2
natural    13:16
nature    17:17    28:2    37:13    53:5    62:8
need    8:12    70:9
needed    14:11    29:2, 10, 21    48:13    49:9    55:10
neither    73:18
Netflix    28:1    45:8
never    26:17    42:21    46:14, 15, 20    57:9
new    29:2    48:18    52:22
newer    16:6    17:21
Nexium    70:2
night    58:15
nights    24:6
noise    65:6
nonstop    39:16
normal    41:6    59:16, 17, 18, 20, 23
normally    11:18    43:22    63:14
Northwest    74:12
notice    47:12, 14    53:12, 21    55:18, 19
noticed    40:8    41:21    46:10    53:5, 14    59:6    60:7
number    32:1    70:23
numbered    1:14

< O >
object    29:11
Objection    18:25    29:5, 17    48:21    51:13    52:2, 15    57:23
observed    16:13
obviously    12:4    15:4    16:4    22:15    23:25    25:3    31:11    38:4    40:5
occasion    19:14    69:14

occurred    8:21, 21, 23    9:2
occurs    10:17    16:18    20:2
offhand    36:2    54:21
office    47:21    61:16    67:21    68:6    74:5
offices    1:17
officially    6:11
Oh    7:7    8:14    23:4    27:11    28:14    39:21    61:1
Okay    5:3, 21    6:3, 5, 14    7:7    8:14    13:3, 7, 11, 14    14:9    17:10    19:14    23:4, 10    24:7    27:7, 11    32:12    33:17    39:11    40:19    41:5, 15, 17    42:22    45:23    46:20    48:6, 23    49:5, 6    51:19    55:2    57:4    58:7    59:17    66:14, 21    68:22    69:21
old    7:7    22:21    23:6, 13    30:20    38:6    39:12    49:19    59:12
older    22:3    62:6    70:13
older,    70:19
oldest    7:1
once    12:2    45:25    46:7, 8, 8    56:4
ones    48:6    62:7    70:11
one's    7:1
ongoing    15:2
open    37:2    47:16    55:8    56:3, 23
opinion    16:15
ORAL    1:8, 11    3:1
orders    60:3
ordinary    67:10
org    34:12
organized    34:13    48:2
original    30:12, 15, 18    31:12    33:12    74:3
outlet    36:3, 5
outside    68:5
Oven    36:21
Overall    19:21
owned    33:17
owner    63:23

< P >
P    2:1, 1
P.C    2:3
p.m    38:14, 21    39:14
PAGE    3:3    31:19, 19    52:5    72:3
pain    12:4
paired    26:24, 25    27:2, 12
parent    35:10
parenting    37:12
part    24:20    48:4
particular    16:8    26:1    27:23    29:21    31:9    33:6    47:25    53:15, 21    54:7
parties    73:20, 23
pathologist    12:14    14:23    20:19
pathologist's    13:20
patted    11:17
PC    1:18    2:8
pediatrician    37:9    61:2, 4    68:10
Pediatrics    61:9
peeked    42:17
penalty    72:20
people    30:2    58:14    60:13
perceived    14:11
period    19:11, 12
perjury    72:20
PERKINS    2:13
person    53:17
personally    27:24
phase    17:15    44:7, 11
phone    11:22    42:7    65:17, 22
phones    11:23
picking    43:1
pictures    6:15, 16    8:4    31:11
pieces    9:23
pink    21:6, 13
pinpoint    9:3, 6
places    33:23    67:21, 22
PLAINTIFFS    2:1
plastic    36:7    38:4
play    26:18    49:19
played    26:9
playing    44:5
please    4:10
plugged    54:25
plugs    36:3
plural    22:17
Plus    29:24
Po    17:4
pocket    38:1
point    9:17    16:4    23:25    30:19    33:25    41:25    44:20
pointed    22:18
points    10:13
pole    17:13
poodle    56:18
portion    27:8
possible    43:8
potato    10:12    11:10

potentially    17:4
pour    17:12
precautions    53:6, 8
preparation    74:2
preschool    60:20
preschooling    60:20
present    8:20    14:16
  15:20    17:5    21:3
  38:20, 21
pretty    17:17    23:7
  29:10    46:19    59:19
preventive    37:15
previous    6:5    63:22
price    30:16, 19
primarily    30:3, 16
  48:11    58:19    64:25
  65:1    67:4
primary    57:22
Prime    28:2    29:22
  31:4
probably    17:4    22:2
  30:23    45:24    48:20
problem    18:13, 19, 22
  69:13
problems    14:10    18:19
  20:2    46:10, 11
Procedure    1:20
procedures    70:9
proceedings    73:16
process    14:8, 14    15:2,
  23, 24, 25    16:2    17:8
  19:20    21:21    29:19
processes    19:19
produced    1:12
product    29:25, 25
  53:15, 21    56:14
products    53:19    54:20
programming    28:3
programs    5:9    26:13, 14
progressing    70:17
prohibited    69:22
provided    12:20
pull    22:4, 5    35:22,
  23    65:22    70:21, 24
pumpkin    64:13
purchase    32:5, 18
  53:3    66:12
purchased    31:16    45:13,
  19, 20    46:1    47:3, 9,
  13    49:7    53:7
purpose    70:16
pursuant    1:19
put    23:14    32:22
  40:7    44:15    52:12
  55:7, 10    63:13, 15
  66:19    70:14
putting    43:1

< Q >
question    9:20    56:6

questions    71:3
quit    9:16
quits    10:17    16:18

< R >
R    2:1
radiologist    14:23
  15:8, 10    20:18
radiology    12:14
rated    29:25
rating    30:9
ratings    30:1
reach    25:24    34:9, 15,
  17    35:8    36:12    38:7
  47:23    48:1    51:5
  63:17
reaching    9:15
read    31:7    37:8, 8, 10,
  13, 16, 25    47:10
  49:11, 15    53:22, 22
  54:1, 5, 8, 15    55:22
  62:3
readied    40:7
reads    53:17
real    5:25    6:1, 2
really    41:1    47:12
  59:13, 14, 21    60:6
  69:22    70:21, 23
Realtor    58:7, 8
reason    26:1    41:15
  47:25    56:2    72:3
reasons    38:6
recall    11:9    18:2
  23:25    30:8    34:4
  41:1    42:5, 6    47:1, 2
  51:6    56:21, 24, 25
  57:19    59:10    63:1
  70:6
received    68:25
Recess    50:14
recommended    32:9, 10,
  12, 21
record    4:1    50:11, 12,
  16    71:4
recovery    16:10    17:8
  19:11, 12, 19
refer    13:2    14:5
referral    14:3    20:18
referred    14:22
Registration    74:11
regular    61:3, 4    67:11,
  12    68:17, 19, 20, 21
regurgitation    10:14
related    73:19
relation    16:17
relationship    68:2
relative    73:22
relatively    9:8    10:1
  16:6
remember    13:22    15:11
  19:17, 18    23:12    30:5,

8    41:2    42:12, 23, 25,
  25    54:7    61:16    66:14
  68:10
reminding    40:19
remote    25:9, 15, 17
  26:7, 9, 10, 18, 22, 25
  27:13    28:8, 16, 16, 18,
  19, 20, 23, 24    29:2, 20,
  21, 21    30:3, 13, 15, 18,
  20    31:1, 4, 8, 9, 12
  32:4, 23    33:2, 6, 8,
  11, 12, 13, 15    34:2, 8
  41:21    42:23    43:3, 23
  44:23, 25    46:3, 10
  51:2, 10, 16    52:9
  53:1    55:2, 15, 23
  56:3, 19, 22    57:1, 4,
  6, 12, 16    62:20    63:3,
  9
remotes    30:11    34:12,
  14    43:20    51:8    52:23
  55:9
removed    17:23
rephrase    9:20
replacement    30:13
reported    1:17
Reporter    73:5
residual    16:13
resort    5:1, 2    58:20
restroom    50:4
resulting    69:1
results    15:18, 19    21:8
review    29:24
reviews    29:25    30:1, 6
  31:10
right    4:18    6:10    8:8
  11:20, 24, 24    13:7, 19
  20:16, 19    23:7    24:23
  26:5    27:16    28:22, 24
  33:6    35:11    40:14
  43:13    44:11    45:1
  50:20    54:25    62:2
  68:8    69:10    71:1
RMR    1:16    74:10
road    16:10
roles    57:25
room    24:12, 14, 23
  25:5, 13, 18    27:7, 16
  28:12    33:2, 7, 10, 19,
  25    34:3, 5, 6    35:2, 3
  40:13    41:22    42:14,
  22    44:4, 19    45:4, 8,
  9    50:23, 25    60:23
  62:12, 13    63:12, 24
  64:15, 24    65:21, 25
  66:2, 3, 4, 21    67:1,
  19    68:2, 4, 5, 6
rooms    36:4
Roughly    50:19
route    41:19
RPR    1:16    74:10

Rules    1:19    40:17, 18
  60:3
run    23:21
running    23:24

< S >
S    2:1    74:4
safety    32:1    37:13, 14
  38:6    61:17, 21    62:3,
  4
sales    4:24
saliva    10:14
sauce    17:16
saved    45:15    49:8
saw    6:14    8:5    12:8,
  9    14:7    40:5    51:7
saying    56:22
says    22:15, 15    54:25
Scammer    15:12
school    7:12, 19, 20
  8:2    39:1    50:18
  67:17
schooling    7:12
screen    45:17
screw    55:25
se    47:21
seal    74:5
search    62:6
seat    53:23    54:2, 9
seats    61:22
Seattle    2:14
second    38:12
secure    46:17, 19    57:9
secured    55:3, 4, 23, 24
securing    55:16
see    12:13    14:14
  19:5    20:17    21:1, 4,
  5    30:22    31:18, 23
  39:20    42:14, 23
  45:21    56:7, 10, 15
  58:22    65:24    69:7
  70:16
seeing    30:8, 13    42:23,
  25    61:13
seen    8:17, 19    15:18
  24:19    42:21    45:25
  52:19    55:9    62:7
  68:8, 13
seller    31:5
selling    31:2
sense    18:21    37:25
sentences    22:16
series    44:10
services    29:22    31:4
set    26:3    27:1, 14, 15,
  22    33:9, 10    34:1
  35:17    70:23    73:15
sets    20:2
seven    30:24, 25
shapes    48:10

Shar    61:7
S-H-A-R    61:7
share    50:23    57:25
she'd    64:9
shelf    32:22    33:4
  43:5    63:13
she'll    16:21
shelving    66:6
Shepherd    7:23
shorthand    1:17    73:4,
  9, 12
shots    68:20
show    44:13    63:14
  64:25    66:2
shown    21:13
shows    28:1    44:9
  63:15    65:1
sic    36:4    45:18
Signature    3:5    72:1
silver    31:13
Similac    17:11
similar    10:12    23:1
  31:12
simple    60:3
single    19:6    64:2, 3
sir    4:10, 17    5:8, 16
  9:22    25:11    62:16, 18
  65:20    66:1    67:6, 15,
  18    68:1    69:3, 6, 24
situation    20:4
six    10:24, 25    30:24,
  25    59:12, 12
sizes    48:10
sleep    24:6, 8, 19, 20
  44:15
sleeping    24:3, 4, 5
  67:4
slimy    18:11    19:5
  69:12
small    9:23    25:6
  38:1, 3, 4, 7    47:7
  50:1    56:18
smaller    25:3, 6, 18
social    60:10
soft    10:23    11:3
  19:19
softer    17:15, 19, 25
solid    17:6, 7    18:1, 23
somebody    11:21
someplace    42:19
sorry    42:5
sort    8:11    16:3, 17
  18:6    31:24    61:18
sorts    10:10    23:22
  37:7    47:6
sound    9:15
sounds    65:7
SOUTHERN    1:1
span    32:19
spare    48:9
speak    22:6, 10    59:21

speaking    10:1    15:22
  21:1    22:16    36:18
special    12:15    36:22
  48:3    55:7
specific    14:10    19:18
  30:5
specifically    54:7
speech    12:13    14:23
  22:10, 25    59:19
speech-language    13:20
  20:19
spell    7:3
spits    10:13
spitting    8:7
square    27:5
St    7:20, 22, 22, 23
stages    15:3, 3
stairs    62:11
stamp    23:15
standard    14:12
standing    20:11
star    30:9, 9
stars    29:25
start    17:6, 24
started    9:15    44:5
  59:11
State    1:16    73:1, 5
stated    73:6
STATES    1:1
stay    41:16
step    14:8    20:14
  64:14
stepfather    23:3
stick    21:24
stop    39:25    40:9    70:5
stopped    66:17    70:7
stops    16:22, 24
storage    25:3, 20    49:1
store    47:17    48:4
  49:8
stored    47:21
strawberries    18:15
  19:7, 8, 15    69:14
stroller    54:14, 15, 18
stud    35:18
studies    21:13, 17
studs    35:25
study    15:6, 7, 17, 19
  20:22, 25    21:8, 24
  22:7
stuffed    52:13
suitable    34:22    35:1,
  4    51:19    52:5, 9, 14,
  20    53:2
Suite    1:18    2:8, 13
  74:12
summer    6:22, 23
sure    12:15    17:1
  40:12, 17    42:1, 20
  51:8    66:11
sustained    29:16

swallow    15:5, 7, 17, 19
17:19    18:23    19:11,
13, 15    20:21, 25
swallowed    10:25    41:18,
20    42:15    44:19    50:21
swallowing    14:15
18:19, 22    21:2, 5
37:17, 20    38:1, 9
49:16, 23    50:2
switch    13:9
sworn    1:13    4:6    73:10
system    29:24    45:7

< T >
T    55:5
table    24:25
tablet    65:18
take    10:25    30:23
40:12, 13, 18, 20, 23
42:20    43:15    45:2, 3
50:3    53:21
taken    1:13    8:15
11:16    53:8    73:8, 21
takes    16:2    58:4
talk    21:10    22:6, 9
23:10
talked    37:9    70:8
talking    9:14    18:5
20:4    22:12    23:7
48:25    61:21    69:10
talks    22:13
Tarlton    2:4
taste    70:7
technique    40:6
techniques    37:12
television    26:3, 21
27:1, 14, 15, 22    34:1
35:17    44:10
Tell    4:10    8:10    10:8
13:19    21:15    23:10
26:22    29:4    42:3
73:10
telling    56:24, 25
ten    65:4
tendency    22:4
terms    17:9    22:12, 25
23:21    29:6, 8    59:17
60:2    69:21
test    21:5
testified    4:7
testing    21:5    70:14
TEXAS    1:1, 17, 19    2:4,
9    4:15    7:14, 16
15:15    16:7    61:8
69:1, 4    73:1, 5
74:10, 12
Thank    28:14    71:2
them,    8:22
themself    35:25
thereof    74:3

thing    8:11    16:3
18:6    30:18    47:13
54:24
things    10:10    13:17
23:22    24:2, 3    27:21
28:2    37:7, 12, 14
38:2, 3, 7    47:5, 6
53:18    59:8    61:21
62:8    67:25    68:20
think    9:1    18:8, 14
22:8, 13    23:14    33:22
35:5    36:2, 9    49:14
50:21    54:21, 23
55:20    56:21    60:14
67:23    69:12    71:1, 1
thinking    20:5
Third    2:13
Thomas    7:20, 22, 23
Thomases    7:22
thoroughly    22:17
thought    13:1    41:24
three    5:4    8:24    9:7,
25    10:1    17:2    20:9
67:3
throat    9:16    10:13
21:25    22:19, 19    70:24
time    7:15    10:11, 18
11:4, 6, 7, 8, 10    12:8,
9    14:24    17:10    18:15
19:6    20:4    21:9, 11,
25    22:3    23:14, 17, 20,
23    24:1, 5, 14    25:1,
4    26:4, 12    27:18
28:7    29:15    30:20
31:25    33:11, 19
34:16    37:5    38:12, 15,
16, 17    39:18    40:6, 9,
10, 19, 20    41:1, 18
42:17    43:9    44:9
47:13, 19, 19    49:11,
15    50:17    51:16    53:9
55:18, 19    58:17, 24
59:1, 1, 9, 10, 15, 21,
23    61:18    62:17, 20
63:8, 9, 25    64:8
65:7    66:9, 15, 20, 22
67:2, 7, 16    73:17
time,    14:25
times    9:25    10:1, 8
12:1    17:2    19:23
22:18    38:16    46:5
68:16, 18
tissue    16:11
toddler    24:21, 24
32:19    37:1    64:1, 3
toddlerhood    32:17
toddler-proofing    35:16
36:20
toddlers    32:11, 13, 22
34:22    35:1, 4    51:12,

17, 20    52:6, 10, 14, 20
53:2
toddler's    35:8
told    5:12    14:18
15:22    21:19    41:24
Tomball    4:15
top    35:20
tough    40:15
toy    25:3, 20    49:22
51:10, 18    52:11, 16
56:18
toys    25:3    35:20
transcribed    73:12
transcript    73:16
transition    32:17
traumatic    12:6    42:6
treated    68:22
treating    70:8
treatment    68:25
tried    35:23
true    72:21    73:7, 16
truth    73:10, 11, 11
try    11:15    16:22
22:4    33:22
trying    19:3    23:14
34:14    60:6
tube    11:4    17:10, 23
70:14
tucked    36:11, 13
tucking    36:15
Tuesday    4:2
turn    25:22    26:15, 20
36:23    55:10
TV    25:3, 4, 6, 10, 12,
18, 23    26:13, 14, 15,
23, 23    27:4, 5, 7, 8,
20    28:11, 15    33:9, 10
36:12    43:6, 10, 19
44:8, 12, 20    45:14, 14
50:25    55:3    63:13, 15
65:12    66:7
TVs    25:2    45:18
two    6:24    7:22    8:6
59:4    62:6    66:17
67:3
type    37:22    58:1
69:15
types    48:4    69:11, 21
typewriting    73:15
typewritten    73:12
typically    25:19, 21, 24
38:15, 16    44:12, 12,
14, 15    53:17    58:18
67:13, 16

< U >
Uh-huh    10:16    35:19
36:24    41:17
ulcer,    21:14
ultrasound    21:7
uncomfortable    12:4

Carey James Gartner    11

| | | |
|---|---|---|
| understand 20:24 31:1 49:6 51:15 60:3 | 50:6 58:14 | 5:2 15:14, 15 |
| understanding 20:21 21:4, 22 30:17 31:3 33:14 44:17, 18, 21 70:19 | wanted 40:12 41:16, 25 | words 22:16 59:19, 25 |
| understands 70:22 | wanting 41:3 | work 4:20, 22 5:1, 5 14:17 24:11 38:20, 22 39:19 43:4 58:11 67:17, 24 68:3 |
| understood 51:10, 22 | warning 31:15, 18, 23 32:7, 9 34:22 51:24 52:5 53:11, 20 54:8 55:1 56:7 | worked 66:24 68:3, 6 |
| undertaken 36:20 | warnings 47:10, 12 49:12 53:12, 13, 15, 18, 22 54:14, 15, 17, 21 | working 58:19 66:17 |
| unfortunately 16:16 | Washington 2:14 | works 68:4 |
| unit 66:7, 7 | watch 12:16 21:7 28:1 44:12 45:8, 16, 18 46:1, 1 47:7, 14 50:25 | wouldn't 23:2 32:8, 8 34:19, 23 52:6 |
| UNITED 1:1 | | wrong 39:17, 24 41:8 |
| University 5:7 7:10 | | |
| unknown 16:4 | watching 26:13 44:8 | < X > |
| unsatisfactory 28:19 | water 61:24 | Xfinity 55:5 |
| unusual 59:7 67:9 | Way 4:13, 16 12:14 16:15 28:19 35:8, 9 39:9 42:2 48:7 54:12 55:20 70:14 | XI 1:6 |
| upstairs 33:25 45:17 62:13 | | X-ray 12:16, 17 21:7 42:1, 9 |
| use 13:3, 6, 8 25:21, 22 34:20, 22 35:1, 4 51:12, 16, 19 52:6, 9, 14, 20 53:2 59:19 63:12, 20 64:10 | ways 37:14 | |
| | web 52:5 | < Y > |
| | website 31:19 52:20 55:22 56:8 | Yeah 22:23 40:16 43:10 57:14 59:14 60:11 61:4 62:24 63:6 64:10 65:2 |
| usual 40:3 | wedding 6:12, 15, 16 | year 6:12 9:4, 7 14:7 27:23 28:4 32:19, 19 40:10 58:25 62:10 68:18 |
| usually 48:12 50:18 65:6 | week 9:7, 9 46:7, 8 | |
| utilizing 37:4 | weekends 46:8, 9 | years 5:4 23:5 59:12 |
| | we'll 13:9 40:23 65:6 | yogurt 17:16 |
| < V > | went 7:18, 20, 24 12:13, 14 29:22 41:12 66:17 | you-all 6:10, 18, 21 8:6 14:5, 10, 22 39:17 50:3 57:25 59:4 60:16 64:16 66:9 |
| varied 38:16 | | |
| varies 16:25 | We're 50:15 | |
| various 15:3 24:11 | weren't 44:18 | |
| vehicle 47:8 54:13 | We've 6:11, 22 61:21 | you-all's 35:16 67:5 |
| versus 54:10, 12 | whatnot 10:14 65:7 | young 32:16 34:19, 23 60:19 62:7 |
| video 11:13, 16, 22, 25 12:2 | wheels 64:14 | younger 30:24 |
| videoed 10:6, 7, 8 11:11 | whichever 13:15 | |
| VIDEOGRAPHER 2:15 4:1 50:12, 15 71:4 | Whip 20:1 | |
| | whipped 18:12, 22 20:1 | |
| videos 8:6, 10, 11, 16, 17 | wife 8:13 11:14 14:17 15:21 20:13, 17 21:9 39:21 41:13, 15, 19 42:3 44:3 56:21 57:20 58:7 62:19 67:13, 19, 20 68:3 | |
| VIDEOTAPED 1:8, 11 3:1 | | |
| views 64:24 | | |
| visits 61:12 | | |
| vocabulary 59:25 | | |
| VS 1:5 | wife's 5:17 | |
| | wind-down 38:17 | |
| < W > | winding-down 44:7, 11 62:17, 20 67:2 | |
| wakes 64:21, 22 | | |
| Walk 17:8, 13 23:21, 24, 24 29:19 | Window 36:9, 15 61:22 | |
| | windows 36:13 | |
| walked 23:12 | Wirrick 2:10 | |
| walking 23:17 59:7, 8, 11 | witness 1:12 4:3, 5 73:8, 9 | |
| wall 35:18, 21 | woke 64:5 | |
| Walsh 2:4 | wondering 6:14 | |
| want 13:2 21:14 29:10, 14, 18, 18 40:12, 19, 20 48:23 | Woodlands 4:14, 15 | |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
*********************************************************
MORGAN GARTNER, INDIVIDUALLY,)
AND AS NEXT FRIEND OF E.G.,  )
A MINOR CHILD,              )
                            )
VS.                         )    CIVIL ACTION NO.
                            )      4:18-CV-02242
                            )
AMAZON.COM, INC., AND HU XI  )
JIE.                        )
             ***************************************
             ORAL AND VIDEOTAPED DEPOSITION OF
                     MORGAN McMILLAN
                     APRIL 16, 2019
             ***************************************

        ORAL AND VIDEOTAPED DEPOSITION OF MORGAN

McMILLAN, produced as a witness at the instance of the

Defendant Amazon.com, Inc., and duly sworn, was taken in

the above-styled and numbered cause on April 16, 2019,

from 12:34 p.m. until 2:00 p.m., before Denise Ganz

Byers, CSR, RPR, CRR, RMR, in and for the State of

Texas, reported by machine shorthand, at the offices of

Munsch Hardt Kopf & Harr, PC, 700 Milam, Suite 2700,

Houston, Texas, pursuant to the Federal Rules of Civil

Procedure.

DEFENDANT'S
EXHIBIT
B

A P P E A R A N C E S

FOR THE PLAINTIFFS:
    Jeff M. Meyerson
    THE MEYERSON LAW FIRM, P.C.
    2224 Walsh Tarlton Lane
    Austin, Texas 78746
    512.330.9001
    Jeffm@meyersonfirm.com


FOR THE DEFENDANT AMAZON.COM, INC.:
    Clifford L. Harrison
    MUNSCH HARDT KOPF & HARR, PC
    700 Milam, Suite 2700
    Houston, Texas 77002
    713.222.1470
    713.222.1475
    charrison@munsch.com

        -and-

    Monique Wirrick
    PERKINS COIE
    1201 Third Ave., Suite 4900
    Seattle, Washington 98101
    206.359.8000
    206.359.9000


VIDEOGRAPHER:
    Jim Dunham

INDEX
ORAL AND VIDEOTAPED DEPOSITION OF
MORGAN McMILLAN
APRIL 16, 2019

                                                            PAGE
Examination by Mr. Harrison                                   4
Examination by Mr. Meyerson                                  61

Appearances                                                   2
Changes and Signature                                        69
Certificate                                                  70


EXHIBITS

EXHIBIT NUMBER          DESCRIPTION                         PAGE


Exhibit Number 1    Photographs produced               58
                    electronically

Exhibit Number 2    Photograph                         63

Exhibit Number 3    Photograph                         63

Exhibit Number 4    Photograph                         63

Exhibit Number 5    Photograph                         64

Exhibit Number 6    Photograph                         64

Exhibit Number 7    Photograph                         65

Exhibit Number 8    Photograph                         66

Exhibit Number 9    Photograph                         66

Exhibit Number 10   Photograph                         67

THE VIDEOGRAPHER:  We are on the record on Disc 1.  It is Tuesday, April 16th, 2019, at 12:34 p.m., and the witness is Morgan McMillan.

MORGAN McMILLAN

was called as a witness by the Defendant Amazon.com, Inc., and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HARRISON:

Q.  Can you tell us your name, please?

A.  Morgan McMillan.

Q.  And your address?

A.  27 Hinterwood Way in The Woodlands, Texas 77375.

Q.  And how long have you-all lived there?

A.  About three years.

Q.  And you live there with your husband, Carey?

A.  Yes.

Q.  And your son Kaden --

A.  Yes.

Q.  -- who's 12?

A.  Yes.

Q.  And, of course, Everly, who is about 2-1/2-ish?

A.  Yes, sir.

Q.  Something like that.

Morgan McMillan                                                    5

A.    (Moving head up and down.)

Q.    Have you been primarily responsible for the interactions with the doctors, with Everly's doctors, as opposed to your husband, going to the appointments, making the appointments, things like that?

A.    I haven't gone to all of them, but, yes, I would say.

Q.    I understand that you recently took her to a speech pathologist and a radiologist.

A.    Yes.

Q.    Was that in one -- one appointment, or was it separate appointments, one --

A.    One --

Q.    -- for each?

A.    -- appointment.

Q.    One appointment and they were both there?

A.    Yes, sir.

Q.    What -- what exactly was the purpose of that appointment?

A.    A swallow study.  To perform a swallow study.

Q.    Is that a -- just a natural thing to do in the course of a typical recovery, or was she having difficulty swallowing that caught the doctor's attention and gave rise to the necessity of having a swallow study?

A. She was having some difficulty swallowing and issues with choking.

Q. Okay. Tell me a little bit about that.

A. It's mostly when she was eating -- eating -- well, I was going to say melon, but she's also had the problem with bread. She just would turn red and she would like projectile vomit and the pieces would come out. (Indicating.)

Q. How often would this happen?

A. I couldn't tell you. Maybe a couple times a month. But, I mean, she may have gone three or four weeks and she was okay and then it would just transpire. Because it depended if we were eating a lot of melons. You know, we -- we had to learn these different things that she couldn't eat.

Q. Well, are there things that she can't eat?

A. There are things she shouldn't eat, yes.

Q. Like what?

A. Cantaloupe, honeydew, bread with peanut butter. I'm forgetting some of the things.

Q. Well, when she eats foods like you just described, the melons and bread, does that cause this -- this reaction every time, or can she eat them sometimes?

A. Every time with melons specifically. Most of the time with like bread with peanut butter. But every

time with pieces of -- I mean, you could probably make melon pieces really, really tiny and that would make a difference.  But if you're just cutting up, you know, like fruit salad, she couldn't have those size pieces. (Indicating.)

Q.   Can she have the same size pieces of other types of food, other types of fruit, for instance?

A.   Some, yes.  Some.  Some types of fruit, yes.

Q.   I'm just wondering if it's the size that triggers the reaction or the type of food.

A.   That's what the study was supposed to help with.

Q.   Well, so you took her to the study and they did the -- what was it, an ultrasound when they -- after she swallowed the fluid?

A.   Right.

Q.   What did that study show or what were you told that the study showed?

A.   She said there was a delay in swallowing with something that they gave her.  It wasn't the liquid.  It was they gave -- it was like a thicker type yogurt.  So it wasn't like a drink-drink.  It was like a yogurt.

And it was -- there was a delay in her swallowing, so it was just sitting right here.  And she was showing me that it's supposed to immediately go

down, and it was just kind of hanging out here. (Indicating.)

Q.   Did it just hesitate before it went down or did it never go down?

A.   It was just slowly trickling, yeah. (Indicating.)

Q.   Does that happen with other types of foods?

A.   I don't know.  She -- she does sometimes say -- and I believe we have some video where she says, "Mommy," and she touches here.

But, you know, it's difficult because she can't articulate the way she's -- you know, what's happening.  So we don't know -- again, we still don't know if it's the size.  They said it could also be partially psychological, so --

Q.   Well, did they -- "they" being -- it's Dr. Cook, isn't it, the speech-language pathologist?  Is it Dr. Cook, Anias Cook?

A.   It was one of them, yes.

Q.   Marla Sammer, I think she's the radiologist.

A.   I think it was the radiologist I spoke to.  I can't remember now.

Q.   All right.  Well, did either --

A.   No.  The speech path -- I'm sorry.  It was the speech -- the pathologist that I spoke with.

Q.    Okay.  Did she tell you why Everly was having this problem, why is the food not going down?

A.    Yes, sir.  There's -- it's not scar tissue. It's just there's damage right there and she said there's not a lot of -- there's not been enough -- I guess like enough research or, I don't know, for them to know.

Because she said the way that you swallow is --  How did she explain it to me?  We just -- we don't know -- we don't know why our body does that.  So it's not a mechanism that we could really do much about because it's so small.

So anything we do is -- we're causing more damage by doing like an invasive surgery, you know, at this point.  We're just going to have to wait.

Q.    Are there foods that she eats with no problem at all?

A.    Yes.

Q.    Give me some examples, if you can.

A.    Just about everything.  I mean, we can give her little pieces of hot dogs.  She eats vegetables.  She eats oatmeal in the morning.

There has been -- there was one time where she did vomit and it was oatmeal.  So it's not, you know, 100 percent of the time.  But she can usually have

oatmeal, cereal.  She likes pancakes, you know, things like that.

Q.  Are there any foods besides melon that you stay away from?

A.  There are, but I just can't think of any. If -- if we're out somewhere and something is -- we think it would be a problem, then we're not going to give it to her.

You know, if it's too big, it's not cut up, or if it's sticky like taffy, something like that, we wouldn't give it to her.  Even like caramel popcorn.

Q.  What have any of the doctors told you about what she might need in the future in terms of medical treatment or therapy or surgery or anything?

A.  I'm not a doctor, so I don't know.  We've heard different -- there's so many different moving parts in this.  There's so many different doctors that we may talk to one time.  Like the pathologist, I spoke with her once, and they transfer me around.  So I don't -- I don't know.

There's -- there's possibilities for -- there was an invasive procedure that they were discussing where they actually go in, and now I believe they're thinking about waiting before we do that.

Q.  Who was discussing the possibility of an

invasive procedure?

A.    Dr. Chu.

Q.    And what kind of invasive procedure was he saying he was thinking about?

A.    Sticking a camera down there to do -- that's where they would actually have to give her anesthesia and then stick a camera down there and see how -- how her esophagus looks from the interior.

Q.    Okay.  So that has not been done?

A.    That has not, no.

Q.    And apparently it's not urgent enough that it needs to be done right now?

A.    I don't know.  We haven't gone back yet.

So that was supposed to be done after this, but -- after this most recent appointment.  But the most recent appointment, they were able to find where -- the area that's, you know, causing problems. So we don't know.  We don't know if they're still going to progress with the -- with the -- the interior scope.

Q.    When is the -- is there another appointment set?

A.    That, I'll have to ask -- that -- that is something my husband does.  He does it online.

Q.    Do you know if he has set -- is there an appointment set --

A.   I -- I don't know.

Q.   -- for this?

A.   I don't know.

Q.   Don't know one way or another?

A.   No.  If -- it'll be, you know, in the next months.  It needs to be after my -- he may be waiting.  It needs to be after my son finishes school.

Q.   Why is that?

A.   Because we're -- we have one car right now.

Q.   Oh, okay.  Well, but why can't it be done while your son is in school?

A.   Because these appointments take a very long time, so I don't want to risk not being there.

Q.   But you don't know if anything is set right now or not, one way or another?

A.   I don't.  My -- if my husband is able to take off, then he's done -- actually gone to some of the appointments and scheduled it himself.  He's the one who can do it online, because the insurance is through his -- his company.  I don't think he has the time to leave, so I'll have to go.

Q.   Okay.  You don't -- because you don't think he can take off work?

A.   Huh-uh.

Q.   Is that right?

A.    No.

Q.    Well, this last study was, what, a few weeks ago --

A.    Yes, sir.

Q.    -- give or take?

A.    Yes, sir.

Q.    In March sometime, you think?

A.    Yes, sir.  Yes.

Q.    Before that, when was the last appointment?

A.    I think it was in January.

Q.    Who was that with?

A.    Perhaps Dr. Chu.

Q.    Did Dr. Chu refer you-all to this speech --

A.    Yes.

Q.    -- language --

A.    Yes.

Q.    -- and the radiologist --

A.    Yes.

Q.    -- to do the swallow study?

A.    Right.

Q.    Did -- did everyone -- well, did Dr. Chu tell you that this was always going to have to be done, or was there some kind of -- something out of the ordinary with regard to her swallowing that made him and you think, "Well, we need to do something else"?

Morgan McMillan                                                    14

A.    There was.  We -- he was aware that she was vomiting.  We let him know.

Q.    Now, how often would she be -- was she vomiting?

A.    It was -- it was happening more often before we kind of narrowed it down to the items that she was, you know, vomiting.  And now it's -- it's been a little bit less because we've taken those items out of her -- you know, altogether.  Actually, we just don't even eat that -- that type of food now.

Q.    And the items you're talking about are the melons?

A.    Right.  But, you know, anything that we -- if -- just using common sense.  Things that are too big, too sticky, taffy-type things, anything like that we just wouldn't -- we wouldn't eat it.

Q.    You mentioned a minute ago a video.  You've got a video of her gagging or having difficulty swallowing or vomiting --

A.    Yes.

Q.    -- or all of the above?

A.    Yes.

Q.    And how -- who took that?

A.    We've both taken a few of them.

Q.    So --

Morgan McMillan                                                    15

A.    Yeah.

Q.    I mean, is it -- does the -- do these events typically take more than 60 seconds?

A.    Oh, yes.  Yeah.  She --

Q.    Like how long?

A.    Sometimes it's 60 seconds of her where her face is deep red before the food actually comes out and we're just patting her on the back or crying or -- I mean, it's awful, it's an awful feeling, before it just all of a sudden comes out.  It's pretty -- it's not pleasant to watch.  (Indicating.)

Q.    What made you think that you wanted to video it?

A.    Just to document the experience, I guess.  You know, we feel very helpless.

Q.    Have you ever had to do a Heimlich type maneuver to free food --

A.    No.

Q.    -- from her throat?

A.    No.

Q.    All right.  Before this appointment in January, when was the last previous appointment?

And I don't need the exact date.  I don't expect you to know the date.  But, I mean, was it a month before?  Were you -- were you going every month,

were you going every week, were you going every six months?

A.    Whenever they tell us to go.  We had a procedure in January where they did some X-rays.  That's where we saw some scarring in the esophagus or -- what they're hoping does not become scar tissue, but there was a -- you could just see that there was some damage there, that it wasn't smooth and flat.

Q.    And that was done by Dr. Chu?

A.    Yes, I believe so.

Q.    Or someone at his referral?

A.    I believe it was him.

Q.    Has he been the primary treating doctor?

A.    I believe so.  We were under the impression initially that it would be Dr. Rodriguez, who was the pediatric surgeon.  I believe Dr. Chu is maybe in his office, so we've been -- we've been talking to him more.

Q.    They're all affiliated with Texas Children's --

A.    Yes.

Q.    -- is my understanding.

Have you --

MR. MEYERSON:  You --  I'm sorry to interrupt.

MR. HARRISON:  I'm sorry.

MR. MEYERSON:  You have to wait until he's

done with his question to answer because the court reporter is taking --

THE WITNESS:  Okay.

MR. MEYERSON:  -- it down.

THE WITNESS:  Okay.  Okay.  Sorry.

Q.   (By Mr. Harrison)  Since this happened, since she swallowed the battery, have you seen any doctors that are not affiliated with Texas Children's?

A.   Her primary care physician.

Q.   And who's -- who's that?

A.   Dr. Abusharr.

Q.   Abu -- say it again.

A.   Abusharr.

Q.   Abusharr.  Okay.  Yeah, I got that name earlier.

Where -- where is his office?  Is he in the Woodlands?

A.   In The Woodlands.

Q.   He's not affiliated with Texas Children's?

A.   No, sir.  He has his own practice.

Q.   Has he been her pediatrician from the beginning --

A.   From the beginning.

Q.   -- so to speak?

What kind of things has Everly seen

Dr. Abusharr for since this -- since she swallowed the battery?

A. Just annual check-ups. Really, that was it. I think maybe she was sick.

We haven't gone to him for -- for this issue because he's not really a specialist and he men -- he actually made that clear, that he didn't know anything about the lithium ion or -- just what he's heard, so --

Q. Is it safe to say, then, that before this happened he never gave -- during any visits, he never gave you any handouts or literature talking about the dangers of swallowing lithium batteries --

A. Huh-uh.

Q. -- did he?

A. No, no, no.

Q. Sometimes she can't spell "huh-uh," so --

A. Oh, so sorry.

Q. No. You're doing fine --

A. No.

Q. -- but I may gently remind you from --

A. Okay.

Q. -- time to time.

A. Okay.

Q. I'm not --

A.    Thank you.

Q.    Well, did he ever -- "he" being the pediatrician -- ever give you any kind of literature involving child safety issues?

A.    Hmm.  He may have.  He may have.  He has a lot of, like, pamphlets and so forth and I always do look at whatever he has sitting around.

But there was nothing on -- on that.  He didn't hand me anything on it.

Q.    But he's got some pamphlets in the reception area?

A.    Yes.  Yeah.

Q.    Do any of them deal with household safety for children?

A.    No.  It's mostly like ailments, you know.  And he does a lot of adults that he sees, so cancer, diabetes, you know, things like that.

Q.    Now, other than the swallowing issue that you've described, does Everly have any other physical or emotional or mental issues that you attribute to this battery ingestion?

A.    She's had nightmares and she sleeps with us. She won't go anywhere near anyone in a -- that looks like a doctor.  Like if you go to like a veterinarian, you know how they wear the, like, smock style or -- I

don't know how you -- but if they look like a doctor, she's terrified.  Of course, she's terrified when we go to the doctor.

And we don't know if she has psychological issues.  They won't know for a while.  But she could be scaring herself or freaking herself out, for lack of a better way to say that.  We -- we won't know for certain for a while.

But she does get -- like when she does choke, she just cries for a very long time.  Just a very sad, scared cry.  Sometimes she's a little shaky.  So we don't know the full extent, but --

Q.   Is there anything unusual about her eating habits, frequency or amounts or anything like that --

A.   No.

Q.   -- that you've noticed?

A.   Not anything unusual, no.

Q.   Any specific foods that she's, like, afraid of, for instance?

A.   No.

Q.   Any foods that she doesn't like for whatever reason?

A.   Yes.  She doesn't like anything that's not candy.

Q.   Okay.  That narrows it down.  Sounds like my

Morgan McMillan                                                     21

teenagers.

Has she had pizza yet?

A.    Oh, she loves pizza.

Q.    Yeah.  Well, I was going to say if she hadn't had it yet, try and delay that for a while.

A.    Yeah.  You're right.

Q.    Because once that starts, yeah, once that --

A.    Yeah.

Q.    -- ship has sailed --

A.    Uh-huh.  Yeah.

Q.    And she's okay with pizza as long as it's cut up in the proper --

A.    Very, very tiny pieces, yeah.  Very tiny.

Q.    What does "tiny" mean?

A.    To be honest, she just -- she likes what she calls "peepa."  She just wants to eat the cheese part off the top, so we just make little pieces and she just eats the cheese, so --

Q.    Now, let's talk about this remote.  Did you have anything to do with purchasing this remote?

A.    I didn't.

Q.    Did you know anything about it as it was being purchased or -- it wasn't discussed or anything?

A.    No.

Q.    Did you -- were you familiar before this

happened with how the remote operated?

A.    No.  I know how most remotes work, you know, the general consensus, yeah, the power button and so forth.

Q.    In terms of how it interacts with the -- the Apple TV box --

A.    No.

Q.    -- and things like that, did you have any idea of how that worked?

A.    No.

Q.    Would it be fair to character -- characterize your experience with remotes is you pick it up and you point it and it's supposed to -- the TV is supposed to come on?

A.    Exactly.

Q.    And you can figure out the channel up and down and the volume up and down?

A.    Exactly.

Q.    Is that about the size of it?

A.    That's -- that's it.

Q.    Okay.  Well, then I assume you had used it before, or not?

A.    I think so.

Q.    Had you used it with Everly's TV before?  The TV in her room, I mean.

Morgan McMillan                                                    23

A.    I believe so, yes.

Q.    What would you typically use it for and when?

A.    If anything, it would be just to turn it off because -- you know, if it was still on.  It was there in her room to kind of monitor.

Because if we put it in the older -- the 12-year-old's room, we don't know.  He could be watching it too late, you know.  So we put it in there for --

Q.    "It" being --

A.    -- him to watch.

Q.    I'm sorry.  I didn't mean to cut you --

A.    Put it --

Q.    -- off.

A.    -- in Everly's room.

Q.    "It" being what?

A.    The TV was in her room so that we could monitor.  So if he left it on, I would have turned it off.

Q.    Well, did Everly ever watch it?  Did you ever turn it on for Everly to watch?

A.    Of course.  Usually he would have turned it on for her to watch, because he watches cartoons with her.

Q.    "He" being?

A.    My --

Q.    Kaden?

Morgan McMillan                                                    24

A.    -- son.  Yes, Kaden.

Q.    All right.  So he would sometimes watch the TV in Everly's room --

A.    Yes, sir.

Q.    -- and use the Apple TV remote?

A.    Yes, sir.

Q.    Where was that remote kept, typically?

A.    There's a basket next to the TV --

Q.    Was it --

A.    -- in there.

Q.    Was it always kept there?

A.    That's where it's supposed to be kept.  But for a short time it was, and then kids, you know.

Q.    So you said you would not use it or you would use it occasionally to turn it off?

A.    I mean, I never went in her room to watch TV, no.  My son was -- I'm not a TV person, really, but my son is.

So if he was in there and let's say he left it on, I would have come and turned it off if it was still playing.  But other than that, no, I never -- I never went in there and watched it.

Q.    When you would go in and turn it off, would the remote be in the basket or would it be on the floor or somewhere else?

A.    For the first few weeks, I believe it was in the basket.  It may have been sitting on the table in front of the TV the rest of the time.

Q.    All right.  There's a table --

A.    Uh-huh.

Q.    -- in front of the TV?

A.    Yes.

Q.    Like -- like a little coffee table or an activity table --

A.    Sure.

Q.    -- to do, like, games and puzzles on?

A.    My friend made it.  It's handmade antique -- yeah, it looks like just a coffee table.  (Indicating.)

Q.    Is there any particular reason why it was supposed to be kept in the basket?

A.    I have a lot of baskets and I like things organized and that's -- her room is greatly decorated and I liked everything in its place.  But, you know, again, that's not realistic.

Q.    Well, did you think there was any safety issue with leaving the remote on the table?

A.    Never.  Never.  Never ever.

Q.    Had you ever known Everly to pick up the remote, play with it, manipulate it, try and make it work?

A.    She may have.  You know, we have -- we have remotes upstairs.  She may have.

Q.    Do you remember one way or another, before this incident, whether she ever tried to do that?

A.    I don't.  I mean, I --  No, I don't exactly recall.  But I would assume, yeah, she -- she would have been more than welcome to, as long as it's not changing the channel when we're watching something.

Q.    Had you ever seen the battery compartment cover come off before this incident?

A.    No.

Q.    For any reason, because it was -- whether it was dropped or whether it was held a certain way when it was being operated or played with or anything.  Had that battery compartment cover ever come off --

A.    No.

Q.    -- to your knowledge?

A.    (Moving head from side to side.)

Q.    Had -- I assume you'd never changed the battery, had you?

A.    No.

Q.    Did you know how the battery compartment cover could come off?

A.    No.

Q.    Did you know that it had a lithium button

battery in it?

A.   No, sir.

Q.   If you had known that it had a lithium button battery in it, would that have made any difference in any decision that you made in terms of purchase or allowing the remote in the house or the way you stored it?

A.   If I was aware of the dangers, I -- I wouldn't have wanted it.  But just saying lithium ion battery, I mean, it just sounds like a battery.

Q.   It didn't mean anything to you one way or the other?

A.   (Moving head from side to side.)

Q.   (Indicating.)

A.   No.  No, sir.  I'm sorry.

Q.   That's all right.  You're doing fine.

Well, had you -- before this incident, had you read anything or heard anything about the dangers of swallowing a lithium battery?

A.   No.  And we -- we try to really stay versed in all those types of things, you know.

Q.   Yeah.  What do you -- what do you mean, you try and stay versed in those types of things?

A.   Always seeing things, you know, on the news, trying to stay sharp on -- on those types of things.

That's why we had everything nailed to her wall, you know, for safety purposes, always trying to be safety conscious.

Q.    Had you -- how did you become safety conscious? Did it just -- I mean, did you sit down and think about it or did you talk to someone or did you read a book on it or just start Googling --

A.    I have --

Q.    -- how to --

A.    -- a 12-year old --

Q.    -- childproof?

A.    I have a 12-year-old who's kamikaze, so he -- it's --

Q.    So that's your education --

A.    Yes.

Q.    -- right there?

A.    Yes.

Q.    How many stitches has he had?

A.    Strangely, none.  I have no idea how this happened.  I don't how --  He's never broken anything, but he was -- he was a little danger man.

Q.    Did you ever have to call poison control?

A.    No.  I don't know how he -- he managed.

Q.    There you are.  You've done --

A.    Yeah, yeah.

Q.   He's a lot better than you thought he was.

A.   Being a helicopter mom, yeah --

Q.   Yeah.

A.   -- paid off, but --

Q.   Would you consider yourself to be a helicopter mom?

A.   Yes.  Yeah.

Q.   And by that -- well, what's your understanding of it when you say "helicopter mom"?

A.   My son calls me smother-mother, so --

Q.   Okay.  Is that -- well, what's your understanding of what that means?

A.   Maybe a little overbearing, a little, you know, on top of her and him all of the time.

Q.   Watching what they're doing?

A.   Yes.

Q.   Making sure they're okay?

A.   Yeah.  Putting them in all kinds of activities that they don't even want to be in, but --

Q.   Well, back to what I was asking a moment ago, how -- how did you -- other than -- well, you told me your 12-year-old was quite an education.

        Beyond that, did you ever go on Google, do any kind of searches on how to baby-proof your house or make it -- make it safer?

A.    Honestly, I don't remember if we did that.  But when I was pregnant, we had the locks on the cabinets and the stove, and she wasn't even born yet.  On the doors, all the doorknobs.  And I'm still, again, pregnant, she was not going to be walking, you know, for a year or two, but we tried to plan ahead.  (Indicating.)

Q.    All right.  And you mentioned the -- like the dresser, is -- it's -- it's -- you can't tilt it over because you've --

A.    Right.

Q.    -- anchored it somehow?

A.    Right.  The TV as well, it's also nailed in to the wall.  (Indicating.)

Q.    Okay.  So she can't pull that over?

A.    Right.

Q.    Things like cords, window cords, did you do anything about those?

A.    We have the windowless blinds, so -- because those are also a danger.  Or the -- not the windowless -- the cordless blinds.  Is that what it is, where you pull them up and down?  So there's no cord.  Not "windowless."  (Indicating.)

Q.    Is that the reason you got the cordless blinds, to eliminate the cord for safety reasons?

A.   Yes.   You know, there's -- again, you're just watching the news and they'll have, you know, something about the dangers of toddlers and those cords, so, yeah.

Q.   But you had never seen anything about any danger of swallowing a lithium battery?

A.   No, sir.

Q.   But I gather you probably are aware of dangers of swallowing things about that size?

A.   Right.

Q.   Coins?

A.   Right.

Q.   LEGOs?

A.   Of course.

Q.   Any number of things?

A.   Right.

Q.   And did you always try and keep those secured, out of reach?

A.   We took every LEGO out of our -- our son's room, which is a lot, and we put them upstairs in our movie theater room.   And then there's two locks on the stairs so that she can't get upstairs.   So, yeah, we've done everything we could, so --

Q.   And this was before the battery ingestion?

A.   Oh, long before, yes, yes.

Q.   Baby gates?

Morgan McMillan                                                                    32

A.    Everywhere.

Q.    Well, tell me about when she was -- a year ago when she was about 19 months old, in April of 2018, what her typical day was, if there was a such thing as a typical day.

A.    She woke up, breakfast.  I walk with a group of my friends every morning.  She's -- every day is different.  We have various activities.

Q.    Do you push her in a stroller when you walk?

A.    She's in the stroller.  She's been in all kinds of activities, so the day changes.  She has toddler group, gymnastics, ballet, tennis.

Q.    Tennis?

A.    I know.  She does tennis.  She's still in a Teddy Bear Tennis for toddlers.  She does all kinds of activities.

My son comes home around 4:30.  And that was -- and then my husband comes home after that.  It's just a lot of playing.  You know, she was 19 months old, so there was not a lot of -- not a lot of structure.  You know, it was just playtime, you know.

Q.    Any other caregiver during the day besides you?

A.    No, sir.

Q.    Would she ever go to like a daycare or anything like that?

Morgan McMillan                                                          33

A.    No.

Q.    No nannies that would come in and help you out once in a while?

A.    No, sir.

Q.    Did you -- did she seem to be developing normally in your opinion?

A.    Yes, sir.  Yes, sir.

Q.    You know, walking, talking appropriately for her age, things like that?

A.    Yes, sir.

Q.    Has her development continued normally in your opinion?

A.    Yes, sir.

Q.    And when I say "development," I mean in all sorts of -- physically, mentally, intellectually, socially, all those areas?

A.    Yes.  Yes, sir.

Q.    I think I asked you this, but does she have any other medical issues other than the swallowing difficulty you were describing earlier?

A.    She -- she does not.  No other issues.

Q.    All right.  Back to my question about a typical day.  I know it's not typical, but would she typically have a nap time or a rest period?

A.    She has never been typical, so, no.  She's --

sometimes she'll go three weeks without a nap, even still, and then sometimes she likes to nap, so --

We've tried to get her on a better schedule, but she's very feisty. It's her way or -- and how are you going to argue? She'll go to sleep when she goes to sleep. So we try to put her down sometimes and she just pops right up.

Q. But that's not at a scheduled time or generally the same time from day-to-day?

A. No. Because there's various activities. And if you put her in the car for more than ten minutes, she's going to pass out, so that changes the schedule.

Q. When they were little did you ever put them in their car seat and set them on the dryer?

A. Dryer?

Q. Did you ever do that?

A. I did that with Kaden, yes.

Q. Well, let's talk about the day of this incident. Now, you can -- this might be difficult and you can take a break any time you want. Okay?

A. (Moving head up and down.)

Q. All right. Just tell me how the day went up until the afternoon.

A. It was just a regular day. I don't remember anything. It was very uneventful.

Morgan McMillan                                                    35

Q.   Did you-all have any activities?

A.   We did not.   We -- it was one of those days where she didn't have any activity for the day.

She took a nap, and then she was -- she was crying.   So I went to her baby gate, and she was kind of throwing a fit by her baby gate.

Q.   Let me back you up just a little bit.   When she took a nap, how did that come about?   Did you say, "Let's go take a nap, it's nap time, I'm going to put you down"?   Was she asleep in the car and you carried her in?   What -- how did that --

A.   No.   We were home that day.   Honestly, I can't remember.

Some -- some days when we walk, if we stop at the park she gets really exhausted, and I'm thinking that's what happened, but I -- I can't remember.

But, at any rate, she -- she woke up around 3, between 3 and 4 and she was crying.

Q.   But you had -- had you gone into her room with her to put her down --

A.   Oh, yes.

Q.   -- for her nap?

A.   Yeah, yeah.   Of course, yes.   She -- because the baby gate was also locked, so she can't --

Q.   She can't go in by herself?

A.    Right.

Q.    So you had gone in with her.  And did you turn the TV on?

A.    No.  The TV was not on.

Q.    The TV was not on?

A.    Huh-uh.

Q.    And --  No?

A.    Huh-uh.

Q.    No?

A.    No, no.  I'm sorry.  No, it was not on.

Q.    And you didn't turn it on?

A.    I did not turn it on.

Q.    When you took her in to her room, where was the remote?

A.    It was right next to her feet, it was upside down, and the cover was laying next to it.

Q.    When you took her into her room for -- to -- for her nap?

A.    Oh, no, not when I took her in.  When I was taking her out.

Q.    All right.  Let's back up then.

      When you took her into her room for the nap, the TV was not on and you didn't turn it on?

A.    No, sir.

Q.    All right.  Would you sometimes turn it on to

calm her down and get her to go to sleep, or does that TV have sometimes the opposite effect?

A.    Yeah.   It would have the opposite effect. Yeah.

Q.    Yeah.   You can't turn on golf --

A.    No.

Q.    -- the Golf Channel --

A.    No.

Q.    -- to get her to go to sleep?

A.    No, no.

Q.    Well, so you go in --

A.    Yeah.

Q.    -- to put her down for her nap.  Any idea how long it took for her to go to sleep?  Did she resist?

A.    No.   Because I've never forced her to take a nap.  Because if she doesn't want to, she's not going to.

So she would have just gone sleepy and I would have taken her in, or, you know, if she starts rubbing her eyes I just lay her down and she'll go to sleep.

Q.    Okay.  And that's what happened?

A.    That's what -- what would have happened, yes.

Q.    Now, when you did that, when you took her in and she laid down, where was the remote?

A.    I -- probably on her table.

Q.    Why do you say "probably on her table"?

A.    Because it's -- again, it would probably be on that table or in the basket.

Q.    And if it's in the basket, she can't reach --

A.    Couldn't reach --

Q.    -- it?

A.    -- it.

Q.    Yeah.  She can't get to it?

A.    Yeah.

Q.    She can't climb?

A.    Right.

Q.    Or she couldn't climb then?

A.    Right.

Q.    And the basket was not on the table, was it?

A.    No, no, I don't believe so.

Q.    Any idea who might have left the remote on the table?

A.    Probably Kaden.  I'm trying to think if she could get to the basket.  The little shelf is only like yea high, so -- (Indicating.)

          No.  It probably was Kaden just left it.

Q.    Well, is there any reason why you didn't pick it up and put it in the basket?

A.    No.

Q.    Did you actually notice it on the table?

A.    No.

Q.    Is the table -- is there anything else that's kept on the table?

A.    Toys.

Q.    Are they typically kept on the table?

A.    There's toys on the table.  I mean, sometimes a snack or a drink is left.  You know, it's just a regular table.

Q.    Okay.  So there's stuff -- is there stuff typically on the table?

A.    Right, yes.

Q.    Okay.  If you had noticed the remote, would you have put it back in the basket?

A.    No.

Q.    Even if you had noticed it there, it wouldn't have concerned you really one way or another?

A.    No, sir.

Q.    So she goes down for a nap.  Any idea how long she slept?

A.    No idea.

Q.    Now, how do you monitor her when she's napping, or do you?  Do you just listen for her?  Do you check on her every five minutes?  How does that work?

A.    We have --

Q.   And --

A.   -- cameras.

Q.   -- when I say -- I don't mean to interrupt. When I say how does that work, I meant how did it work in April of 2018.

A.   Right.  We have a camera I can watch, but I usually just listen for her or watch for her.  I was likely in the living room, which is incredibly close, within just a few feet of her room, so --

Q.   Well, so do you remember what happened next?

A.   When she was crying, I was alerted.  I walked over to her.  She was standing by the baby gate.  That's where the remote was upside down and the cover was laying next to it.

And I looked to see, you know, what -- what goes inside, what kind of batteries.  I noticed that the battery wasn't there.

Q.   How did -- how did you know that a battery was supposed to be there?  It was just --

A.   Well, it's --

Q.   -- pretty obvious?

A.   -- a TV remote, yeah.  I mean, it's missing a battery inside of it.  There's a hole.

So I immediately thought it was maybe the dog who took it, you know, maybe ate it.  I don't know

why.

My son came home. I asked him to help look for the missing, you know, battery, or did maybe the dog get it.

And she was being fussy, and I was more concerned with why she was being fussy, still not -- not quite putting it together.

Q. When you say "fussy," what do you mean? Just normal fussiness or --

A. A little -- she has a tendency to be ornery, but she was more so than usual, more so than usual.

Q. And this was about what time, 3 or so?

A. She woke up between like 3 and 4. I don't remember exactly when. And my son usually gets home between like, 4:20 and 4:45. So I don't know. It wasn't that long -- much longer, maybe a half hour at the most, that my son walks in.

And she was -- she was not consolable really. She was just -- she was just crying, just a lot of crying. And so I was trying to take care of her.

And I said, "Can you please find the battery so I know if I need to take the dog in to the vet?" Again, just not -- you know, now you look back and you feel guilt. But I just -- I didn't put it together.

Q.   Why did you think the dog might have gotten it?

A.   I don't know.  I just -- I didn't think she would have picked it up, maybe.  I don't know.

Q.   You said the remote was laying close to the gate or close to her bed?

A.   It was right by it, on the other side of the gate, standing right next to her.  (Indicating.)

Q.   Now, had you ever bought button batteries before?

A.   I never have.

Q.   Had you seen packages of button batteries in the home -- in your home before, that might have been bought by your husband, for instance?

A.   We have a thing of batteries that has -- like they're all -- they're all organized and we don't have any of those types of batteries.  (Indicating.)

Q.   Had you ever, before this happened, read any warnings on the batteries or the battery packages?

A.   I don't remember seeing any of them, no.

Q.   Do you remember on the date this happened when she was napping ever checking the camera monitor?

A.   No, I didn't need to do it that day.  I was -- I was in the living room.

But you asked on a typical day what I've done in the -- you know, when she's sleeping.  I can.

If I -- let's say I want to take a shower, then I would sometimes even bring the phone in the shower just so I could, you know, see her.  (Indicating.)

Q.   Had Everly ever been to the emergency room before?

A.   No, sir.  I think there was a time she may have had Strep throat, or it may have been Kaden.  I can't remember.

Q.   All right.  Let's go back then to the day this happened.

So she's fussy and Kaden has -- has come home from school and you haven't put it together that -- that Everly might have swallowed the battery yet, you just know she's fussy and you think the battery is missing --

A.   Right.

Q.   -- is supposed to be there, so you asked him, does he know where it is and look for it --

A.   Right.

Q.   -- and maybe the dog ate it.

A.   Two separate problems.

Q.   Yeah.  So then what happened?

A.   My husband came home.  I was complaining that she was being -- that she was crying, which now I feel so guilty about, but --

Morgan McMillan                                          44

So he said he was going to give her a bath, because that was foolproof, she always stops crying.

Q.   When you say it's "foolproof," that works --

A.   All -- every time.

Q.   -- to get her --

A.   Right.

Q.   -- to stop being fussy?

A.   Anything going on, that will -- that will stop the crying.

So when he took her in the bath and came out and he said, "That didn't work.  She's -- something is really wrong.  She's crying," it just instantly hit me that, "Oh, my gosh.  I've got to tell him, the battery."

And then I -- I searched it on my phone.

Q.   Searched what on your phone?

A.   Batteries.  I don't know.  I can't tell you exactly what I did, but I just looked up like the dangers of a battery in a child, what if a child swallowed it.

And that's when the -- the trouble began.  That's when we kind of realized it.  And he ran out the door with her.

And I just calmly told him, I said, "I

don't want you to get too scared, but I think I know what's going on."  And so he ran to the hospital.

Q.    Okay.  Then what happened?

A.    He took her to the hospital, and they were able to get it out within, you know, a few hours.  But it's not like it just went -- it didn't just go that smoothly, obviously.

Q.    How long was she in the hospital?

A.    Four or five days.  They -- they wanted to either keep her or they were going to send her home on a feeding tube.

And we -- so we -- we let her come home on the feeding tube, which was absurd, because she has to stay attached to a giant, you know, 6-foot pole. (Indicating.)  But we -- we had her at home on the feeding tube for a few weeks.

Q.    And the feeding tube went in through her nose?

A.    Correct.

Q.    Is that the way it worked?

A.    Yes, sir.

Q.    And you-all were, I understand, like giving her Similac, things like that?

A.    Yes, sir.

Q.    For how long?

A.    It was supposed to be a month, but they -- I

want to say it was maybe two to three weeks and they said that she was okay to come off the feeding tube.

Q.    "They" being the Texas Children's?

A.    Texas --

Q.    -- doctors?

A.    -- Children's, yes, sir.  Sorry.

Q.    And how did they know that?  Did you take her back in and they examined her and said, "We think she can come off"?

A.    Yes, sir.  We -- we took her back in and they did some X-rays and -- I can't remember if they did an interior scope at that time.  I believe they did.  Yes. That's -- that was the first interior scope before.

Q.    What do you mean, "interior scope"?

A.    Where they actually went inside and saw like -- like a perforation.  And that's when we were told she can eat, but we're going to have to see over time how it -- how the perforation heals or if it turns to scar tissue.

Q.    Did the perforation heal?

A.    That's what we still don't know.  There's still something there that you can see.  We don't know if it's scar tissue yet.  They'll have to go back in again, which is where they have to give her anesthesia to find out for certain.

Q.    Did they tell you that they were pleased with the recovery that she was making?

A.    No.   But what they did say is they were happy that it got out in time because there's a lot of children who aren't so lucky.

But I don't think they've ever been really pleased with how things are healing right now because she does have some -- something going on.

Q.    When you say she has something going on, how often is it happening now, given that you know a little bit about what foods to avoid?   How often does she have a problem swallowing?   Is it every day, every meal, once a week?   Any idea?

A.    Once every couple of weeks, you know, she'll have something.   It's not always melon.   Again, that's just a guarantee.

You know, now it can be, you know, like a hot dog, for instance, and she just couldn't -- she just maybe -- we don't know.   Maybe she's eating it fast or something.   We -- we can't figure it out.

Q.    Okay.   So you could give her the same size piece of hot dog on one day and she might have a problem and then give the same size piece another day and she might not have a problem?

A.    Right.

Q.    Is she on any kind of medicines?

A.    She was taking -- it's like a Zantac or Pepcid. I don't -- something that was supposed to coat her stomach.  But they said they didn't want her on it long term.

Q.    So she's not on it now?

A.    She's not on it now.

Q.    When -- do you remember when was the last time she was on this medicine?

A.    Maybe two months ago.

Q.    So what is your understanding of this other test that needs to be done to see if there's any scar tissue and when it might be done?

A.    Honestly, we've heard some different things. They -- they said we were going to do that in like March, and then the swallow study came up first.  So I'm not certain.  I believe the issue -- they've asked us, too, do -- because it is invasive, do we want to wait, do we want to do it, you know, right away.

Q.    So it's really you-all's call on when you do it?

A.    Right.

Q.    So there's no urgency in doing it right away, is it?  I don't -- it doesn't sound like.

A.    The -- the pathologist, the one -- the doctor

that I spoke with a few weeks ago said the best bet is something that's done a little longer down the road where they do that scope where she actually can communicate where the issue is.

The problem is she -- even when they find it, they can't -- there's not a lot they can do until she can communicate with them that "this is where it's hurting, this is where I have difficulty," because -- I don't know, I'm not a doctor so I don't want to say it wrong, you know.

Q.    Well, have they given you any indication on when that might be, other than when she can communicate better?

A.    Oh, she did.  She said, "I would wait until she was 7, 8, 9, 10 years old."

Q.    Oh, okay.

A.    So she was very specific, yes.

Q.    Oh --

A.    Like --

Q.    -- okay.

A.    -- much older.

Q.    Good.  Well, do you know of any reason why any appointments to see any of these doctors need to take place between now and the time Everly is 7 or 8?

A.    There's still the scope, the other scope that

Dr. Chu would be doing.

The other one I was telling you about is through the speech pathologist. That's where Everly has to talk. So she has to be communicating with them while this is going on. (Indicating.)

Q. Okay. I've got you. But they're both scopes; right?

A. Right.

Q. All right. Well, what other scope does Dr. Chu want to do and when does he want to do it?

A. That's the one where it's more invasive because they're going to have to put her to sleep.

Q. That's got a camera on it?

A. Right.

Q. And -- Okay. When does he want to do that? Has he told you?

A. No, no. That would -- it would likely be this summer, because, again, I'd want to do it where I could be there, you know, when my son is not in school.

Q. And the purpose of that is basically to see what's -- see what it looks like --

A. Right.

Q. -- I guess?

A. Yeah.

Q. See if it's -- how it's healing or if there's

something else that needs to be done?

A.    Right.

Q.    Beyond doing that scope, is there any anticipation of any other medical procedures, follow-ups, check-ups?

A.    There were several options, another being the psychological side of things, because she seems to have some -- she definitely has some -- some psychological issues.  And they said that's very common.  It just compounds the problem.

Q.    All right.  She -- you said she definitely has some psychological issues.  What do --

A.    Yes.

Q.    -- you mean?

A.    I mean, if you -- if you're dressed like a doctor --

Q.    Oh.

A.    -- she --

Q.    Yeah.

A.    -- says, "Help, help," and she'll run behind me.

Q.    You told me about that earlier.  I forgot.

A.    Yeah.

Q.    What else?

A.    Well, Dr. Chu said it best, that usually the

Morgan McMillan                                        52

psychological goes along with this, so a lot of times children will psych themselves out as well as having that issue.

Q.   As well as having what issue?

A.   Having the issues in their esophagus, that some of it can also be mental or psychological.

Q.   Well, have you seen any evidence that she has any such thing, any psychological issue?

A.   I was fairly certain that some of it is, because she's -- it's not always the same thing.  She could eat oatmeal every morning for breakfast and then sometimes she would just -- she would vomit.  So it's perplexing and that's why I was -- that's why I asked.

And he said, "Oh, yeah, we were going to discuss that in the future."  He said that he's had children who had an issue with swallowing and it would follow them into, you know, their high school years where they would still get psyched up about that kind of stuff.  And so that's -- it's -- it's hard to hear that, you know.  (Indicating.)

Q.   All right.  But some kids don't?

A.   Some kids don't, right.

Q.   When he says "some get psyched up into high school," what did -- what did you understand him to mean?

A.   He -- I'm -- I'm not a doctor, but he could explain it better, that -- but it has to do with just a fear, when you're -- when you're swallowing something and you feel -- you know, you've gone through an emotional traumatic experience.  And so some of it could also be psychological, some of it could be actual choking, but it's --

Again, I'm not a doctor.  I just know that if you give her the same thing every morning but only, you know, one in 50 times that's the thing that she vomits, you know, I feel like maybe she does have some psychological issues, and especially the doctors, she gets so scared.

She had nightmares for a while.  She's only had like one nightmare in the last month, so they've -- they've cut down a lot.

Q.   I guess you can't tell what the nightmare is about.

A.   (Moving head from side to side.)

Q.   It's just, what, she wakes up afraid or something?

A.   Yeah.  She'll say, "No."  Yeah, she seems -- she's scared of something.

Q.   Now, she is 2-1/2 now?

A.   Yes.

Q.   How are her communication skills?  I mean, is she talking in complete sentences yet?

A.   Not really.  She has her own language that I understand, though.  But I think she's okay.  We haven't had her tested, but I feel like she's okay.

MR. HARRISON:  Let me take another look at these photos.  I might have a few questions.

MR. MEYERSON:  (Indicating.)  I put them in two stacks here.

MR. HARRISON:  Oh.

MR. MEYERSON:  I was going to ask her about some of those.

MR. HARRISON:  Oh, okay.

Q.   (By Mr. Harrison)  Well, let me just ask, I've got a handful of these photos that are -- I understand it's a -- what's it called?  What's this -- this --

A.   Oh, Groovebook.

Q.   -- program called?

A.   Groovebook, yes.

Q.   Okay.  And how does it work?  You take pictures on your -- on your phone and then it automatically goes to a -- what, a website or what?

A.   You have an account --  Yes.  I scrapbook a lot, so I just want pictures from my phone to come -- and they come in the mail, like in a little book.  And

if you don't upload enough pictures for my scrapbooking

it'll automatically take random pictures, like more

recent pictures, and just send them to you in the mail.

Q.    Do you get a book once a month?

A.    Yes, sir.

Q.    How many pictures in it?

A.    200.  Well, I have two of them, I get 200

pictures.

Q.    Oh, okay.  So you decide how many you order or

something?

A.    Right.

Q.    And they charge you based on that?

A.    Yeah.  It's $3 for 100 pictures.  I pay $6 a

month.

Q.    Okay.  So -- and it tells you the date and time

the picture was taken?

A.    Yes, sir.

Q.    And so all of these were taken with your phone?

A.    Yes, sir.

MR. HARRISON:  And I'm not sure how to

identify these.  I don't necessarily want to attach them

all.

MR. MEYERSON:  Well, we had your office

scan them.

MR. HARRISON:  Right.

MR. MEYERSON:  All of those that you've got.

MR. HARRISON:  Right.

MR. MEYERSON:  They emailed them to you, I assume.  They emailed it to me.

MR. HARRISON:  They did?

MR. MEYERSON:  Yeah.  So I could email it to the court reporter and she could attach that as an exhibit.

MR. HARRISON:  That's -- that would be great.  Let's do that.

MR. MEYERSON:  And then we can -- what I would suggest is then if you're referring to a specific one you can slap a number on the back of it --

MR. HARRISON:  Uh-huh.

MR. MEYERSON:  -- and then either you or I can hang onto it --

MR. HARRISON:  Yeah.

MR. MEYERSON:  -- or something of that nature.

MR. HARRISON:  Yeah.  I don't know that I even plan on --

MR. MEYERSON:  Or you can describe the -- referring to the photo, and then we'll be able to identify it at trial.

Q.    (By Mr. Harrison)   Let me just ask you this then.   It looks like these were all taken right around the time of the -- she swallowed the battery.   Is that right?

A.    Yes, sir.   Although I do want to add, if I've screenshotted it, take a screenshot at a later date, it will show that date.   So if right now that's in my phone and I want it to be more recent and I take a screenshot, it will be today's date.

So if any of them say like recent, they wouldn't -- they may not necessarily be recent pictures, if that makes sense.

Q.    Okay.   Well, all of these pictures have a date at the top.   And that date at the top doesn't necessarily tell you when the picture was taken; is that what you're saying?

A.    Not if it says like 2019.

Q.    Okay.   Well, every one I've seen so far says April of 2018.

A.    Okay.   That is correct.

Q.    So let me just ask you, is -- were all of these taken --

A.    Yes.

Q.    -- in April of 2018?

A.    Yes.   Yes, sir.

Morgan McMillan                                                    58

Q.    Okay.  All right.

MR. HARRISON:  Okay.  I think I kept those in the same stacks you put them in.  So, yeah, let's -- let's attach all of them collectively as Exhibit 1.

Do you want to do that?

MR. MEYERSON:  That's fine.  Let me -- I can just email right now to you.  Although it's a big one, it might take a second to go through.

MR. HARRISON:  Well, I want to take a break anyway, if you don't mind.  Why don't we take a break and see if you can email that to the court reporter and that collective batch of photos will be Exhibit 1.

MR. MEYERSON:  Okay.

MR. HARRISON:  Right.

MR. MEYERSON:  What is your email?

THE VIDEOGRAPHER:  Off the record at 1:41 p.m.

(Recess from 1:41 until 1:49.)

(Exhibit Number 1 was marked.)

THE VIDEOGRAPHER:  We are back on the record on Disc 2 at 1:49 p.m.

Q.    (By Mr. Harrison)  Have you continued to buy things from the Amazon site since this happened?

A.    There are some things, yes, yeah.

Q.    Okay.  So you're still -- you're still buying things through the Amazon site, different types of things?

A.    Yes.  We're -- we're just more cautious now.

Q.    In what way?  What do you mean?

A.    We won't buy certain things like vitamins.  You know, we just don't know what's legitimate now to -- to purchase.  You know, we don't trust them.

Q.    Well, what sorts of things do you buy through the Amazon website?

A.    I don't -- I was going to say makeup, but then I stopped buying makeup from there so --

Q.    Any particular reason?

A.    I got lipstick that wasn't -- it wasn't the lipstick that I had been wearing for many years, so it was very strange.

Q.    All right.  What sorts of things do you purchase?

A.    I don't know.  A book, I got -- I recently bought a book for my son because we needed it within a couple of days and I -- again, I -- we only have one car right now.  I --

Q.    Yeah.  Why do you-all have one car?  I'm just curious.

A.    My car flooded in Harvey and they gave it back

to me and just dried it out because they didn't want to have to pay for it, it's an expensive car.  And so they just thought, "Well, here, we'll just clean it."  You know, that's what they said, they cleaned it.

Q.    "They" being who, the insurance company?

A.    Geico.  Yeah.  Yeah.  It wreaked of mold so much that our next-door neighbor, when we rolled the windows down, was like, "I can smell it.  That's -- that's awful."

But they -- we -- they sent it back like four times to clean it and so we finally just got rid of it and now we're -- we're just -- we're getting by on one car fairly easily because Carey only works a few miles away, so we'll buy another one eventually.

Q.    It sounds like you're able to make do with just one.

A.    Yeah.  It's been really --

Q.    I can't imagine -- with the four teenagers, and my wife is a Realtor, I can't imagine having less than six cars.

A.    Yes.  Yeah.  Well, once I get back to working more, we'll -- No, it's true, it's true.  We -- Yeah.

Q.    We don't have six cars.  We've got four cars. The two younger ones are 14 and 15, so they're not driving yet.

All right.  Thank you.  I think that's all I've got for the moment.

A.   Okay.

Q.   Thank you very much.

MR. HARRISON:  Pass the witness.

THE WITNESS:  Thank you.

EXAMINATION

BY MR. MEYERSON:

Q.   Mrs. McMillan, you mentioned Hurricane Harvey.
Did Hurricane Harvey affect or delay your use of the
remote control at issue in this case?

A.   It did, yes.

Q.   How was that?

A.   We just took everything upstairs that -- and
saved all -- that was one of the things that we hadn't
used yet, so we just took it upstairs and we
didn't totally -- or didn't use it.

Q.   And when your husband took Everly to the
hospital, was there a power outage in the area at that
time?

A.   Yes.

Q.   Did the power outage affect your house?

A.   Yes.

Q.   Okay.  And did the power outage -- when your
husband went to the first hospital, was that hospital

affected by the power outage?

A.   Yes.   They weren't able to see him.

Q.   Which hospital was that?

A.   Memorial Hermann in The Woodlands, the emergency center.

Q.   And then where was the next place that your husband took Everly?

A.   They told him to go to --

Q.   Was it Texas Children's Urgent Care?

A.   Yes, in Panther Creek.

Q.   And do you know what they said about what should be done with Everly?

A.   They said that it was too great an injury, they wouldn't be able to see her.  It would likely be faster for him to drive to Texas Children's, the main center, than to get an ambulance to come.

Q.   And that's where she finally received treatment?

A.   Right, right.

Q.   We've got some photos here.  I'm going to -- I know that all of these are part of Exhibit 1, but I'm just going to go ahead and sticker them.

MR. MEYERSON:  And with counsel's permission I'll just hang onto these photos and describe them during the deposition.  I need 1 through 11.

MR. HARRISON:  Don't use exhibit sticker Number 1.

MR. MEYERSON:  I'm sorry.  Yes.

(Exhibit Number 2 was marked.)

Q.  (By Mr. Meyerson)  What I'll do is go ahead and show you what I've marked as Gartner 2.  And what are we -- what is this here?  Do you recognize that?

A.  Yes.

Q.  What is -- what are we looking at?

A.  That was when they found the button battery in her esophagus.

Q.  Is this a photo that you took?  Is this a photo you took of the X-ray image?

A.  Yes.  Yes, it is.

(Exhibit Number 3 was marked.)

Q.  (By Mr. Meyerson)  Okay.  And then is that the same with Gartner 3?

A.  Yes, sir.  Yes, sir.  It's a picture of the X-ray.

Q.  Is this something you saw at the hospital?

A.  Yes.  Yes, sir.

(Exhibit Number 4 was marked.)

Q.  (By Mr. Meyerson)  I'm showing you what I've marked as Gartner 4.  When is this?

A.  That is the -- the remote.

Q.   And that little black thing, what is that?

A.   The -- the cover that was off of it.

Q.   And I notice that's in a Ziploc bag.  Is that correct?

A.   Yes.  I did it that night, actually.

Q.   That was going to be my next question.  Who put it in the Ziploc bag?

A.   I did, yeah.

Q.   Okay.  And when was it put in the Ziploc bag?

A.   That night, in case the doctors needed it.

         (Exhibit Number 5 was marked.)

Q.   (By Mr. Meyerson)  I'm showing you what I've marked as Gartner 5.  What is that image?  Do you recognize that?

A.   That is what her esophagus looked like.

Q.   How did you get that image?

A.   I believe that was before we were leaving.

Q.   Did you take that image at the hospital?

A.   Yes, sir.

         (Exhibit Number 6 was marked.)

Q.   (By Mr. Meyerson)  I'm showing you Gartner 6. What is Gartner 6?

A.   That was -- that was the next day when they were doing the first meeting with us to go over the extent of the injuries.  It shows her -- the eroding of

her esophagus lining and -- (Indicating.)

Q. This is a photo you took at the hospital?

A. Yes, sir.

Q. And what is your understanding of what these images are of?

A. They were showing us how badly damaged it is. That's why it looks charred.

Q. Did the doctors tell you how it's supposed to look?

A. Yes. It should be pink.

Q. And this is an image of her throat -- her esophagus? I'm sorry.

A. Her esophagus, yes.

(Exhibit Number 7 was marked.)

Q. (By Mr. Meyerson) I'll show you Gartner Number 7. And is this a photo that you took?

A. Yes. This is in the hospital. She was in -- she was in hell the whole time.

Q. And when you say that, what do you mean?

A. It was her hell. She couldn't move. She was hooked up to all these machines. And she had just started walking and running, and she -- she doesn't understand.

And they wouldn't let her eat.

Q. You mean --

A.   They said that she could go three days without eating.

Q.   When you say she just started walking and running, you're talking about before this incident?

A.   Right.

Q.   Could you tell she was suffering at this time?

A.   Of course.  She wanted food and she could smell food and -- and they wouldn't let her eat.

(Exhibit Number 8 was marked.)

Q.   (By Mr. Meyerson)  I'm going to show you Gartner 8.  What do we see there?

Do you want to take a break?  I just have a couple more questions.

A.   No.  I'm okay.

This was -- I tried to get another picture, but she was crying the whole time.  She was very hungry.

Q.   Are you talking about Gartner Number 8?  Is this --

A.   Gartner 8, yes.

Q.   That's an image of Everly in the hospital?

A.   It's 7:35 the next day.  She still wasn't able to eat anything.

(Exhibit Number 9 was marked.)

Q.   (By Mr. Meyerson)  And the image marked as

Gartner Number 9, what is this an image of? Is that Everly?

A. That was her at the doctor. Right as we were leaving we had to go see the doctor.

Q. The side of her face that's brown, what is that?

A. That's the tape that she was complaining about, but it held the -- her feeding tube so she couldn't pull it out. And she was pressed up against the glass and she was hitting her head on it. I think she was just really frustrated. (Indicating.)

(Exhibit Number 10 was marked.)

Q. (By Mr. Meyerson) And, last, I want to show you Gartner 10. This is you and Everly, I believe.

A. Yes.

Q. Do you know where that is?

A. That was her follow-up appointment. We were in the -- in the room about to see the doctor and hopefully -- we were hoping that they were going to remove her feeding tube, but they didn't.

Q. And the feeding tube is the tube that's going through her nostril?

A. Right.

Q. Thank you.

MR. MEYERSON: I'll pass the witness.

MR. HARRISON:  Nothing further.

THE VIDEOGRAPHER:  Off the record at 2:00 p.m.

(Deposition concluded at 2:00 p.m.)

CHANGES AND SIGNATURE

MORGAN McMILLAN                    APRIL 16, 2019

PAGE LINE CHANGE                         REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

     I declare under penalty of perjury that the

foregoing is true and correct.


          _____

          MORGAN McMILLAN

THE STATE OF TEXAS:

COUNTY  OF  HARRIS:

        I, Denise Ganz Byers, Certified Shorthand

Reporter in and for the State of Texas, do hereby

certify that the facts stated by me in the caption

hereto are true; that the foregoing deposition of

MORGAN McMILLAN, the witness hereinbefore named, was

taken by me in machine shorthand, the said witness

having been by me first duly cautioned and sworn to tell

the truth, the whole truth and nothing but the truth,

and later transcribed from machine shorthand to

typewritten form by me.

        I further certify that the above and

foregoing deposition, as set forth in typewriting, is

a full, true and correct transcript of the proceedings

had at the time of taking said deposition.

        I further certify that I am neither

attorney or counsel for, nor related to or employed

by any of the parties to the action in which this

deposition is taken, and further that I am not a

relative or employee of any attorney or counsel

employed by the parties hereto, or financially

interested in the action.

I further certify that charges for the preparation of the foregoing completed deposition were $_____ for the original thereof, charged to Attorney(s) for the Defendant Amazon.com, Inc.

GIVEN under my hand and seal of office on this, the 18th day of April, 2019.

_____

Denise Ganz Byers, CSR, RPR, RMR, CRR
Texas CSR No. 2037
Expiration Date: 12/31/20
Lexitas - Firm Registration No. 539
13101 Northwest Freeway, Suite 210
Houston, Texas 77040
281.469.5580

## WORD INDEX

**< $ >**
$3  55:13
$6  55:13

**< 1 >**
1  3:12  4:2  58:4, 13, 20  62:21, 25  63:2
1:41  58:18, 19
1:49  58:19, 22
10  3:12  49:15  67:12, 14
100  9:25  55:13
11  62:25
12  4:21  71:11
12:34  1:15  4:2
1201  2:13
12-year  28:10
12-year-old  28:12  29:22
12-year-old's  23:7
13101  71:12
14  60:24
15  60:24
16  1:9, 14  3:2  69:2
16th  4:2
18th  71:6
19  32:3, 19

**< 2 >**
2  3:4, 12  53:24  58:22  63:4, 6
2:00  1:15  68:3, 4
20  71:11
200  55:7, 7
2018  32:3  40:5  57:19, 24
2019  1:9, 14  3:2  4:2  57:17  69:2  71:6
2037  71:10
206.359.8000  2:14
206.359.9000  2:15
2-1  4:23  53:24
210  71:12
2224  2:4
27  4:13
2700  1:18  2:8
281.469.5580  71:13
2-ish  4:23

**< 3 >**
3  3:12  35:18, 18  41:12, 13  63:15, 17
31  71:11

**< 4 >**
4  3:4, 12  35:18  41:13  63:22, 24
4:18-CV-02242  1:5

4:20  41:15
4:30  32:17
4:45  41:15
4900  2:13

**< 5 >**
5  3:12  64:11, 13
50  53:10
512.330.9001  2:5
539  71:11
58  3:12

**< 6 >**
6  3:12  64:20, 21, 22
60  15:3, 6
61  3:4
63  3:12, 12, 12
64  3:12, 12
65  3:12
66  3:12, 12
67  3:12
69  3:6
6-foot  45:14

**< 7 >**
7  3:12  49:15, 24  65:14, 16
7:35  66:22
70  3:6
700  1:18  2:8
713.222.1470  2:9
713.222.1475  2:10
77002  2:9
77040  71:12
77375  4:14
78746  2:4

**< 8 >**
8  3:12  49:15, 24  66:9, 11, 18, 20

**< 9 >**
9  3:12  49:15  66:24  67:1
98101  2:14

**< A >**
able  11:16  12:16  45:4  56:24  60:15  62:2, 14  66:22
above-styled  1:14
absurd  45:13
Abu  17:12
Abusharr  17:11, 13, 14  18:1
account  54:23
ACTION  1:5  70:20, 24
activities  29:18  32:8, 11, 16  34:10  35:1
activity  25:9  35:3

actual  53:6
add  57:5
address  4:12
adults  19:16
affect  61:10, 22
affiliated  16:18  17:8, 19
afraid  20:18  53:20
afternoon  34:23
age  33:9
ago  13:3  14:17  29:20  32:2  48:10  49:1
ahead  30:6  62:22  63:5
ailments  19:15
alerted  40:11
allowing  27:6
altogether  14:9
Amazon  58:24  59:2, 10
AMAZON.COM  1:6, 13  2:7  4:5  71:4
ambulance  62:16
amounts  20:14
anchored  30:12
anesthesia  11:6  46:24
Anias  8:18
annual  18:3
answer  17:1
anticipation  51:4
antique  25:12
anyway  58:10
apparently  11:11
Appearances  3:4
Apple  22:6  24:5
appointment  5:11, 15, 16, 19  11:15, 16, 20, 25  13:9  15:21, 22  67:17
appointments  5:4, 5, 12  12:12, 18  49:23
appropriately  33:8
APRIL  1:9, 14  3:2  4:2  32:3  40:5  57:19, 24  69:2  71:6
area  11:17  19:11  61:19
areas  33:16
argue  34:5
articulate  8:12
asked  33:18  41:2  42:24  43:17  48:17  52:13
asking  29:20
asleep  35:10
assume  22:21  26:6, 19  56:5
ate  40:25  43:20
attach  55:21  56:8  58:4

attached    45:14
attention    5:23
attorney    70:19, 22
71:4
attribute    19:20
Austin    2:4
automatically    54:21
55:2
Ave    2:13
avoid    47:11
aware    14:1    27:8    31:7
awful    15:9, 9    60:9

< B >
Baby    31:25    35:5, 6,
24    40:12
baby-proof    29:24
back    11:13    15:8
29:20    33:22    35:7
36:21    39:14    41:23
43:9    46:8, 10, 23
56:14    58:21    59:25
60:10, 21
badly    65:6
bag    64:3, 7, 9
ballet    32:12
based    55:12
basically    50:20
basket    24:8, 24    25:2,
15    38:4, 5, 15, 20, 24
39:14
baskets    25:16
batch    58:12
bath    44:2, 11
batteries    18:13    40:16
42:8, 11, 14, 16, 18
44:18
battery    17:7    18:2
19:21    26:9, 15, 20, 22
27:1, 4, 9, 10, 19
31:5, 23    40:17, 18, 23
41:3, 22    42:18    43:13,
14    44:15, 20    57:3
63:10
Bear    32:15
bed    42:5
began    44:22
beginning    17:22, 23
believe    8:9    10:23
16:10, 12, 14, 16    23:1
25:1    38:16    46:12
48:17    64:17    67:14
best    49:1    51:25
bet    49:1
better    20:7    29:1
34:3    49:13    53:2
Beyond    29:23    51:3
big    10:9    14:14    58:7
bit    6:3    14:8    35:7
47:11

black    64:1
blinds    30:19, 21, 24
body    9:10
book    28:6    54:25
55:4    59:19, 20
born    30:3
bought    42:8, 13    59:20
box    22:6
bread    6:6, 19, 22, 25
break    34:20    58:10, 11
66:12
breakfast    32:6    52:11
bring    43:2
broken    28:20
brown    67:5
butter    6:19, 25
button    22:3    26:25
27:3    42:8, 11    63:10
buy    58:23    59:6, 9
60:14
buying    59:1, 12
Byers    1:16    70:4
71:10

< C >
C    2:1
cabinets    30:2
call    28:22    48:20
called    4:5    54:16, 18
calls    21:16    29:10
calm    37:1
calmly    44:25
camera    11:5, 7    40:6
42:21    50:13
cameras    40:2
cancer    19:16
candy    20:24
Cantaloupe    6:19
caption    70:6
car    12:9    34:11, 14
35:10    59:21, 23, 25
60:2, 13
caramel    10:11
care    17:9    41:20    62:9
caregiver    32:22
Carey    4:17    60:13
carried    35:10
cars    60:20, 23, 23
cartoons    23:22
case    61:11    64:10
caught    5:23
cause    1:14    6:22
causing    9:13    11:17
cautioned    70:10
cautious    59:4
center    62:5, 15
cereal    10:1
certain    20:7    26:13
46:25    48:17    52:9
59:6

Certificate    3:6
Certified    70:4
certify    70:6, 14, 18
71:1
CHANGE    69:3
changed    26:19
Changes    3:6    32:11
34:12    69:1
changing    26:7
channel    22:16    26:8
37:7
character    22:11
characterize    22:11
charge    55:12
charged    71:3
charges    71:1
charred    65:7
charrison@munsch.com
2:10
check    39:23
checking    42:21
check-ups    18:3    51:5
cheese    21:16, 18
CHILD    1:4    19:4
44:20, 20
childproof    28:11
children    19:14    47:5
52:2, 16
Children's    16:18    17:8,
19    46:3, 6    62:9, 15
choke    20:10
choking    6:2    53:7
Chu    11:2    13:12, 13,
21    16:9, 16    50:1, 9
51:25
CIVIL    1:5, 19
clean    60:3, 11
cleaned    60:4
clear    18:7
Clifford    2:7
climb    38:11, 13
close    40:8    42:4, 5
coat    48:3
coffee    25:8, 13
COIE    2:13
Coins    31:10
collective    58:12
collectively    58:4
come    6:7    22:14
24:20    26:10, 15, 23
33:2    35:8    43:11
45:12    46:2, 9    54:24,
25    62:16
comes    15:7, 10    32:17,
18
common    14:14    51:9
communicate    49:4, 7, 12
communicating    50:4
communication    54:1
company    12:20    60:5

compartment   26:9, 15, 22
complaining   43:23    67:7
complete   54:2
completed   71:2
compounds   51:10
concerned   39:17    41:6
concluded   68:4
conscious   28:3, 4
consensus   22:3
consider   29:5
consolable   41:18
continued   33:11   58:23
control   28:22   61:11
Cook   8:17, 18, 18
cord   30:22, 25
cordless   30:21, 24
cords   30:17, 17   31:3
Correct   45:18   57:20
  64:4   69:21   70:16
counsel   70:19, 22
counsel's   62:23
COUNTY   70:2
couple   6:10   47:14
  59:21   66:13
course   4:23   5:22
  20:2   23:21   31:13
  35:23   66:7
COURT   1:1   17:1   56:8
  58:11
cover   26:9, 15, 22
  36:16   40:13   64:2
Creek   62:10
cries   20:10
CRR   1:16   71:10
cry   20:11
crying   15:8   35:5, 18
  40:11   41:19, 20
  43:24   44:3, 10   66:16
crying,   44:13
CSR   1:16   71:10, 10
curious   59:24
cut   10:9   21:11
  23:11   53:16
cutting   7:3

< D >
damage   9:4, 14   16:7
damaged   65:6
danger   28:21   30:20
  31:5
dangers   18:13   27:8,
  18   31:3, 7   44:20
date   15:23, 24   42:20
  55:15   57:6, 7, 9, 13,
  14   71:11
day   32:4, 5, 7, 11, 22
  33:23   34:18, 22, 24
  35:3, 12   42:22, 24
  43:9   47:12, 22, 23
  64:23   66:22   71:6
daycare   32:24

days   35:2, 14   45:9
  59:21   66:1
day-to-day   34:9
deal   19:13
decide   55:9
decision   27:5
declare   69:20
decorated   25:17
deep   15:7
Defendant   1:13   2:7
  4:5   71:4
definitely   51:8, 11
delay   7:19, 23   21:5
  61:10
Denise   1:15   70:4
  71:10
depended   6:13
DEPOSITION   1:8, 11
  3:1   62:25   68:4
  70:7, 15, 17, 21   71:2
describe   56:23   62:24
described   6:22   19:19
describing   33:20
DESCRIPTION   3:6
developing   33:5
development   33:11
development,   33:14
diabetes   19:17
difference   7:3   27:4
different   6:14   10:16,
  16, 17   32:8   48:14
  59:2
difficult   8:11   34:19
difficulty   5:23   6:1
  14:18   33:20
difficulty,   49:8
Disc   4:2   58:22
discuss   52:15
discussed   21:23
discussing   10:23, 25
DISTRICT   1:1, 1
DIVISION   1:2
doctor   10:15   16:13
  19:24   20:1, 3   48:25
  49:9   51:16   53:1, 8
  67:3, 4, 18
doctors   5:3, 3   10:12,
  17   17:7   46:5   49:23
  53:12   64:10   65:8
doctor's   5:23
document   15:14
dog   40:25   41:4, 22
  42:1   43:20   47:18, 22
dogs   9:21
doing   9:14   18:19
  27:16   29:15   48:23
  50:1   51:3   64:24
door   44:24
doorknobs   30:4
doors   30:4

Dr   8:17, 18   11:2
  13:12, 13, 21   16:9, 15,
  16   17:11   18:1   50:1,
  9   51:25
dressed   51:15
dresser   30:9
dried   60:1
drink   39:8
drink-drink   7:22
drive   62:15
driving   60:25
dropped   26:13
dryer   34:14, 15
duly   1:13   4:6   70:10
Dunham   2:17

< E >
E   2:1, 1
E.G   1:3
earlier   17:15   33:20
  51:22
easily   60:13
eat   6:15, 16, 17, 23
  14:9, 16   21:16   46:17
  52:11   65:24   66:8, 23
eating   6:4, 4, 13
  20:13   47:19   66:2
eats   6:21   9:16, 21,
  22   21:18
education   28:14   29:22
effect   37:2, 3
either   8:23   45:10
  56:16
electronically   3:12
eliminate   30:25
email   56:7   58:7, 11,
  16
emailed   56:4, 5
emergency   43:4   62:5
emotional   19:20   53:5
employed   70:19, 23
employee   70:22
eroding   64:25
esophagus   11:8   16:5
  52:5   63:11   64:15
  65:1, 12, 13
especially   53:12
events   15:2
eventually   60:14
Everly   4:23   9:1
  17:25   19:19   23:19,
  20   25:23   43:4, 13
  49:24   50:3   61:18
  62:7, 12   66:21   67:2,
  14
Everly's   5:3   22:24
  23:14   24:3
evidence   52:7
exact   15:23
exactly   5:18   22:15,
  18   26:5   41:14   44:19

Morgan McMillan

4

| | | |
|---|---|---|
| Examination   3:4, 4 | food   7:7, 10   9:2 | giving   45:21 |
| 4:8   61:7 | 14:10   15:7, 17   66:7, | glass   67:9 |
| examined   4:6   46:8 | 8 | go   7:25   8:4   10:23 |
| examples   9:19 | foods   6:21   8:7   9:16 | 12:21   16:3   19:23, 24 |
| exhausted   35:15 | 10:3   20:18, 21   47:11 | 20:2   24:23   29:23 |
| EXHIBIT   3:6, 12, 12, 12, | foolproof   44:2 | 32:24   34:1, 5   35:9, |
| 12, 12, 12, 12, 12, 12, | foolproof,   44:4 | 25   37:1, 9, 11, 14, 20 |
| 12   56:9   58:4, 13, 20 | forced   37:15 | 43:9   45:6   46:23 |
| 62:21   63:1, 4, 15, 22 | foregoing   69:21   70:7, | 58:8   62:8, 22   63:5 |
| 64:11, 20   65:14   66:9, | 15   71:2 | 64:24   66:1   67:4 |
| 24   67:12 | forgetting   6:20 | goes   34:6   39:19 |
| EXHIBITS   3:6 | forgot   51:22 | 40:16   52:1   54:21 |
| expect   15:24 | form   70:13 | going   5:4   6:5   9:2, |
| expensive   60:2 | forth   19:6   22:4 | 15   10:7   11:18   13:22 |
| experience   15:14 | 70:15 | 15:25   16:1, 1   21:4 |
| 22:12   53:5 | found   63:10 | 30:5   34:5, 12   35:9 |
| Expiration   71:11 | four   6:11   45:9 | 37:16   44:1, 9   45:2, |
| explain   9:9   53:2 | 60:11, 18, 23 | 10   46:17   47:8, 9 |
| extent   20:12   64:25 | freaking   20:6 | 48:15   50:5, 12   52:14 |
| eyes   37:20 | free   15:17 | 54:11   59:11   62:20, |
| | Freeway   71:12 | 22   64:6   66:10   67:19, |
| < F > | frequency   20:14 | 21 |
| face   15:6   67:5 | FRIEND   1:3   25:12 | golf   37:5, 7 |
| facts   70:6 | friends   32:7 | Good   49:22 |
| fair   22:11 | front   25:3, 6 | Google   29:23 |
| fairly   52:9   60:13 | fruit   7:4, 7, 8 | Googling   28:7 |
| familiar   21:25 | frustrated   67:11 | gosh   44:14 |
| far   57:18 | full   20:12   70:16 | gotten   42:1 |
| fast   47:19 | further   68:1   70:14, | great   56:11   62:13 |
| faster   62:14 | 18, 21   71:1 | greatly   25:17 |
| fear   53:3 | fussiness   41:9 | Groovebook   54:17, 19 |
| Federal   1:19 | fussy   41:5, 6   43:11, | group   32:6, 12 |
| feeding   45:11, 13, 16, | 14   44:8 | guarantee   47:16 |
| 17   46:2   67:8, 20, 21 | fussy,   41:8 | guess   9:6   15:14 |
| feel   15:15   41:24 | future   10:13   52:15 | 50:23   53:17 |
| 43:24   53:4, 11   54:5 | | guilt   41:24 |
| feeling   15:9 | < G > | guilty   43:25 |
| feet   36:15   40:9 | gagging   14:18 | gymnastics   32:12 |
| feisty   34:4 | games   25:11 | |
| figure   22:16   47:20 | Ganz   1:15   70:4   71:10 | < H > |
| finally   60:11   62:17 | GARTNER   1:3   63:6, 17, | habits   20:14 |
| financially   70:23 | 24   64:13, 21, 22 | half   41:16 |
| find   11:16   41:21 | 65:15   66:11, 18, 20 | hand   19:9   71:5 |
| 46:24   49:5 | 67:1, 14 | handful   54:15 |
| fine   18:19   27:16 | gate   35:5, 6, 24 | handmade   25:12 |
| 58:6 | 40:12   42:5, 7 | handouts   18:12 |
| finishes   12:7 | gates   31:25 | hang   56:17   62:24 |
| FIRM   2:3   71:11 | gather   31:7 | hanging   8:1 |
| first   4:6   25:1 | Geico   60:6 | happen   6:9   8:7 |
| 46:13   48:16   61:25 | general   22:3 | happened   17:6   18:11 |
| 64:24   70:10 | generally   34:8 | 22:1   28:20   35:16 |
| fit   35:6 | gently   18:21 | 37:22, 23   40:10 |
| five   39:24   45:9 | getting   60:12 | 42:17, 20   43:10, 22 |
| flat   16:8 | giant   45:14 | 45:3   58:24 |
| flooded   59:25 | Give   9:19, 20   10:8, | happening   8:13   14:5 |
| floor   24:24 | 11   11:6   13:5   19:3 | 47:10 |
| fluid   7:15 | 44:1   46:24   47:21, 23 | happy   47:3 |
| follow   52:17 | 53:9 | hard   52:19 |
| follows   4:7 | given   47:10   49:11 | Hardt   1:18   2:8 |
| follow-up   67:17 | 71:5 | Harr   1:18   2:8 |
| follow-ups   51:5 | | HARRIS   70:2 |

Morgan McMillan

5

Harrison   2:7   3:4   4:9   16:24   17:6   54:6, 10, 13, 14   55:20, 25   56:3, 6, 10, 15, 18, 21   57:1   58:2, 9, 15, 23   61:5   63:1   68:1
Harvey   59:25   61:9, 10
head   5:1   26:18   27:13   34:21   53:19   67:10
heal   46:20
healing   47:7   50:25
heals   46:18
hear   52:19
heard   10:15   18:9   27:18   48:14
Heimlich   15:16
held   26:13   67:8
helicopter   29:2, 5, 9
hell   65:18, 20
help   7:11   33:2   41:2   51:20
help,   51:20
helpless   15:15
hereinbefore   70:8
hereto   70:7, 23
Hermann   62:4
hesitate   8:3
high   38:21   52:17, 23
Hinterwood   4:13
hit   44:13
hitting   67:10
Hmm   19:5
hole   40:23
home   32:17, 18   35:12   41:2, 14   42:12, 12   43:12, 23   45:10, 12, 15
honest   21:15
Honestly   30:1   35:12   48:14
honeydew   6:19
hooked   65:21
hopefully   67:19
hoping   16:6   67:19
hospital   45:2, 4, 8   61:19, 25, 25   62:3   63:20   64:18   65:2, 17   66:21
hot   9:21   47:18, 22
hour   41:16
hours   45:5
house   27:6   29:24   61:22
household   19:13
HOUSTON   1:2, 19   2:9   71:12
HU   1:6
Huh-uh   12:24   18:14   36:6, 8
huh-uh,   18:17

hungry   66:17
Hurricane   61:9, 10
hurting   49:8
husband   4:17   5:4   11:23   12:16   32:18   42:13   43:23   61:18, 25   62:7

< I >
idea   22:8   28:19   37:13   38:17   39:19, 21   47:13
identify   55:21   56:25
image   63:13   64:13, 16, 18   65:11   66:21, 25   67:1
images   65:5
imagine   60:18, 19
immediately   7:25   40:24
impression   16:14
incident   26:4, 10   27:17   34:19   66:4
incredibly   40:8
INDEX   3:1
Indicating   6:8   7:5   8:2, 6   15:11   25:13   27:14   30:7, 14, 23   38:21   42:7, 16   43:3   45:15   50:5   52:20   54:8   65:1   67:11
indication   49:11
INDIVIDUALLY,   1:3
ingestion   19:21   31:23
initially   16:15
injuries   64:25
injury   62:13
inside   40:16, 23   46:15
instance   1:12   7:7   20:19   42:13   47:18
instantly   44:13
insurance   12:19   60:5
intellectually   33:15
interactions   5:3
interacts   22:5
interested   70:24
interior   11:8, 19   46:12, 13, 14
interrupt   16:23   40:3
invasive   9:14   10:22   11:1, 3   48:18   50:11
involving   19:4
ion   18:8   27:9
issue   18:6   19:18   25:20   48:17   49:4   52:3, 4, 8, 16   61:11
issues   6:2   19:4, 20   20:5   33:19, 21   51:9, 12   52:5   53:12
items   14:6, 8, 11
it'll   12:5   55:2

< J >
January   13:10   15:21   16:4
Jeff   2:3
Jeffm@meyersonfirm.com   2:5
JIE   1:7
Jim   2:17

< K >
Kaden   4:19   23:25   24:1   34:17   38:19, 22   43:7, 11
kamikaze   28:12
keep   31:16   45:10
kept   24:7, 11, 12   25:15   39:4, 6   58:2
kids   24:13   52:21, 22
kind   8:1   11:3   13:23   14:6   17:25   19:3   23:5   29:24   35:6   40:16   44:23   48:1   52:18
kinds   29:18   32:10, 15
know   6:14   7:3   8:8, 11, 12, 13, 14   9:6, 7, 10, 10, 14, 25   10:1, 9, 15, 20   11:13, 17, 18, 18, 24   12:1, 3, 4, 5, 14   14:2, 7, 9, 13   15:15, 24   18:7   19:15, 17, 25   20:1, 4, 5, 7, 12   21:22   22:2, 2   23:4, 7, 8   24:13   25:18   26:1, 22, 25   27:21, 24   28:2, 23   29:13   30:5   31:1, 2   32:14, 19, 21, 21   33:8, 23   37:19   39:8   40:15, 18, 25, 25   41:3, 15, 22, 23   42:2, 3, 25   43:3, 14, 18   44:18   45:1, 5, 14   46:7, 21, 22   47:10, 14, 17, 17, 19   48:19   49:9, 10, 22   50:19   52:17, 20   53:4, 8, 10, 11   56:21   59:7, 7, 8, 19   60:4   62:11, 21   67:16
knowledge   26:17
known   25:23   27:3
Kopf   1:18   2:8

< L >
L   2:7
lack   20:6
laid   37:25
Lane   2:4
language   13:15   54:3

| | | |
|---|---|---|
| late    23:8 | loves    21:3 | Milam    1:18    2:8 |
| LAW    2:3 | lucky    47:5 | miles    60:14 |
| lay    37:20 | | mind    58:10 |
| laying    36:16    40:14 | < M > | MINOR    1:4 |
| 42:4 | M    2:3 | minute    14:17 |
| learn    6:14 | machine    1:17    70:9, 12 | minutes    34:11    39:24 |
| leave    12:21 | machines    65:21 | missing    40:22    41:3 |
| leaving    25:21    64:17 | mail    54:25    55:3 | 43:15 |
| 67:4 | main    62:15 | mold    60:6 |
| left    23:17    24:20 | makeup    59:11, 12 | mom    29:2, 6, 9 |
| 38:17, 22    39:8 | making    5:5    29:17 | moment    29:20    61:2 |
| legitimate    59:7 | 47:2 | Mommy,    8:10 |
| LEGO    31:18 | man    28:21 | Monique    2:10 |
| LEGOs    31:12 | managed    28:23 | monitor    23:5, 17 |
| let's    21:19    24:19 | maneuver    15:17 | 39:22    42:21 |
| 34:18    35:9    36:21 | manipulate    25:24 | month    6:11    15:25, 25 |
| 43:1, 9    56:11    58:3, 4 | March    13:7    48:16 | 45:25    53:15    55:4, 14 |
| Lexitas    71:11 | marked    58:20    63:4, 6, | months    12:6    16:2 |
| liked    25:18 | 15, 22, 24    64:11, 13, | 32:3, 19    48:10 |
| likes    10:1    21:15 | 20    65:14    66:9, 24, 25 | MORGAN    1:3, 8, 11    3:2 |
| 34:2 | 67:12 | 4:3, 4, 11    69:2, 24 |
| LINE    69:3 | Marla    8:20 | 70:8 |
| lining    65:1 | McMILLAN    1:8, 12    3:2 | morning    9:22    32:7 |
| lipstick    59:14, 15 | 4:3, 4, 11    61:9    69:2, | 52:11    53:9 |
| liquid    7:20 | 24    70:8 | move    65:20 |
| listen    39:23    40:7 | meal    47:12 | movie    31:20 |
| literature    18:12    19:3 | mean    6:11    7:1    9:20 | Moving    5:1    10:16 |
| lithium    18:8, 13 | 15:2, 8, 24    21:14 | 26:18    27:13    34:21 |
| 26:25    27:3, 9, 19 | 22:25    23:11    24:16 | 53:19 |
| 31:5 | 26:5    27:10, 11, 22 | Munsch    1:18    2:8 |
| little    6:3    9:21 | 28:5    33:14    39:7 | |
| 14:7    20:11    21:17 | 40:3, 22    41:8    46:14 | < N > |
| 25:8    28:21    29:13, 13 | 51:14, 15    52:25    54:1 | N    2:1 |
| 34:13    35:7    38:20 | 59:5    65:19, 25 | nailed    28:1    30:13 |
| 41:10    47:10    49:2 | means    29:12 | name    4:10    17:14 |
| 54:25    64:1 | meant    40:4 | named    70:8 |
| live    4:17 | mechanism    9:11 | nannies    33:2 |
| lived    4:15 | medical    10:13    33:19 | nap    33:24    34:1, 2 |
| living    40:8    42:23 | 51:4 | 35:4, 8, 9, 9, 22 |
| locked    35:24 | medicine    48:9 | 36:18, 23    37:13, 16 |
| locks    30:2    31:20 | medicines    48:1 | 39:19 |
| long    4:15    12:12 | meeting    64:24 | napping    39:22    42:21 |
| 15:5    20:10    21:11 | melon    6:5    7:2    10:3 | narrowed    14:6 |
| 26:7    31:24    37:14 | 47:15 | narrows    20:25 |
| 39:19    41:16    45:8, 24 | melons    6:13, 22, 24 | natural    5:21 |
| 48:4 | 14:12 | nature    56:20 |
| longer    41:16    49:2 | Memorial    62:4 | near    19:23 |
| look    19:6    20:1    41:3, | men    18:6 | necessarily    55:21 |
| 23    43:18    54:6    65:9 | mental    19:20    52:6 | 57:11, 15 |
| looked    40:15    44:19 | mentally    33:15 | necessity    5:24 |
| 64:15 | mentioned    14:17    30:8 | need    10:13    13:25 |
| looking    63:9 | 61:9 | 15:23    41:22    42:22 |
| looks    11:8    19:23 | Meyerson    2:3, 3    3:4 | 49:23    62:25 |
| 25:13    50:21    57:2 | 16:22, 25    17:4    54:8, | needed    59:20    64:10 |
| 65:7 | 11    55:23    56:1, 4, 7, | needs    11:12    12:6, 7 |
| lot    6:13    9:5    19:5, | 12, 16, 19, 23    58:6, 14, | 48:12    51:1 |
| 16    25:16    29:1    31:19 | 16    61:8    62:23    63:3, | neighbor    60:7 |
| 32:19, 20, 20    41:19 | 5, 16, 23    64:12, 21 | neither    70:18 |
| 47:4    49:6    52:1 | 65:15    66:10, 25 | never    8:4    18:11, 11 |
| 53:16    54:24 | 67:13, 25 | 24:16, 21, 22    25:22, |
| | | 22, 22    26:19    28:20 |

31:4    33:25    37:15
42:10
news    27:24    31:2
next-door    60:7
night    64:5, 10
nightmare    53:15, 17
nightmares    19:22    53:14
normal    41:9
normally    33:6, 11
Northwest    71:12
nose    45:17
nostril    67:22
notice    39:1    64:3
noticed    20:16    39:13,
16    40:16
NUMBER    3:6, 12, 12, 12,
12, 12, 12, 12, 12, 12,
12    31:14    56:14
58:20    63:2, 4, 15, 22
64:11, 20    65:14, 16
66:9, 18, 24    67:1, 12
numbered    1:14

< O >
oatmeal    9:22, 24    10:1
52:11
obvious    40:21
obviously    45:7
occasionally    24:15
office    16:17    17:16
55:23    71:5
offices    1:17
Oh    12:10    15:4    18:18
21:3    31:24    35:21
36:19    44:14    49:14,
16, 18    51:17    52:14
54:10, 13, 17    55:9
Okay    6:3, 12    9:1
11:9    12:10, 22    17:3,
5, 5, 14    18:22, 24
20:25    21:11    22:21
29:11, 17    30:15
34:20    37:22    39:10,
13    45:3    46:2    47:21
49:16, 20    50:6, 15
54:4, 5, 13, 20    55:9,
15    57:13, 18, 20    58:1,
2, 14    59:1    61:3, 24
63:16    64:9    66:14
old    28:10    32:3, 19
49:15
older    23:6    49:21
once    10:19    21:7, 7
33:3    47:12, 14    55:4
60:21
ones    60:24
online    11:23    12:19
operated    22:1    26:14
opinion    33:6, 12
opposed    5:4

opposite    37:2, 3
options    51:6
ORAL    1:8, 11    3:1
order    55:9
ordinary    13:23
organized    25:17    42:15
original    71:3
ornery    41:10
outage    61:19, 22, 24
62:1
overbearing    29:13

< P >
P    2:1, 1
P.C    2:3
p.m    1:15, 15    4:2
58:18, 22    68:3, 4
packages    42:11, 18
PAGE    3:2, 6    69:3
paid    29:4
pamphlets    19:6, 10
pancakes    10:1
Panther    62:10
park    35:15
part    21:16    62:21
partially    8:15
particular    25:14    59:13
parties    70:20, 23
parts    10:16
pass    34:12    61:5
67:25
path    8:24
pathologist    5:9    8:17,
25    10:18    48:25    50:3
patting    15:8
pay    55:13    60:2
PC    1:18    2:8
peanut    6:19, 25
pediatric    16:16
pediatrician    17:21
19:3
peepa    21:16
penalty    69:20
Pepcid    48:2
percent    9:25
perforation    46:16, 18,
20
perform    5:20
period    33:24
perjury    69:20
PERKINS    2:13
permission    62:24
perplexing    52:13
person    24:17
phone    43:2    44:16, 17
54:21, 24    55:18    57:7
photo    56:24    63:12, 12
65:2, 16
Photograph    3:12, 12, 12,
12, 12, 12, 12, 12, 12
Photographs    3:12

photos    54:7, 15    58:12
62:20, 24
physical    19:19
physically    33:15
physician    17:9
pick    22:12    25:23
38:23
picked    42:3
picture    55:16    57:15
63:18    66:16
pictures    54:20, 24
55:1, 2, 3, 6, 8, 13
57:11, 13
piece    47:22, 23
pieces    6:7    7:1, 2, 4,
6    9:21    21:13, 17
pink    65:10
pizza    21:2, 3, 11
place    25:18    49:24
62:6
PLAINTIFFS    2:1
plan    30:6    56:22
play    25:24
played    26:14
playing    24:21    32:19
playtime    32:21
pleasant    15:10
please    4:10    41:21
pleased    47:1, 7
point    9:15    22:13
poison    28:22
pole    45:14
popcorn    10:11
pops    34:7
possibilities    10:21
possibility    10:25
power    22:3    61:19, 22,
24    62:1
practice    17:20
pregnant    30:2, 5
preparation    71:2
pressed    67:9
pretty    15:10    40:21
previous    15:22
primarily    5:2
primary    16:13    17:9
probably    7:1    31:7
38:1, 2, 3, 19, 22
problem    6:6    9:2, 16
10:7    47:12, 22, 24
49:5    51:10
problems    11:17    43:21
Procedure    1:20    10:22
11:1, 3    16:4
procedures    51:4
proceedings    70:16
produced    1:12    3:12
program    54:18
progress    11:19
projectile    6:7

proper    21:12
psych    52:2
psyched    52:18, 23
psychological    8:15
  20:4    51:7, 8, 12
  52:1, 6, 8    53:6, 12
pull    30:15, 22    67:8
purchase    27:5    59:8, 18
purchased    21:23
purchasing    21:20
purpose    5:18    50:20
purposes    28:2
pursuant    1:19
push    32:9
put    23:6, 8, 12    31:19
  34:6, 11, 13    35:9, 20
  37:13    38:24    39:14
  41:24    43:12    50:12
  54:8    58:3    64:6, 9
Putting    29:18    41:7
puzzles    25:11

< Q >
question    17:1    33:22
  64:6
questions    54:7    66:13
quite    29:22    41:7

< R >
R    2:1
radiologist    5:9    8:20,
  21    13:17
ran    44:23    45:2
random    55:2
rate    35:17
reach    31:17    38:5, 6
reaction    6:23    7:10
read    27:18    28:6
  42:17
realistic    25:19
realized    44:23
really    7:2, 2    9:11
  18:3, 6    24:17    27:20
  35:15    39:17    41:19
  44:13    47:6    48:20
  54:3    60:17    67:11
Realtor    60:19
reason    20:22    25:14
  26:12    30:24    38:23
  49:22    59:13    69:3
reasons    30:25
recall    26:6
received    62:17
reception    19:10
Recess    58:19
recognize    63:7    64:14
record    4:1    58:17, 22
  68:2
recovery    5:22    47:2
red    6:6    15:7

refer    13:13
referral    16:11
referring    56:13, 24
regard    13:24
Registration    71:11
regular    34:24    39:8
related    70:19
relative    70:22
remember    8:22    26:3
  30:1    34:24    35:13, 16
  40:10    41:14    42:19,
  20    43:8    46:11    48:8
remind    18:21
remote    21:19, 20    22:1
  24:5, 7, 24    25:21, 24
  27:6    36:14    37:25
  38:17    39:13    40:13,
  22    42:4    61:11    63:25
remotes    22:2, 12    26:2
remove    67:20
reported    1:17
reporter    17:2    56:8
  58:12    70:5
research    9:6
resist    37:14
responsible    5:2
rest    25:3    33:24
rid    60:11
Right    7:16, 24    8:23
  9:4    11:12    12:9, 14,
  25    13:20    14:13
  15:21    21:6    24:2
  25:4    27:16    28:16
  30:8, 11, 13, 16    31:9,
  11, 15    33:22    34:7, 22
  36:1, 15, 21, 25    38:12,
  14    39:12    40:6    42:6,
  7    43:9, 16, 19    44:7
  47:7, 25    48:19, 22, 23
  50:7, 8, 9, 14, 22
  51:2, 11    52:21, 22
  55:11, 25    56:3    57:2,
  4, 7    58:1, 7, 15
  59:17, 22    61:1    62:19,
  19    66:5    67:3, 23
rise    5:24
risk    12:13
RMR    1:16    71:10
road    49:2
Rodriguez    16:15
rolled    60:7
room    22:25    23:5, 7,
  14, 16    24:3, 16    25:17
  31:19, 20    35:19
  36:13, 17, 22    40:8, 9
  42:23    43:4    67:18
RPR    1:16    71:10
rubbing    37:20
Rules    1:19
run    51:20

running    65:22    66:4

< S >
S    2:1    71:4
sad    20:11
safe    18:10
safer    29:25
safety    19:4, 13    25:20
  28:2, 2, 4    30:25
sailed    21:9
salad    7:4
Sammer    8:20
saved    61:15
saw    16:5    46:15    63:20
saying    11:4    27:9
  57:16
says    8:9    51:20
  52:23    57:17, 18
scan    55:24
scar    9:3    16:6    46:19,
  23    48:12
scared    20:11    45:1
  53:13, 23
scaring    20:6
scarring    16:5
schedule    34:4, 12
scheduled    12:18    34:8
school    12:7, 11    43:12
  50:19    52:17
school,    52:24
scope    11:19    46:12, 13,
  14    49:3, 25, 25    50:9
  51:3
scopes    50:6
scrapbook    54:23
scrapbooking    55:1
screenshot    57:6, 8
screenshotted    57:6
seal    71:5
searched    44:16, 17
searches    29:24
seat    34:14
Seattle    2:14
second    58:8
seconds    15:3, 6
secured    31:16
see    11:7    16:7    40:15
  43:3    46:17, 22    48:12
  49:23    50:20, 21, 25
  58:11    62:2, 14    66:11
  67:4, 18
seeing    27:24    42:19
seen    17:7, 25    26:9
  31:4    42:11    52:7
  57:18
sees    19:16
send    45:10    55:3
sense    14:14    57:12
sent    60:10
sentences    54:2
separate    5:12    43:21

Morgan McMillan                                                                9

set    11:21, 24, 25
12:14    34:14    70:15
shaky    20:11
sharp    27:25
shelf    38:20
she'll    34:1, 5    37:20
47:14    51:20    53:22
ship    21:9
short    24:13
shorthand    1:17    70:4,
9, 12
show    7:17    57:7    63:6
65:15    66:10    67:13
showed    7:18
shower    43:1, 2
showing    7:25    63:23
64:12, 21    65:6
shows    64:25
sick    18:4
side    26:18, 18    27:13,
13    42:6    51:7    53:19,
19    67:5
Signature    3:6    69:1
Similac    45:22
sir    4:24    5:17    9:3
13:4, 6, 8    17:20
24:4, 6    27:2, 15
31:6    32:23    33:4, 7,
7, 10, 13, 17    36:24
39:18    43:6    45:20, 23
46:6, 10    55:5, 17, 19
57:5, 25    63:18, 18, 21
64:19    65:3
sit    28:5
site    58:24    59:2
sitting    7:24    19:7
25:2
six    16:1    60:20, 23
size    7:4, 6, 9    8:14
22:19    31:8    47:21, 23
skills    54:1
slap    56:14
sleep    34:5, 6    37:1, 9,
14, 21    50:12
sleeping    42:25
sleeps    19:22
sleepy    37:18
slept    39:20
slowly    8:5
small    9:12
smell    60:8    66:7
smock    19:25
smooth    16:8
smoothly    45:7
smother-mother    29:10
snack    39:8
socially    33:16
son    4:19    12:7, 11
24:1, 17, 18    29:10
32:17    41:2, 14, 17

50:19    59:20
son's    31:18
sorry    8:24    16:22, 24
17:5    18:18    23:11
27:15    36:10    46:6
63:3    65:12
sorts    33:15    59:9, 17
sound    48:24
Sounds    20:25    27:10
60:15
SOUTHERN    1:1
speak    17:24
specialist    18:6
specific    20:18    49:17
56:13
specifically    6:24
speech    5:9    8:24, 25
13:13    50:3
speech-language    8:17
spell    18:17
spoke    8:21, 25    10:18
49:1
stacks    54:9    58:3
stairs    31:21
standing    40:12    42:7
start    28:7
started    65:22    66:3
starts    21:7    37:19
State    1:16    70:1, 5
stated    70:6
STATES    1:1
stay    10:3    27:20, 23,
25    45:14
stick    11:7
sticker    62:22    63:1
Sticking    11:5
sticky    10:10    14:15
stitches    28:18
stomach    48:4
stop    35:14    44:8, 9
stopped    59:12
stops    44:2
stored    27:6
stove    30:3
strange    59:16
Strangely    28:19
Strep    43:7
stroller    32:9, 10
structure    32:20
study    5:20, 20, 25
7:11, 13, 17, 18    13:2,
19    48:16
stuff    39:10, 10    52:19
style    19:25
sudden    15:10
suffering    66:6
suggest    56:13
Suite    1:18    2:8, 13
71:12
summer    50:18

supposed    7:11, 25
11:14    22:13, 13
24:12    25:15    40:19
43:17    45:25    48:3
65:8
Sure    25:10    29:17
55:20
surgeon    16:16
surgery    9:14    10:14
swallow    5:20, 20, 24
9:8    13:19    48:16
swallowed    7:15    17:7
18:1    43:13    44:21
57:3
swallowing    5:23    6:1
7:19, 24    13:24    14:18
18:13    19:18    27:19
31:5, 8    33:19    47:12
52:16    53:3
sworn    1:13    4:6    70:10

< T >
table    25:2, 4, 8, 9, 13,
21    38:1, 2, 4, 15, 18
39:1, 3, 4, 6, 7, 9, 11
taffy    10:10
taffy-type    14:15
take    12:12, 16, 23
13:5    15:3    34:20
35:9    37:15    41:20, 22
43:1    46:7    49:23
54:6, 20    55:2    57:6,
8    58:8, 9, 10    64:18
66:12
taken    1:13    14:8, 24
37:19    55:16, 18    57:2,
15, 22    70:9, 21
talk    10:18    21:19
28:6    34:18    50:4
talking    14:11    16:17
18:12    33:8    54:2
66:4, 18
tape    67:7
Tarlton    2:4
Teddy    32:15
teenagers    21:1    60:18
tell    4:10    6:3, 10
9:1    13:21    16:3
32:2    34:22    44:14, 18
47:1    53:17    57:15
65:8    66:6    70:10
telling    50:2
tells    55:15
ten    34:11
tendency    41:10
tennis    32:12, 13, 14, 15
term    48:5
terms    10:13    22:5
27:5
terrified    20:2, 2

test    48:12
tested    54:5
testified    4:7
TEXAS    1:1, 17, 19    2:4,
9    4:13    16:18    17:8,
19    46:3, 4    62:9, 15
70:1, 5    71:10, 12
Thank    19:1    61:1, 4, 6
67:24
theater    31:20
therapy    10:14
thereof    71:3
thicker    7:21
thing    5:21    32:4
42:14    52:8, 10    53:9,
10    64:1
things    5:5    6:14, 16,
17, 20    10:1    14:14, 15
17:25    19:17    22:8
25:16    27:21, 23, 24,
25    30:17    31:8, 14
33:9    45:22    47:7
48:14    51:7    58:24, 25
59:2, 3, 6, 9, 17    61:15
think    8:20, 21    10:5,
7    12:20, 22    13:7, 10,
25    15:12    18:4    22:23
25:20    28:5    33:18
38:19    42:1, 2    43:6,
14    45:1    46:8    47:6
54:4    58:2    61:1
67:10
thinking    10:24    11:4
35:15
Third    2:13
thought    29:1    40:24
60:3
three    4:16    6:11
34:1    46:1    66:1
throat    15:19    43:7
65:11
throwing    35:6
tilt    30:9
time    6:23, 24, 25    7:1
9:23, 25    10:18    12:13,
20    18:23, 23    20:10
24:13    25:3    29:14
33:24    34:8, 9, 20
35:9    41:12    43:6
44:5    46:12, 17    47:4
48:8    49:24    55:15
57:3    61:20    65:18
66:6, 16    70:17
times    6:10    52:1
53:10    60:11
tiny    7:2    21:13, 13, 14
tissue    9:3    16:6
46:19, 23    48:13
today's    57:9
toddler    32:11
toddlers    31:3    32:15

told    7:17    10:12
29:21    44:25    46:16
50:16    51:22    62:8
top    21:17    29:14
57:14, 14
totally    61:17
touches    8:10
Toys    39:5, 7
transcribed    70:12
transcript    70:16
transfer    10:19
transpire    6:12
traumatic    53:5
treating    16:13
treatment    10:14    62:18
trial    56:25
trickling    8:5
tried    26:4    30:6
34:3    66:15
triggers    7:10
trouble    44:22
true    60:22, 22    69:21
70:7, 16
trust    59:8
truth    70:11, 11, 11
try    21:5    25:24
27:20, 22    31:16    34:6
trying    27:25    28:2
38:19    41:20
tube    45:11, 13, 16, 17
46:2    67:8, 20, 21, 21
Tuesday    4:2
turn    6:6    23:3, 20
24:15, 23    36:2, 11, 12,
23, 25    37:5
turned    23:17, 21    24:20
turns    46:18
TV    22:6, 13, 24, 25
23:16    24:2, 5, 8, 16,
17    25:3, 6    30:13
36:3, 4, 5, 23    37:2
40:22
two    30:6    31:20
43:21    46:1    48:10
54:9    55:7    60:24
type    7:10, 21    14:10
15:16
types    7:7, 7, 8    8:7
27:21, 23, 25    42:16
59:2
typewriting    70:15
typewritten    70:13
typical    5:22    32:4, 5
33:22, 23, 25    42:24
typically    15:3    23:2
24:7    33:23    39:6, 11

< U >
Uh-huh    21:10    25:5
56:15
ultrasound    7:14

understand    5:8    45:21
52:24    54:4, 15    65:23
understanding    16:20
29:8, 12    48:11    65:4
uneventful    34:25
UNITED    1:1
unusual    20:13, 17
upload    55:1
upside    36:15    40:13
upstairs    26:2    31:19,
21    61:14, 16
urgency    48:23
urgent    11:11    62:9
use    23:2    24:5, 14, 15
61:10, 17    63:1
usual    41:11, 11
usually    9:25    23:21
40:7    41:14    51:25

< V >
various    32:8    34:10
vegetables    9:21
versed    27:20, 23
vet    41:23
veterinarian    19:24
video    8:9    14:17, 18
15:12
VIDEOGRAPHER    2:15    4:1
58:17, 21    68:2
VIDEOTAPED    1:8, 11    3:1
visits    18:11
vitamins    59:6
volume    22:17
vomit    6:7    9:24    52:12
vomiting    14:2, 4, 7, 19
vomits    53:11
VS    1:5

< W >
wait    9:15    16:25
48:18    49:14
waiting    10:24    12:6
wakes    53:20
walk    32:6, 9    35:14
walked    40:11
walking    30:5    33:8
65:22    66:3
walks    41:17
wall    28:1    30:14
Walsh    2:4
want    12:13    29:19
34:20    37:16    43:1
45:1    46:1    48:4, 18,
19    49:9    50:10, 10, 15,
18    54:24    55:21    57:5,
8    58:5, 9    60:1
66:12    67:13
wanted    15:12    27:9
45:9    66:7
wants    21:16

warnings   42:18
Washington   2:14
watch   15:11   23:10, 19,
20, 22   24:2, 16   40:6,
7
watched   24:22
watches   23:22
watching   23:7   26:8
29:15   31:2
Way   4:13   8:12   9:8
12:4, 15   20:7   26:3,
13   27:6, 11   34:4
39:17   45:19   59:5
wear   19:25
wearing   59:15
website   54:22   59:10
week   16:1   47:13
weeks   6:12   13:2
25:1   34:1   45:16
46:1   47:14   49:1
welcome   26:7
we'll   56:24   60:3, 14,
22
went   8:3   24:16, 22
34:22   35:5   45:6, 17
46:15   61:25
we're   9:13, 15   10:6,
7   12:9   15:7   26:8
46:17   59:4, 4   60:12,
12, 12
weren't   62:2
We've   10:15   14:8, 24
16:17, 17   31:21   34:3
48:14   60:23   62:20
wife   60:19
window   30:17
windowless   30:19, 21, 23
windows   60:8
Wirrick   2:10
witness   1:12   4:3, 5
17:3, 5   61:5, 6
67:25   70:8, 9
woke   32:6   35:17
41:13
wondering   7:9
Woodlands   4:13   17:17,
18   62:4
work   12:23   22:2
25:25   39:24   40:4, 4
44:12   54:20
worked   22:9   45:19
working   60:21
works   44:4   60:13
wouldn't   10:11   14:16,
16   27:8   39:16   57:11
62:14   65:24   66:8
wreaked   60:6
wrong   44:13   49:10

< X >

XI   1:6
X-ray   63:13, 19
X-rays   16:4   46:11

< Y >
yea   38:21
yeah   8:5   15:1, 4
17:14   19:12   21:4, 6,
7, 8, 10, 13   22:3
25:13   26:6   27:22
28:25, 25   29:2, 3, 7,
18   31:3, 21   35:23, 23
37:3, 4, 5, 12   38:9,
10   40:22   43:22
50:24   51:19, 23
52:14   53:22, 22
55:13   56:7, 18, 21
58:3, 25   59:23   60:6,
6, 17, 21, 22   64:8
year   30:6   32:2
years   4:16   49:15
52:17   59:15
yogurt   7:21, 22
you-all   4:15   13:13
35:1   45:21   59:23
you-all's   48:20
younger   60:24

< Z >
Zantac   48:2
Ziploc   64:3, 7, 9