IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

*********************************************************

MORGAN GARTNER, INDIVIDUALLY,)
AND AS NEXT FRIEND OF E.G.,  )
A MINOR CHILD,               )
                             )
VS.                          )    CIVIL ACTION NO.
                             )       4:18-CV-02242
                             )
AMAZON.COM, INC., AND HU XI  )
JIE.                         )

*************************************

ORAL AND VIDEOTAPED DEPOSITION OF
MORGAN McMILLAN
APRIL 16, 2019

*************************************

ORAL AND VIDEOTAPED DEPOSITION OF MORGAN

McMILLAN, produced as a witness at the instance of the

Defendant Amazon.com, Inc., and duly sworn, was taken in

the above-styled and numbered cause on April 16, 2019,

from 12:34 p.m. until 2:00 p.m., before Denise Ganz

Byers, CSR, RPR, CRR, RMR, in and for the State of

Texas, reported by machine shorthand, at the offices of

Munsch Hardt Kopf & Harr, PC, 700 Milam, Suite 2700,

Houston, Texas, pursuant to the Federal Rules of Civil

Procedure.

DEFENDANT'S
EXHIBIT
B

A P P E A R A N C E S

FOR THE PLAINTIFFS:
     Jeff M. Meyerson
     THE MEYERSON LAW FIRM, P.C.
     2224 Walsh Tarlton Lane
     Austin, Texas 78746
     512.330.9001
     Jeffm@meyersonfirm.com


FOR THE DEFENDANT AMAZON.COM, INC.:
     Clifford L. Harrison
     MUNSCH HARDT KOPF & HARR, PC
     700 Milam, Suite 2700
     Houston, Texas 77002
     713.222.1470
     713.222.1475
     charrison@munsch.com

          -and-

     Monique Wirrick
     PERKINS COIE
     1201 Third Ave., Suite 4900
     Seattle, Washington 98101
     206.359.8000
     206.359.9000


VIDEOGRAPHER:
     Jim Dunham

```
                          INDEX
         ORAL AND VIDEOTAPED DEPOSITION OF
                   MORGAN McMILLAN
                    APRIL 16, 2019


                                            PAGE
Examination by Mr. Harrison                  4
Examination by Mr. Meyerson                  61

Appearances                                  2
Changes and Signature                        69
Certificate                                  70




                      EXHIBITS

EXHIBIT NUMBER        DESCRIPTION                PAGE


Exhibit Number 1     Photographs produced       58
                     electronically

Exhibit Number 2     Photograph                 63

Exhibit Number 3     Photograph                 63

Exhibit Number 4     Photograph                 63

Exhibit Number 5     Photograph                 64

Exhibit Number 6     Photograph                 64

Exhibit Number 7     Photograph                 65

Exhibit Number 8     Photograph                 66

Exhibit Number 9     Photograph                 66

Exhibit Number 10    Photograph                 67
```

THE VIDEOGRAPHER:  We are on the record on Disc 1.  It is Tuesday, April 16th, 2019, at 12:34 p.m., and the witness is Morgan McMillan.

MORGAN McMILLAN

was called as a witness by the Defendant Amazon.com, Inc., and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HARRISON:

Q.   Can you tell us your name, please?

A.   Morgan McMillan.

Q.   And your address?

A.   27 Hinterwood Way in The Woodlands, Texas 77375.

Q.   And how long have you-all lived there?

A.   About three years.

Q.   And you live there with your husband, Carey?

A.   Yes.

Q.   And your son Kaden --

A.   Yes.

Q.   -- who's 12?

A.   Yes.

Q.   And, of course, Everly, who is about 2-1/2-ish?

A.   Yes, sir.

Q.   Something like that.

A.   (Moving head up and down.)

Q.   Have you been primarily responsible for the interactions with the doctors, with Everly's doctors, as opposed to your husband, going to the appointments, making the appointments, things like that?

A.   I haven't gone to all of them, but, yes, I would say.

Q.   I understand that you recently took her to a speech pathologist and a radiologist.

A.   Yes.

Q.   Was that in one -- one appointment, or was it separate appointments, one --

A.   One --

Q.   -- for each?

A.   -- appointment.

Q.   One appointment and they were both there?

A.   Yes, sir.

Q.   What -- what exactly was the purpose of that appointment?

A.   A swallow study.  To perform a swallow study.

Q.   Is that a -- just a natural thing to do in the course of a typical recovery, or was she having difficulty swallowing that caught the doctor's attention and gave rise to the necessity of having a swallow study?

A.    She was having some difficulty swallowing and issues with choking.

Q.    Okay.  Tell me a little bit about that.

A.    It's mostly when she was eating -- eating -- well, I was going to say melon, but she's also had the problem with bread.  She just would turn red and she would like projectile vomit and the pieces would come out.  (Indicating.)

Q.    How often would this happen?

A.    I couldn't tell you.  Maybe a couple times a month.  But, I mean, she may have gone three or four weeks and she was okay and then it would just transpire.  Because it depended if we were eating a lot of melons.  You know, we -- we had to learn these different things that she couldn't eat.

Q.    Well, are there things that she can't eat?

A.    There are things she shouldn't eat, yes.

Q.    Like what?

A.    Cantaloupe, honeydew, bread with peanut butter.  I'm forgetting some of the things.

Q.    Well, when she eats foods like you just described, the melons and bread, does that cause this -- this reaction every time, or can she eat them sometimes?

A.    Every time with melons specifically.  Most of the time with like bread with peanut butter.  But every

time with pieces of -- I mean, you could probably make melon pieces really, really tiny and that would make a difference.  But if you're just cutting up, you know, like fruit salad, she couldn't have those size pieces. (Indicating.)

Q.  Can she have the same size pieces of other types of food, other types of fruit, for instance?

A.  Some, yes.  Some.  Some types of fruit, yes.

Q.  I'm just wondering if it's the size that triggers the reaction or the type of food.

A.  That's what the study was supposed to help with.

Q.  Well, so you took her to the study and they did the -- what was it, an ultrasound when they -- after she swallowed the fluid?

A.  Right.

Q.  What did that study show or what were you told that the study showed?

A.  She said there was a delay in swallowing with something that they gave her.  It wasn't the liquid.  It was they gave -- it was like a thicker type yogurt.  So it wasn't like a drink-drink.  It was like a yogurt.

And it was -- there was a delay in her swallowing, so it was just sitting right here.  And she was showing me that it's supposed to immediately go

down, and it was just kind of hanging out here.

(Indicating.)

Q.    Did it just hesitate before it went down or did it never go down?

A.    It was just slowly trickling, yeah.

(Indicating.)

Q.    Does that happen with other types of foods?

A.    I don't know.  She -- she does sometimes say -- and I believe we have some video where she says, "Mommy," and she touches here.

But, you know, it's difficult because she can't articulate the way she's -- you know, what's happening.  So we don't know -- again, we still don't know if it's the size.  They said it could also be partially psychological, so --

Q.    Well, did they -- "they" being -- it's Dr. Cook, isn't it, the speech-language pathologist?  Is it Dr. Cook, Anias Cook?

A.    It was one of them, yes.

Q.    Marla Sammer, I think she's the radiologist.

A.    I think it was the radiologist I spoke to.  I can't remember now.

Q.    All right.  Well, did either --

A.    No.  The speech path -- I'm sorry.  It was the speech -- the pathologist that I spoke with.

Q.    Okay.  Did she tell you why Everly was having this problem, why is the food not going down?

A.    Yes, sir.  There's -- it's not scar tissue. It's just there's damage right there and she said there's not a lot of -- there's not been enough -- I guess like enough research or, I don't know, for them to know.

Because she said the way that you swallow is -- How did she explain it to me?  We just -- we don't know -- we don't know why our body does that.  So it's not a mechanism that we could really do much about because it's so small.

So anything we do is -- we're causing more damage by doing like an invasive surgery, you know, at this point.  We're just going to have to wait.

Q.    Are there foods that she eats with no problem at all?

A.    Yes.

Q.    Give me some examples, if you can.

A.    Just about everything.  I mean, we can give her little pieces of hot dogs.  She eats vegetables.  She eats oatmeal in the morning.

There has been -- there was one time where she did vomit and it was oatmeal.  So it's not, you know, 100 percent of the time.  But she can usually have

oatmeal, cereal.  She likes pancakes, you know, things like that.

Q.  Are there any foods besides melon that you stay away from?

A.  There are, but I just can't think of any.  If -- if we're out somewhere and something is -- we think it would be a problem, then we're not going to give it to her.

You know, if it's too big, it's not cut up, or if it's sticky like taffy, something like that, we wouldn't give it to her.  Even like caramel popcorn.

Q.  What have any of the doctors told you about what she might need in the future in terms of medical treatment or therapy or surgery or anything?

A.  I'm not a doctor, so I don't know.  We've heard different -- there's so many different moving parts in this.  There's so many different doctors that we may talk to one time.  Like the pathologist, I spoke with her once, and they transfer me around.  So I don't -- I don't know.

There's -- there's possibilities for -- there was an invasive procedure that they were discussing where they actually go in, and now I believe they're thinking about waiting before we do that.

Q.  Who was discussing the possibility of an

invasive procedure?

A.    Dr. Chu.

Q.    And what kind of invasive procedure was he saying he was thinking about?

A.    Sticking a camera down there to do -- that's where they would actually have to give her anesthesia and then stick a camera down there and see how -- how her esophagus looks from the interior.

Q.    Okay.  So that has not been done?

A.    That has not, no.

Q.    And apparently it's not urgent enough that it needs to be done right now?

A.    I don't know.  We haven't gone back yet.

So that was supposed to be done after this, but -- after this most recent appointment.  But the most recent appointment, they were able to find where -- the area that's, you know, causing problems. So we don't know.  We don't know if they're still going to progress with the -- with the -- the interior scope.

Q.    When is the -- is there another appointment set?

A.    That, I'll have to ask -- that -- that is something my husband does.  He does it online.

Q.    Do you know if he has set -- is there an appointment set --

A.   I -- I don't know.

Q.   -- for this?

A.   I don't know.

Q.   Don't know one way or another?

A.   No.  If -- it'll be, you know, in the next months.  It needs to be after my -- he may be waiting.  It needs to be after my son finishes school.

Q.   Why is that?

A.   Because we're -- we have one car right now.

Q.   Oh, okay.  Well, but why can't it be done while your son is in school?

A.   Because these appointments take a very long time, so I don't want to risk not being there.

Q.   But you don't know if anything is set right now or not, one way or another?

A.   I don't.  My -- if my husband is able to take off, then he's done -- actually gone to some of the appointments and scheduled it himself.  He's the one who can do it online, because the insurance is through his -- his company.  I don't think he has the time to leave, so I'll have to go.

Q.   Okay.  You don't -- because you don't think he can take off work?

A.   Huh-uh.

Q.   Is that right?

Morgan McMillan                                                13

A.   No.

Q.   Well, this last study was, what, a few weeks ago --

A.   Yes, sir.

Q.   -- give or take?

A.   Yes, sir.

Q.   In March sometime, you think?

A.   Yes, sir.  Yes.

Q.   Before that, when was the last appointment?

A.   I think it was in January.

Q.   Who was that with?

A.   Perhaps Dr. Chu.

Q.   Did Dr. Chu refer you-all to this speech --

A.   Yes.

Q.   -- language --

A.   Yes.

Q.   -- and the radiologist --

A.   Yes.

Q.   -- to do the swallow study?

A.   Right.

Q.   Did -- did everyone -- well, did Dr. Chu tell you that this was always going to have to be done, or was there some kind of -- something out of the ordinary with regard to her swallowing that made him and you think, "Well, we need to do something else"?

Morgan McMillan                                                    14

A.   There was.   We -- he was aware that she was vomiting.   We let him know.

Q.   Now, how often would she be -- was she vomiting?

A.   It was -- it was happening more often before we kind of narrowed it down to the items that she was, you know, vomiting.   And now it's -- it's been a little bit less because we've taken those items out of her -- you know, altogether.   Actually, we just don't even eat that -- that type of food now.

Q.   And the items you're talking about are the melons?

A.   Right.   But, you know, anything that we -- if -- just using common sense.   Things that are too big, too sticky, taffy-type things, anything like that we just wouldn't -- we wouldn't eat it.

Q.   You mentioned a minute ago a video.   You've got a video of her gagging or having difficulty swallowing or vomiting --

A.   Yes.

Q.   -- or all of the above?

A.   Yes.

Q.   And how -- who took that?

A.   We've both taken a few of them.

Q.   So --

A.    Yeah.

Q.    I mean, is it -- does the -- do these events typically take more than 60 seconds?

A.    Oh, yes.  Yeah.  She --

Q.    Like how long?

A.    Sometimes it's 60 seconds of her where her face is deep red before the food actually comes out and we're just patting her on the back or crying or -- I mean, it's awful, it's an awful feeling, before it just all of a sudden comes out.  It's pretty -- it's not pleasant to watch.  (Indicating.)

Q.    What made you think that you wanted to video it?

A.    Just to document the experience, I guess.  You know, we feel very helpless.

Q.    Have you ever had to do a Heimlich type maneuver to free food --

A.    No.

Q.    -- from her throat?

A.    No.

Q.    All right.  Before this appointment in January, when was the last previous appointment?

And I don't need the exact date.  I don't expect you to know the date.  But, I mean, was it a month before?  Were you -- were you going every month,

Morgan McMillan                                                16

were you going every week, were you going every six months?

A.   Whenever they tell us to go.  We had a procedure in January where they did some X-rays.  That's where we saw some scarring in the esophagus or -- what they're hoping does not become scar tissue, but there was a -- you could just see that there was some damage there, that it wasn't smooth and flat.

Q.   And that was done by Dr. Chu?

A.   Yes, I believe so.

Q.   Or someone at his referral?

A.   I believe it was him.

Q.   Has he been the primary treating doctor?

A.   I believe so.  We were under the impression initially that it would be Dr. Rodriguez, who was the pediatric surgeon.  I believe Dr. Chu is maybe in his office, so we've been -- we've been talking to him more.

Q.   They're all affiliated with Texas Children's --

A.   Yes.

Q.   -- is my understanding.

Have you --

MR. MEYERSON:  You --  I'm sorry to interrupt.

MR. HARRISON:  I'm sorry.

MR. MEYERSON:  You have to wait until he's

done with his question to answer because the court reporter is taking --

THE WITNESS:  Okay.

MR. MEYERSON:  -- it down.

THE WITNESS:  Okay.  Okay.  Sorry.

Q.   (By Mr. Harrison)  Since this happened, since she swallowed the battery, have you seen any doctors that are not affiliated with Texas Children's?

A.   Her primary care physician.

Q.   And who's -- who's that?

A.   Dr. Abusharr.

Q.   Abu -- say it again.

A.   Abusharr.

Q.   Abusharr.  Okay.  Yeah, I got that name earlier.

Where -- where is his office?  Is he in the Woodlands?

A.   In The Woodlands.

Q.   He's not affiliated with Texas Children's?

A.   No, sir.  He has his own practice.

Q.   Has he been her pediatrician from the beginning --

A.   From the beginning.

Q.   -- so to speak?

What kind of things has Everly seen

Dr. Abusharr for since this -- since she swallowed the battery?

A.    Just annual check-ups.  Really, that was it.  I think maybe she was sick.

We haven't gone to him for -- for this issue because he's not really a specialist and he men -- he actually made that clear, that he didn't know anything about the lithium ion or -- just what he's heard, so --

Q.    Is it safe to say, then, that before this happened he never gave -- during any visits, he never gave you any handouts or literature talking about the dangers of swallowing lithium batteries --

A.    Huh-uh.

Q.    -- did he?

A.    No, no, no.

Q.    Sometimes she can't spell "huh-uh," so --

A.    Oh, so sorry.

Q.    No.  You're doing fine --

A.    No.

Q.    -- but I may gently remind you from --

A.    Okay.

Q.    -- time to time.

A.    Okay.

Q.    I'm not --

Morgan McMillan                                              19

A.    Thank you.

Q.    Well, did he ever -- "he" being the pediatrician -- ever give you any kind of literature involving child safety issues?

A.    Hmm.  He may have.  He may have.  He has a lot of, like, pamphlets and so forth and I always do look at whatever he has sitting around.

But there was nothing on -- on that.  He didn't hand me anything on it.

Q.    But he's got some pamphlets in the reception area?

A.    Yes.  Yeah.

Q.    Do any of them deal with household safety for children?

A.    No.  It's mostly like ailments, you know.  And he does a lot of adults that he sees, so cancer, diabetes, you know, things like that.

Q.    Now, other than the swallowing issue that you've described, does Everly have any other physical or emotional or mental issues that you attribute to this battery ingestion?

A.    She's had nightmares and she sleeps with us.  She won't go anywhere near anyone in a -- that looks like a doctor.  Like if you go to like a veterinarian, you know how they wear the, like, smock style or -- I

don't know how you -- but if they look like a doctor, she's terrified.  Of course, she's terrified when we go to the doctor.

And we don't know if she has psychological issues.  They won't know for a while.  But she could be scaring herself or freaking herself out, for lack of a better way to say that.  We -- we won't know for certain for a while.

But she does get -- like when she does choke, she just cries for a very long time.  Just a very sad, scared cry.  Sometimes she's a little shaky.  So we don't know the full extent, but --

Q.    Is there anything unusual about her eating habits, frequency or amounts or anything like that --

A.    No.

Q.    -- that you've noticed?

A.    Not anything unusual, no.

Q.    Any specific foods that she's, like, afraid of, for instance?

A.    No.

Q.    Any foods that she doesn't like for whatever reason?

A.    Yes.  She doesn't like anything that's not candy.

Q.    Okay.  That narrows it down.  Sounds like my

teenagers.

Has she had pizza yet?

A.    Oh, she loves pizza.

Q.    Yeah.  Well, I was going to say if she hadn't had it yet, try and delay that for a while.

A.    Yeah.  You're right.

Q.    Because once that starts, yeah, once that --

A.    Yeah.

Q.    -- ship has sailed --

A.    Uh-huh.  Yeah.

Q.    And she's okay with pizza as long as it's cut up in the proper --

A.    Very, very tiny pieces, yeah.  Very tiny.

Q.    What does "tiny" mean?

A.    To be honest, she just -- she likes what she calls "peepa."  She just wants to eat the cheese part off the top, so we just make little pieces and she just eats the cheese, so --

Q.    Now, let's talk about this remote.  Did you have anything to do with purchasing this remote?

A.    I didn't.

Q.    Did you know anything about it as it was being purchased or -- it wasn't discussed or anything?

A.    No.

Q.    Did you -- were you familiar before this

happened with how the remote operated?

A.    No.    I know how most remotes work, you know, the general consensus, yeah, the power button and so forth.

Q.    In terms of how it interacts with the -- the Apple TV box --

A.    No.

Q.    -- and things like that, did you have any idea of how that worked?

A.    No.

Q.    Would it be fair to character -- characterize your experience with remotes is you pick it up and you point it and it's supposed to -- the TV is supposed to come on?

A.    Exactly.

Q.    And you can figure out the channel up and down and the volume up and down?

A.    Exactly.

Q.    Is that about the size of it?

A.    That's -- that's it.

Q.    Okay.    Well, then I assume you had used it before, or not?

A.    I think so.

Q.    Had you used it with Everly's TV before?    The TV in her room, I mean.

A.    I believe so, yes.

Q.    What would you typically use it for and when?

A.    If anything, it would be just to turn it off because -- you know, if it was still on.  It was there in her room to kind of monitor.

Because if we put it in the older -- the 12-year-old's room, we don't know.  He could be watching it too late, you know.  So we put it in there for --

Q.    "It" being --

A.    -- him to watch.

Q.    I'm sorry.  I didn't mean to cut you --

A.    Put it --

Q.    -- off.

A.    -- in Everly's room.

Q.    "It" being what?

A.    The TV was in her room so that we could monitor.  So if he left it on, I would have turned it off.

Q.    Well, did Everly ever watch it?  Did you ever turn it on for Everly to watch?

A.    Of course.  Usually he would have turned it on for her to watch, because he watches cartoons with her.

Q.    "He" being?

A.    My --

Q.    Kaden?

A.    -- son.  Yes, Kaden.

Q.    All right.  So he would sometimes watch the TV in Everly's room --

A.    Yes, sir.

Q.    -- and use the Apple TV remote?

A.    Yes, sir.

Q.    Where was that remote kept, typically?

A.    There's a basket next to the TV --

Q.    Was it --

A.    -- in there.

Q.    Was it always kept there?

A.    That's where it's supposed to be kept.  But for a short time it was, and then kids, you know.

Q.    So you said you would not use it or you would use it occasionally to turn it off?

A.    I mean, I never went in her room to watch TV, no.  My son was -- I'm not a TV person, really, but my son is.

So if he was in there and let's say he left it on, I would have come and turned it off if it was still playing.  But other than that, no, I never -- I never went in there and watched it.

Q.    When you would go in and turn it off, would the remote be in the basket or would it be on the floor or somewhere else?

A.   For the first few weeks, I believe it was in the basket.  It may have been sitting on the table in front of the TV the rest of the time.

Q.   All right.  There's a table --

A.   Uh-huh.

Q.   -- in front of the TV?

A.   Yes.

Q.   Like -- like a little coffee table or an activity table --

A.   Sure.

Q.   -- to do, like, games and puzzles on?

A.   My friend made it.  It's handmade antique -- yeah, it looks like just a coffee table.  (Indicating.)

Q.   Is there any particular reason why it was supposed to be kept in the basket?

A.   I have a lot of baskets and I like things organized and that's -- her room is greatly decorated and I liked everything in its place.  But, you know, again, that's not realistic.

Q.   Well, did you think there was any safety issue with leaving the remote on the table?

A.   Never.  Never.  Never ever.

Q.   Had you ever known Everly to pick up the remote, play with it, manipulate it, try and make it work?

A.   She may have.  You know, we have -- we have remotes upstairs.  She may have.

Q.   Do you remember one way or another, before this incident, whether she ever tried to do that?

A.   I don't.  I mean, I --  No, I don't exactly recall.  But I would assume, yeah, she -- she would have been more than welcome to, as long as it's not changing the channel when we're watching something.

Q.   Had you ever seen the battery compartment cover come off before this incident?

A.   No.

Q.   For any reason, because it was -- whether it was dropped or whether it was held a certain way when it was being operated or played with or anything.  Had that battery compartment cover ever come off --

A.   No.

Q.   -- to your knowledge?

A.   (Moving head from side to side.)

Q.   Had -- I assume you'd never changed the battery, had you?

A.   No.

Q.   Did you know how the battery compartment cover could come off?

A.   No.

Q.   Did you know that it had a lithium button

battery in it?

A.   No, sir.

Q.   If you had known that it had a lithium button battery in it, would that have made any difference in any decision that you made in terms of purchase or allowing the remote in the house or the way you stored it?

A.   If I was aware of the dangers, I -- I wouldn't have wanted it.  But just saying lithium ion battery, I mean, it just sounds like a battery.

Q.   It didn't mean anything to you one way or the other?

A.   (Moving head from side to side.)

Q.   (Indicating.)

A.   No.  No, sir.  I'm sorry.

Q.   That's all right.  You're doing fine.

Well, had you -- before this incident, had you read anything or heard anything about the dangers of swallowing a lithium battery?

A.   No.  And we -- we try to really stay versed in all those types of things, you know.

Q.   Yeah.  What do you -- what do you mean, you try and stay versed in those types of things?

A.   Always seeing things, you know, on the news, trying to stay sharp on -- on those types of things.

Morgan McMillan                                                                                  28

That's why we had everything nailed to her wall, you know, for safety purposes, always trying to be safety conscious.

Q.    Had you -- how did you become safety conscious? Did it just -- I mean, did you sit down and think about it or did you talk to someone or did you read a book on it or just start Googling --

A.    I have --

Q.    -- how to --

A.    -- a 12-year old --

Q.    -- childproof?

A.    I have a 12-year-old who's kamikaze, so he -- it's --

Q.    So that's your education --

A.    Yes.

Q.    -- right there?

A.    Yes.

Q.    How many stitches has he had?

A.    Strangely, none.  I have no idea how this happened.  I don't how --  He's never broken anything, but he was -- he was a little danger man.

Q.    Did you ever have to call poison control?

A.    No.  I don't know how he -- he managed.

Q.    There you are.  You've done --

A.    Yeah, yeah.

Q.   He's a lot better than you thought he was.

A.   Being a helicopter mom, yeah --

Q.   Yeah.

A.   -- paid off, but --

Q.   Would you consider yourself to be a helicopter mom?

A.   Yes.  Yeah.

Q.   And by that -- well, what's your understanding of it when you say "helicopter mom"?

A.   My son calls me smother-mother, so --

Q.   Okay.  Is that -- well, what's your understanding of what that means?

A.   Maybe a little overbearing, a little, you know, on top of her and him all of the time.

Q.   Watching what they're doing?

A.   Yes.

Q.   Making sure they're okay?

A.   Yeah.  Putting them in all kinds of activities that they don't even want to be in, but --

Q.   Well, back to what I was asking a moment ago, how -- how did you -- other than -- well, you told me your 12-year-old was quite an education.

     Beyond that, did you ever go on Google, do any kind of searches on how to baby-proof your house or make it -- make it safer?

Morgan McMillan                                                30

A.    Honestly, I don't remember if we did that.  But when I was pregnant, we had the locks on the cabinets and the stove, and she wasn't even born yet.  On the doors, all the doorknobs.  And I'm still, again, pregnant, she was not going to be walking, you know, for a year or two, but we tried to plan ahead. (Indicating.)

Q.    All right.  And you mentioned the -- like the dresser, is -- it's -- it's -- you can't tilt it over because you've --

A.    Right.

Q.    -- anchored it somehow?

A.    Right.  The TV as well, it's also nailed in to the wall.  (Indicating.)

Q.    Okay.  So she can't pull that over?

A.    Right.

Q.    Things like cords, window cords, did you do anything about those?

A.    We have the windowless blinds, so -- because those are also a danger.  Or the -- not the windowless -- the cordless blinds.  Is that what it is, where you pull them up and down?  So there's no cord.  Not "windowless."  (Indicating.)

Q.    Is that the reason you got the cordless blinds, to eliminate the cord for safety reasons?

Morgan McMillan                                    31

A.    Yes.   You know, there's -- again, you're just watching the news and they'll have, you know, something about the dangers of toddlers and those cords, so, yeah.

Q.    But you had never seen anything about any danger of swallowing a lithium battery?

A.    No, sir.

Q.    But I gather you probably are aware of dangers of swallowing things about that size?

A.    Right.

Q.    Coins?

A.    Right.

Q.    LEGOs?

A.    Of course.

Q.    Any number of things?

A.    Right.

Q.    And did you always try and keep those secured, out of reach?

A.    We took every LEGO out of our -- our son's room, which is a lot, and we put them upstairs in our movie theater room.  And then there's two locks on the stairs so that she can't get upstairs.  So, yeah, we've done everything we could, so --

Q.    And this was before the battery ingestion?

A.    Oh, long before, yes, yes.

Q.    Baby gates?

Morgan McMillan                                      32

A.    Everywhere.

Q.    Well, tell me about when she was -- a year ago when she was about 19 months old, in April of 2018, what her typical day was, if there was a such thing as a typical day.

A.    She woke up, breakfast.  I walk with a group of my friends every morning.  She's -- every day is different.  We have various activities.

Q.    Do you push her in a stroller when you walk?

A.    She's in the stroller.  She's been in all kinds of activities, so the day changes.  She has toddler group, gymnastics, ballet, tennis.

Q.    Tennis?

A.    I know.  She does tennis.  She's still in a Teddy Bear Tennis for toddlers.  She does all kinds of activities.

My son comes home around 4:30.  And that was -- and then my husband comes home after that.  It's just a lot of playing.  You know, she was 19 months old, so there was not a lot of -- not a lot of structure.  You know, it was just playtime, you know.

Q.    Any other caregiver during the day besides you?

A.    No, sir.

Q.    Would she ever go to like a daycare or anything like that?

A.   No.

Q.   No nannies that would come in and help you out once in a while?

A.   No, sir.

Q.   Did you -- did she seem to be developing normally in your opinion?

A.   Yes, sir.  Yes, sir.

Q.   You know, walking, talking appropriately for her age, things like that?

A.   Yes, sir.

Q.   Has her development continued normally in your opinion?

A.   Yes, sir.

Q.   And when I say "development," I mean in all sorts of -- physically, mentally, intellectually, socially, all those areas?

A.   Yes.  Yes, sir.

Q.   I think I asked you this, but does she have any other medical issues other than the swallowing difficulty you were describing earlier?

A.   She -- she does not.  No other issues.

Q.   All right.  Back to my question about a typical day.  I know it's not typical, but would she typically have a nap time or a rest period?

A.   She has never been typical, so, no.  She's --

Morgan McMillan                                          34

sometimes she'll go three weeks without a nap, even still, and then sometimes she likes to nap, so --

We've tried to get her on a better schedule, but she's very feisty.  It's her way or -- and how are you going to argue?  She'll go to sleep when she goes to sleep.  So we try to put her down sometimes and she just pops right up.

Q.   But that's not at a scheduled time or generally the same time from day-to-day?

A.   No.   Because there's various activities.  And if you put her in the car for more than ten minutes, she's going to pass out, so that changes the schedule.

Q.   When they were little did you ever put them in their car seat and set them on the dryer?

A.   Dryer?

Q.   Did you ever do that?

A.   I did that with Kaden, yes.

Q.   Well, let's talk about the day of this incident.  Now, you can -- this might be difficult and you can take a break any time you want.  Okay?

A.   (Moving head up and down.)

Q.   All right.  Just tell me how the day went up until the afternoon.

A.   It was just a regular day.  I don't remember anything.  It was very uneventful.

Morgan McMillan 35

Q.   Did you-all have any activities?

A.   We did not.  We -- it was one of those days where she didn't have any activity for the day.

She took a nap, and then she was -- she was crying.  So I went to her baby gate, and she was kind of throwing a fit by her baby gate.

Q.   Let me back you up just a little bit.  When she took a nap, how did that come about?  Did you say, "Let's go take a nap, it's nap time, I'm going to put you down"?  Was she asleep in the car and you carried her in?  What -- how did that --

A.   No.  We were home that day.  Honestly, I can't remember.

Some -- some days when we walk, if we stop at the park she gets really exhausted, and I'm thinking that's what happened, but I -- I can't remember.

But, at any rate, she -- she woke up around 3, between 3 and 4 and she was crying.

Q.   But you had -- had you gone into her room with her to put her down --

A.   Oh, yes.

Q.   -- for her nap?

A.   Yeah, yeah.  Of course, yes.  She -- because the baby gate was also locked, so she can't --

Q.   She can't go in by herself?

Morgan McMillan                                        36

A.    Right.

Q.    So you had gone in with her.  And did you turn the TV on?

A.    No.  The TV was not on.

Q.    The TV was not on?

A.    Huh-uh.

Q.    And --  No?

A.    Huh-uh.

Q.    No?

A.    No, no.  I'm sorry.  No, it was not on.

Q.    And you didn't turn it on?

A.    I did not turn it on.

Q.    When you took her in to her room, where was the remote?

A.    It was right next to her feet, it was upside down, and the cover was laying next to it.

Q.    When you took her into her room for -- to -- for her nap?

A.    Oh, no, not when I took her in.  When I was taking her out.

Q.    All right.  Let's back up then.

      When you took her into her room for the nap, the TV was not on and you didn't turn it on?

A.    No, sir.

Q.    All right.  Would you sometimes turn it on to

calm her down and get her to go to sleep, or does that TV have sometimes the opposite effect?

A.    Yeah.  It would have the opposite effect. Yeah.

Q.    Yeah.  You can't turn on golf --

A.    No.

Q.    -- the Golf Channel --

A.    No.

Q.    -- to get her to go to sleep?

A.    No, no.

Q.    Well, so you go in --

A.    Yeah.

Q.    -- to put her down for her nap.  Any idea how long it took for her to go to sleep?  Did she resist?

A.    No.  Because I've never forced her to take a nap.  Because if she doesn't want to, she's not going to.

So she would have just gone sleepy and I would have taken her in, or, you know, if she starts rubbing her eyes I just lay her down and she'll go to sleep.

Q.    Okay.  And that's what happened?

A.    That's what -- what would have happened, yes.

Q.    Now, when you did that, when you took her in and she laid down, where was the remote?

Morgan McMillan                                                                        38

A.    I -- probably on her table.

Q.    Why do you say "probably on her table"?

A.    Because it's -- again, it would probably be on that table or in the basket.

Q.    And if it's in the basket, she can't reach --

A.    Couldn't reach --

Q.    -- it?

A.    -- it.

Q.    Yeah.  She can't get to it?

A.    Yeah.

Q.    She can't climb?

A.    Right.

Q.    Or she couldn't climb then?

A.    Right.

Q.    And the basket was not on the table, was it?

A.    No, no, I don't believe so.

Q.    Any idea who might have left the remote on the table?

A.    Probably Kaden.  I'm trying to think if she could get to the basket.  The little shelf is only like yea high, so -- (Indicating.)

          No.  It probably was Kaden just left it.

Q.    Well, is there any reason why you didn't pick it up and put it in the basket?

A.    No.

Morgan McMillan 39

Q.   Did you actually notice it on the table?

A.   No.

Q.   Is the table -- is there anything else that's kept on the table?

01:16   A.   Toys.

Q.   Are they typically kept on the table?

A.   There's toys on the table.  I mean, sometimes a snack or a drink is left.  You know, it's just a regular table.

01:16   Q.   Okay.  So there's stuff -- is there stuff typically on the table?

A.   Right, yes.

Q.   Okay.  If you had noticed the remote, would you have put it back in the basket?

01:17   A.   No.

Q.   Even if you had noticed it there, it wouldn't have concerned you really one way or another?

A.   No, sir.

Q.   So she goes down for a nap.  Any idea how long 01:17  she slept?

A.   No idea.

Q.   Now, how do you monitor her when she's napping, or do you?  Do you just listen for her?  Do you check on her every five minutes?  How does that work?

01:17   A.   We have --

Q.    And --

A.    -- cameras.

Q.    -- when I say -- I don't mean to interrupt.
When I say how does that work, I meant how did it work
in April of 2018.

A.    Right.  We have a camera I can watch, but I
usually just listen for her or watch for her.  I was
likely in the living room, which is incredibly close,
within just a few feet of her room, so --

Q.    Well, so do you remember what happened next?

A.    When she was crying, I was alerted.  I walked
over to her.  She was standing by the baby gate.  That's
where the remote was upside down and the cover was
laying next to it.

And I looked to see, you know, what --
what goes inside, what kind of batteries.  I noticed
that the battery wasn't there.

Q.    How did -- how did you know that a battery was
supposed to be there?  It was just --

A.    Well, it's --

Q.    -- pretty obvious?

A.    -- a TV remote, yeah.  I mean, it's missing a
battery inside of it.  There's a hole.

So I immediately thought it was maybe the
dog who took it, you know, maybe ate it.  I don't know

why.

My son came home. I asked him to help look for the missing, you know, battery, or did maybe the dog get it.

And she was being fussy, and I was more concerned with why she was being fussy, still not -- not quite putting it together.

Q. When you say "fussy," what do you mean? Just normal fussiness or --

A. A little -- she has a tendency to be ornery, but she was more so than usual, more so than usual.

Q. And this was about what time, 3 or so?

A. She woke up between like 3 and 4. I don't remember exactly when. And my son usually gets home between like, 4:20 and 4:45. So I don't know. It wasn't that long -- much longer, maybe a half hour at the most, that my son walks in.

And she was -- she was not consolable really. She was just -- she was just crying, just a lot of crying. And so I was trying to take care of her.

And I said, "Can you please find the battery so I know if I need to take the dog in to the vet?" Again, just not -- you know, now you look back and you feel guilt. But I just -- I didn't put it together.

Morgan McMillan 42

Q.   Why did you think the dog might have gotten it?

A.   I don't know.   I just -- I didn't think she would have picked it up, maybe.   I don't know.

Q.   You said the remote was laying close to the gate or close to her bed?

A.   It was right by it, on the other side of the gate, standing right next to her.   (Indicating.)

Q.   Now, had you ever bought button batteries before?

A.   I never have.

Q.   Had you seen packages of button batteries in the home -- in your home before, that might have been bought by your husband, for instance?

A.   We have a thing of batteries that has -- like they're all -- they're all organized and we don't have any of those types of batteries.   (Indicating.)

Q.   Had you ever, before this happened, read any warnings on the batteries or the battery packages?

A.   I don't remember seeing any of them, no.

Q.   Do you remember on the date this happened when she was napping ever checking the camera monitor?

A.   No, I didn't need to do it that day.   I was -- I was in the living room.

But you asked on a typical day what I've done in the -- you know, when she's sleeping.   I can.

If I -- let's say I want to take a shower, then I would sometimes even bring the phone in the shower just so I could, you know, see her.  (Indicating.)

Q.    Had Everly ever been to the emergency room before?

A.    No, sir.  I think there was a time she may have had Strep throat, or it may have been Kaden.  I can't remember.

Q.    All right.  Let's go back then to the day this happened.

So she's fussy and Kaden has -- has come home from school and you haven't put it together that -- that Everly might have swallowed the battery yet, you just know she's fussy and you think the battery is missing --

A.    Right.

Q.    -- is supposed to be there, so you asked him, does he know where it is and look for it --

A.    Right.

Q.    -- and maybe the dog ate it.

A.    Two separate problems.

Q.    Yeah.  So then what happened?

A.    My husband came home.  I was complaining that she was being -- that she was crying, which now I feel so guilty about, but --

So he said he was going to give her a bath, because that was foolproof, she always stops crying.

Q.    When you say it's "foolproof," that works --

A.    All -- every time.

Q.    -- to get her --

A.    Right.

Q.    -- to stop being fussy?

A.    Anything going on, that will -- that will stop the crying.

So when he took her in the bath and came out and he said, "That didn't work.  She's -- something is really wrong.  She's crying," it just instantly hit me that, "Oh, my gosh.  I've got to tell him, the battery."

And then I -- I searched it on my phone.

Q.    Searched what on your phone?

A.    Batteries.  I don't know.  I can't tell you exactly what I did, but I just looked up like the dangers of a battery in a child, what if a child swallowed it.

And that's when the -- the trouble began.  That's when we kind of realized it.  And he ran out the door with her.

And I just calmly told him, I said, "I

don't want you to get too scared, but I think I know what's going on."  And so he ran to the hospital.

Q.   Okay.  Then what happened?

A.   He took her to the hospital, and they were able to get it out within, you know, a few hours.  But it's not like it just went -- it didn't just go that smoothly, obviously.

Q.   How long was she in the hospital?

A.   Four or five days.  They -- they wanted to either keep her or they were going to send her home on a feeding tube.

And we -- so we -- we let her come home on the feeding tube, which was absurd, because she has to stay attached to a giant, you know, 6-foot pole. (Indicating.)  But we -- we had her at home on the feeding tube for a few weeks.

Q.   And the feeding tube went in through her nose?

A.   Correct.

Q.   Is that the way it worked?

A.   Yes, sir.

Q.   And you-all were, I understand, like giving her Similac, things like that?

A.   Yes, sir.

Q.   For how long?

A.   It was supposed to be a month, but they -- I

Morgan McMillan                                                                46

want to say it was maybe two to three weeks and they said that she was okay to come off the feeding tube.

Q.    "They" being the Texas Children's?

A.    Texas --

Q.    -- doctors?

A.    -- Children's, yes, sir.  Sorry.

Q.    And how did they know that?  Did you take her back in and they examined her and said, "We think she can come off"?

A.    Yes, sir.  We -- we took her back in and they did some X-rays and -- I can't remember if they did an interior scope at that time.  I believe they did.  Yes.  That's -- that was the first interior scope before.

Q.    What do you mean, "interior scope"?

A.    Where they actually went inside and saw like -- like a perforation.  And that's when we were told she can eat, but we're going to have to see over time how it -- how the perforation heals or if it turns to scar tissue.

Q.    Did the perforation heal?

A.    That's what we still don't know.  There's still something there that you can see.  We don't know if it's scar tissue yet.  They'll have to go back in again, which is where they have to give her anesthesia to find out for certain.

Q.    Did they tell you that they were pleased with the recovery that she was making?

A.    No.  But what they did say is they were happy that it got out in time because there's a lot of children who aren't so lucky.

But I don't think they've ever been really pleased with how things are healing right now because she does have some -- something going on.

Q.    When you say she has something going on, how often is it happening now, given that you know a little bit about what foods to avoid?  How often does she have a problem swallowing?  Is it every day, every meal, once a week?  Any idea?

A.    Once every couple of weeks, you know, she'll have something.  It's not always melon.  Again, that's just a guarantee.

You know, now it can be, you know, like a hot dog, for instance, and she just couldn't -- she just maybe -- we don't know.  Maybe she's eating it fast or something.  We -- we can't figure it out.

Q.    Okay.  So you could give her the same size piece of hot dog on one day and she might have a problem and then give the same size piece another day and she might not have a problem?

A.    Right.

Q.   Is she on any kind of medicines?

A.   She was taking -- it's like a Zantac or Pepcid. I don't -- something that was supposed to coat her stomach.  But they said they didn't want her on it long term.

Q.   So she's not on it now?

A.   She's not on it now.

Q.   When -- do you remember when was the last time she was on this medicine?

A.   Maybe two months ago.

Q.   So what is your understanding of this other test that needs to be done to see if there's any scar tissue and when it might be done?

A.   Honestly, we've heard some different things. They -- they said we were going to do that in like March, and then the swallow study came up first.  So I'm not certain.  I believe the issue -- they've asked us, too, do -- because it is invasive, do we want to wait, do we want to do it, you know, right away.

Q.   So it's really you-all's call on when you do it?

A.   Right.

Q.   So there's no urgency in doing it right away, is it?  I don't -- it doesn't sound like.

A.   The -- the pathologist, the one -- the doctor

that I spoke with a few weeks ago said the best bet is something that's done a little longer down the road where they do that scope where she actually can communicate where the issue is.

The problem is she -- even when they find it, they can't -- there's not a lot they can do until she can communicate with them that "this is where it's hurting, this is where I have difficulty," because -- I don't know, I'm not a doctor so I don't want to say it wrong, you know.

Q. Well, have they given you any indication on when that might be, other than when she can communicate better?

A. Oh, she did. She said, "I would wait until she was 7, 8, 9, 10 years old."

Q. Oh, okay.

A. So she was very specific, yes.

Q. Oh --

A. Like --

Q. -- okay.

A. -- much older.

Q. Good. Well, do you know of any reason why any appointments to see any of these doctors need to take place between now and the time Everly is 7 or 8?

A. There's still the scope, the other scope that

Dr. Chu would be doing.

The other one I was telling you about is through the speech pathologist.  That's where Everly has to talk.  So she has to be communicating with them while this is going on.  (Indicating.)

Q.  Okay.  I've got you.  But they're both scopes; right?

A.  Right.

Q.  All right.  Well, what other scope does Dr. Chu want to do and when does he want to do it?

A.  That's the one where it's more invasive because they're going to have to put her to sleep.

Q.  That's got a camera on it?

A.  Right.

Q.  And -- Okay.  When does he want to do that? Has he told you?

A.  No, no.  That would -- it would likely be this summer, because, again, I'd want to do it where I could be there, you know, when my son is not in school.

Q.  And the purpose of that is basically to see what's -- see what it looks like --

A.  Right.

Q.  -- I guess?

A.  Yeah.

Q.  See if it's -- how it's healing or if there's

something else that needs to be done?

A.   Right.

Q.   Beyond doing that scope, is there any anticipation of any other medical procedures, follow-ups, check-ups?

A.   There were several options, another being the psychological side of things, because she seems to have some -- she definitely has some -- some psychological issues.  And they said that's very common.  It just compounds the problem.

Q.   All right.  She -- you said she definitely has some psychological issues.  What do --

A.   Yes.

Q.   -- you mean?

A.   I mean, if you -- if you're dressed like a doctor --

Q.   Oh.

A.   -- she --

Q.   Yeah.

A.   -- says, "Help, help," and she'll run behind me.

Q.   You told me about that earlier.  I forgot.

A.   Yeah.

Q.   What else?

A.   Well, Dr. Chu said it best, that usually the

psychological goes along with this, so a lot of times children will psych themselves out as well as having that issue.

Q.    As well as having what issue?

A.    Having the issues in their esophagus, that some of it can also be mental or psychological.

Q.    Well, have you seen any evidence that she has any such thing, any psychological issue?

A.    I was fairly certain that some of it is, because she's -- it's not always the same thing.  She could eat oatmeal every morning for breakfast and then sometimes she would just -- she would vomit.  So it's perplexing and that's why I was -- that's why I asked.

And he said, "Oh, yeah, we were going to discuss that in the future."  He said that he's had children who had an issue with swallowing and it would follow them into, you know, their high school years where they would still get psyched up about that kind of stuff.  And so that's -- it's -- it's hard to hear that, you know.  (Indicating.)

Q.    All right.  But some kids don't?

A.    Some kids don't, right.

Q.    When he says "some get psyched up into high school," what did -- what did you understand him to mean?

A.   He -- I'm -- I'm not a doctor, but he could explain it better, that -- but it has to do with just a fear, when you're -- when you're swallowing something and you feel -- you know, you've gone through an emotional traumatic experience.  And so some of it could also be psychological, some of it could be actual choking, but it's --

Again, I'm not a doctor.  I just know that if you give her the same thing every morning but only, you know, one in 50 times that's the thing that she vomits, you know, I feel like maybe she does have some psychological issues, and especially the doctors, she gets so scared.

She had nightmares for a while.  She's only had like one nightmare in the last month, so they've -- they've cut down a lot.

Q.   I guess you can't tell what the nightmare is about.

A.   (Moving head from side to side.)

Q.   It's just, what, she wakes up afraid or something?

A.   Yeah.  She'll say, "No."  Yeah, she seems -- she's scared of something.

Q.   Now, she is 2-1/2 now?

A.   Yes.

Q.   How are her communication skills?  I mean, is she talking in complete sentences yet?

A.   Not really.  She has her own language that I understand, though.  But I think she's okay.  We haven't had her tested, but I feel like she's okay.

MR. HARRISON:  Let me take another look at these photos.  I might have a few questions.

MR. MEYERSON:  (Indicating.)  I put them in two stacks here.

MR. HARRISON:  Oh.

MR. MEYERSON:  I was going to ask her about some of those.

MR. HARRISON:  Oh, okay.

Q.   (By Mr. Harrison)  Well, let me just ask, I've got a handful of these photos that are -- I understand it's a -- what's it called?  What's this -- this --

A.   Oh, Groovebook.

Q.   -- program called?

A.   Groovebook, yes.

Q.   Okay.  And how does it work?  You take pictures on your -- on your phone and then it automatically goes to a -- what, a website or what?

A.   You have an account --  Yes.  I scrapbook a lot, so I just want pictures from my phone to come -- and they come in the mail, like in a little book.  And

Morgan McMillan                                                            55

if you don't upload enough pictures for my scrapbooking

it'll automatically take random pictures, like more

recent pictures, and just send them to you in the mail.

Q.    Do you get a book once a month?

A.    Yes, sir.

Q.    How many pictures in it?

A.    200.  Well, I have two of them, I get 200

pictures.

Q.    Oh, okay.  So you decide how many you order or

something?

A.    Right.

Q.    And they charge you based on that?

A.    Yeah.  It's $3 for 100 pictures.  I pay $6 a

month.

Q.    Okay.  So -- and it tells you the date and time

the picture was taken?

A.    Yes, sir.

Q.    And so all of these were taken with your phone?

A.    Yes, sir.

MR. HARRISON:  And I'm not sure how to

identify these.  I don't necessarily want to attach them

all.

MR. MEYERSON:  Well, we had your office

scan them.

MR. HARRISON:  Right.

MR. MEYERSON:  All of those that you've got.

MR. HARRISON:  Right.

MR. MEYERSON:  They emailed them to you, I assume.  They emailed it to me.

MR. HARRISON:  They did?

MR. MEYERSON:  Yeah.  So I could email it to the court reporter and she could attach that as an exhibit.

MR. HARRISON:  That's -- that would be great.  Let's do that.

MR. MEYERSON:  And then we can -- what I would suggest is then if you're referring to a specific one you can slap a number on the back of it --

MR. HARRISON:  Uh-huh.

MR. MEYERSON:  -- and then either you or I can hang onto it --

MR. HARRISON:  Yeah.

MR. MEYERSON:  -- or something of that nature.

MR. HARRISON:  Yeah.  I don't know that I even plan on --

MR. MEYERSON:  Or you can describe the -- referring to the photo, and then we'll be able to identify it at trial.

Q.    (By Mr. Harrison)   Let me just ask you this then.   It looks like these were all taken right around the time of the -- she swallowed the battery.   Is that right?

A.    Yes, sir.   Although I do want to add, if I've screenshotted it, take a screenshot at a later date, it will show that date.   So if right now that's in my phone and I want it to be more recent and I take a screenshot, it will be today's date.

So if any of them say like recent, they wouldn't -- they may not necessarily be recent pictures, if that makes sense.

Q.    Okay.   Well, all of these pictures have a date at the top.   And that date at the top doesn't necessarily tell you when the picture was taken; is that what you're saying?

A.    Not if it says like 2019.

Q.    Okay.   Well, every one I've seen so far says April of 2018.

A.    Okay.   That is correct.

Q.    So let me just ask you, is -- were all of these taken --

A.    Yes.

Q.    -- in April of 2018?

A.    Yes.   Yes, sir.

Morgan McMillan                                                    58

Q.    Okay.  All right.

MR. HARRISON:  Okay.  I think I kept those in the same stacks you put them in.  So, yeah, let's -- let's attach all of them collectively as Exhibit 1.

Do you want to do that?

MR. MEYERSON:  That's fine.  Let me -- I can just email right now to you.  Although it's a big one, it might take a second to go through.

MR. HARRISON:  Well, I want to take a break anyway, if you don't mind.  Why don't we take a break and see if you can email that to the court reporter and that collective batch of photos will be Exhibit 1.

MR. MEYERSON:  Okay.

MR. HARRISON:  Right.

MR. MEYERSON:  What is your email?

THE VIDEOGRAPHER:  Off the record at 1:41 p.m.

(Recess from 1:41 until 1:49.)

(Exhibit Number 1 was marked.)

THE VIDEOGRAPHER:  We are back on the record on Disc 2 at 1:49 p.m.

Q.    (By Mr. Harrison)  Have you continued to buy things from the Amazon site since this happened?

A.    There are some things, yes, yeah.

Morgan McMillan                                                    59

Q.   Okay.  So you're still -- you're still buying things through the Amazon site, different types of things?

A.   Yes.  We're -- we're just more cautious now.

Q.   In what way?  What do you mean?

A.   We won't buy certain things like vitamins.  You know, we just don't know what's legitimate now to -- to purchase.  You know, we don't trust them.

Q.   Well, what sorts of things do you buy through the Amazon website?

A.   I don't -- I was going to say makeup, but then I stopped buying makeup from there so --

Q.   Any particular reason?

A.   I got lipstick that wasn't -- it wasn't the lipstick that I had been wearing for many years, so it was very strange.

Q.   All right.  What sorts of things do you purchase?

A.   I don't know.  A book, I got -- I recently bought a book for my son because we needed it within a couple of days and I -- again, I -- we only have one car right now.  I --

Q.   Yeah.  Why do you-all have one car?  I'm just curious.

A.   My car flooded in Harvey and they gave it back

Morgan McMillan                                                    60

to me and just dried it out because they didn't want to have to pay for it, it's an expensive car.  And so they just thought, "Well, here, we'll just clean it."  You know, that's what they said, they cleaned it.

Q.    "They" being who, the insurance company?

A.    Geico.  Yeah.  Yeah.  It wreaked of mold so much that our next-door neighbor, when we rolled the windows down, was like, "I can smell it.  That's -- that's awful."

But they -- we -- they sent it back like four times to clean it and so we finally just got rid of it and now we're -- we're just -- we're getting by on one car fairly easily because Carey only works a few miles away, so we'll buy another one eventually.

Q.    It sounds like you're able to make do with just one.

A.    Yeah.  It's been really --

Q.    I can't imagine -- with the four teenagers, and my wife is a Realtor, I can't imagine having less than six cars.

A.    Yes.  Yeah.  Well, once I get back to working more, we'll -- No, it's true, it's true.  We -- Yeah.

Q.    We don't have six cars.  We've got four cars. The two younger ones are 14 and 15, so they're not driving yet.

                    All right.  Thank you.  I think that's all
I've got for the moment.

          A.    Okay.

          Q.    Thank you very much.

                    MR. HARRISON:  Pass the witness.

                    THE WITNESS:  Thank you.

                    EXAMINATION

BY MR. MEYERSON:

          Q.    Mrs. McMillan, you mentioned Hurricane Harvey.
Did Hurricane Harvey affect or delay your use of the
remote control at issue in this case?

          A.    It did, yes.

          Q.    How was that?

          A.    We just took everything upstairs that -- and
saved all -- that was one of the things that we hadn't
used yet, so we just took it upstairs and we
didn't totally -- or didn't use it.

          Q.    And when your husband took Everly to the
hospital, was there a power outage in the area at that
time?

          A.    Yes.

          Q.    Did the power outage affect your house?

          A.    Yes.

          Q.    Okay.  And did the power outage -- when your
husband went to the first hospital, was that hospital

affected by the power outage?

A.    Yes.    They weren't able to see him.

Q.    Which hospital was that?

A.    Memorial Hermann in The Woodlands, the emergency center.

Q.    And then where was the next place that your husband took Everly?

A.    They told him to go to --

Q.    Was it Texas Children's Urgent Care?

A.    Yes, in Panther Creek.

Q.    And do you know what they said about what should be done with Everly?

A.    They said that it was too great an injury, they wouldn't be able to see her.    It would likely be faster for him to drive to Texas Children's, the main center, than to get an ambulance to come.

Q.    And that's where she finally received treatment?

A.    Right, right.

Q.    We've got some photos here.    I'm going to -- I know that all of these are part of Exhibit 1, but I'm just going to go ahead and sticker them.

MR. MEYERSON:    And with counsel's permission I'll just hang onto these photos and describe them during the deposition.    I need 1 through 11.

MR. HARRISON:  Don't use exhibit sticker Number 1.

MR. MEYERSON:  I'm sorry.  Yes.

(Exhibit Number 2 was marked.)

Q.  (By Mr. Meyerson)  What I'll do is go ahead and show you what I've marked as Gartner 2.  And what are we -- what is this here?  Do you recognize that?

A.  Yes.

Q.  What is -- what are we looking at?

A.  That was when they found the button battery in her esophagus.

Q.  Is this a photo that you took?  Is this a photo you took of the X-ray image?

A.  Yes.  Yes, it is.

(Exhibit Number 3 was marked.)

Q.  (By Mr. Meyerson)  Okay.  And then is that the same with Gartner 3?

A.  Yes, sir.  Yes, sir.  It's a picture of the X-ray.

Q.  Is this something you saw at the hospital?

A.  Yes.  Yes, sir.

(Exhibit Number 4 was marked.)

Q.  (By Mr. Meyerson)  I'm showing you what I've marked as Gartner 4.  When is this?

A.  That is the -- the remote.

Q.   And that little black thing, what is that?

A.   The -- the cover that was off of it.

Q.   And I notice that's in a Ziploc bag.  Is that correct?

A.   Yes.  I did it that night, actually.

Q.   That was going to be my next question.  Who put it in the Ziploc bag?

A.   I did, yeah.

Q.   Okay.  And when was it put in the Ziploc bag?

A.   That night, in case the doctors needed it.

            (Exhibit Number 5 was marked.)

Q.   (By Mr. Meyerson)  I'm showing you what I've marked as Gartner 5.  What is that image?  Do you recognize that?

A.   That is what her esophagus looked like.

Q.   How did you get that image?

A.   I believe that was before we were leaving.

Q.   Did you take that image at the hospital?

A.   Yes, sir.

            (Exhibit Number 6 was marked.)

Q.   (By Mr. Meyerson)  I'm showing you Gartner 6. What is Gartner 6?

A.   That was -- that was the next day when they were doing the first meeting with us to go over the extent of the injuries.  It shows her -- the eroding of

her esophagus lining and -- (Indicating.)

Q.   This is a photo you took at the hospital?

A.   Yes, sir.

Q.   And what is your understanding of what these images are of?

A.   They were showing us how badly damaged it is. That's why it looks charred.

Q.   Did the doctors tell you how it's supposed to look?

A.   Yes.  It should be pink.

Q.   And this is an image of her throat -- her esophagus?  I'm sorry.

A.   Her esophagus, yes.

(Exhibit Number 7 was marked.)

Q.   (By Mr. Meyerson)  I'll show you Gartner Number 7.  And is this a photo that you took?

A.   Yes.  This is in the hospital.  She was in -- she was in hell the whole time.

Q.   And when you say that, what do you mean?

A.   It was her hell.  She couldn't move.  She was hooked up to all these machines.  And she had just started walking and running, and she -- she doesn't understand.

And they wouldn't let her eat.

Q.   You mean --

A.   They said that she could go three days without eating.

Q.   When you say she just started walking and running, you're talking about before this incident?

01:58   A.   Right.

Q.   Could you tell she was suffering at this time?

A.   Of course.  She wanted food and she could smell food and -- and they wouldn't let her eat.

(Exhibit Number 8 was marked.)

01:58   Q.   (By Mr. Meyerson)  I'm going to show you Gartner 8.  What do we see there?

Do you want to take a break?  I just have a couple more questions.

A.   No.  I'm okay.

01:58   This was -- I tried to get another picture, but she was crying the whole time.  She was very hungry.

Q.   Are you talking about Gartner Number 8?  Is this --

01:58   A.   Gartner 8, yes.

Q.   That's an image of Everly in the hospital?

A.   It's 7:35 the next day.  She still wasn't able to eat anything.

(Exhibit Number 9 was marked.)

01:58   Q.   (By Mr. Meyerson)  And the image marked as

Gartner Number 9, what is this an image of?  Is that Everly?

A.   That was her at the doctor.  Right as we were leaving we had to go see the doctor.

Q.   The side of her face that's brown, what is that?

A.   That's the tape that she was complaining about, but it held the -- her feeding tube so she couldn't pull it out.  And she was pressed up against the glass and she was hitting her head on it.  I think she was just really frustrated.  (Indicating.)

        (Exhibit Number 10 was marked.)

Q.   (By Mr. Meyerson)  And, last, I want to show you Gartner 10.  This is you and Everly, I believe.

A.   Yes.

Q.   Do you know where that is?

A.   That was her follow-up appointment.  We were in the -- in the room about to see the doctor and hopefully -- we were hoping that they were going to remove her feeding tube, but they didn't.

Q.   And the feeding tube is the tube that's going through her nostril?

A.   Right.

Q.   Thank you.

        MR. MEYERSON:  I'll pass the witness.

MR. HARRISON:  Nothing further.

THE VIDEOGRAPHER:  Off the record at 2:00 p.m.

(Deposition concluded at 2:00 p.m.)