IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MORGAN GARTNER, INDIVIDUALLY AND AS NEXT FRIEND OF E.G., A MINOR CHILD, | ) ) ) ) |
|     Plaintiff, | ) Civil Action No. ) 4:18-CV-02242 |
| VS. | ) ) |
| AMAZON.COM, INC., AND HU XI JIE, | ) ) |
|         Defendants. | ) |

---------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

JAHAN RASTY

NOVEMBER 11, 2019

---------------------------------------

    ORAL AND VIDEOTAPED DEPOSITION OF JAHAN RASTY, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on November 11, 2019, from 1:54 p.m. to 3:23 p.m., before Lindy Layman, CSR in and for the State of Texas, reported by machine shorthand, at the offices of MCM Elegante Hotel, 801 Avenue Q, Lubbock, Texas, pursuant to the Federal Rules of Civil Procedure.

DEFENDANT'S EXHIBIT
C

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    Mr. Jeff Meyerson
    The Meyerson Law Firm, PC
    2224 Walsh Tarlton Lane
    Suite 120
    Austin, Texas  78746
    (512) 330-9001
    JeffM@meyersonfirm.com

FOR THE DEFENDANTS:

    Mr. Clifford Harrison (Via Telephone)
    Munsch Hardt Kopf & Harr, PC
    700 Milam
    Suite 2700
    Houston, Texas  77002
    (713) 222-1470
    (713) 222-1475 Fax
    Charrison@munsch.com

ALSO PRESENT:

    Mr. Craig Stone, Videographer

INDEX

                                                              PAGE

Appearances....................................    2

JAHAN RASTY
        Examination by Mr. Harrison..............    4
        Examination by Mr. Meyerson..............   55

Signature and Changes..........................   63

Reporter's Certificate.........................   65


                          EXHIBITS

NO.   DESCRIPTION                                 PAGE

1     Thumb Drive..............................    9

P R O C E E D I N G S

THE VIDEOGRAPHER:  We're now on the record. Today's date is November 11th, 2019.  The time is 1:54 p.m.  This is the videotaped deposition of Jahan Rasty in the style Morgan Gartner, Individually and As Next Friend of E.G., A Minor Child versus Amazon.com, Inc., and Hu Xi Jie, Cause No. 4:18-CV-02242.  If counsel will introduce theirself for the record.

MR. MEYERSON:  Jeff Meyerson for the Gartner family.

MR. HARRISON:  And this is Cliff Harrison for Amazon.

THE VIDEOGRAPHER:  Our court reporter will now swear in the witness.

JAHAN RASTY, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HARRISON:

Q.  Tell us your name, please.

A.  Jahan Rasty.

Q.  And you have been retained as a consultant by the Gartner family to assist them in this litigation; is that right?

A.  Well, I wouldn't say the Gartner family themselves, but the counsel for the Gartners.

Q. I got ya. And you did a report dated April 11th, 2019; is that right?

A. That's correct.

Q. Is that your final report in this case?

A. I believe I have two reports in this case.

THE WITNESS: Can you pass me that?

THE REPORTER: Uh-huh.

A. Let me just look at --

MR. MEYERSON: He's asking if that's your final report.

A. Yeah. My final report -- sorry -- is dated May 20th, 2019.

Q. (BY MR. HARRISON) Okay. Well, the only thing I've -- the only one I've seen is April 11th, 2019. What's in the May report that's different?

A. Okay. The May report, basically we got some more exemplars from Amazon, and we confirmed that they don't conform to the UL standards.

MR. MEYERSON: Oh, this is -- Cliff, this is his report on your expert. So it's -- it's four pages. I think it's his response to your expert's testing devices.

MR. HARRISON: Okay. So there's a May report that's in response to Sala's (phonetic) report?

MR. MEYERSON: Yeah. The real report is

the one you've got.

MR. HARRISON: Okay.

MR. MEYERSON: This one, I can shoot it over to you quick, though. It's just -- it mentions the -- the ones -- I know y'all had the various MM numbers and MC numbers on the remotes.

MR. HARRISON: Okay. All right. Do you have the ability to e-mail it to me? I don't need it right now, but if you can e-mail it, I can print it out during a short break and take a look at it. And I may not have any questions about it, but I might.

MR. MEYERSON: Sure.

MR. HARRISON: Yeah. If you don't mind just e-mailing that, that would be great.

Q. (BY MR. HARRISON) All right. Dr. Rasty, your -- your report of April 11th -- and the second one is dated what?

A. May 20th.

Q. All right. And the May 20th report is some additional testing of some other exemplar remotes; is that right?

A. Yes. We got some additional exemplar remotes from Amazon that we purchased, and we just did some testing on them to see how easily the battery compartment lid comes off.

Q.   How many additional exemplar report -- or additional exemplars did you test?

A.   I believe we tested about half a dozen.

Q.   All right.  And when you say "exemplars," were these made by the same manufacturer as in this case?

A.   I don't know the exact manufacturer.  I mean, I have -- I have them here with me, so I can look to see who the manufacturers are.  I don't remember the exact manufacturer.

Q.   Do you have any evidence that any of the exemplars, whether it was the one you tested for the April 11th report or the six others that you tested for the May 20th report, if any of those exemplars were made by the same manufacturer as the subject remote in this case?

A.   I have the M numbers, but at this time I don't remember the manufacturers.

Q.   All right.  Is it fair to say, then, that you do not have any evidence that any of the seven exemplars you tested were actually made by the same manufacturer as the subject remote in this case?

A.   No, I wouldn't say that that's accurate.  I just don't remember --

Q.   Okay.

A.   -- as I'm sitting here whether they are or not,

so I can't answer the question one way or the other.

Q.   Then tell me what evidence you have sitting here today that any of these seven exemplars were made by the same manufacturer of the -- as the subject remote.

A.   Well, I mean, that was not the scope of my work.  My -- the scope of my work was to -- to purchase these exemplars and test them, but, you know, I wasn't here to prove they were the same manufacturer or they weren't the same manufacturer.  I was given some M numbers or some references to purchase some remotes, and we purchased them and we tested them, but I wasn't looking to see if it's the same manufacturer; it's not the same manufacturer.

Q.   Okay.

A.   It's just whatever was available on Amazon that resembled the -- you know, the remote in question.

Q.   What's an M number?

A.   These are just like -- I guess they're designations.  They come in with a series of numbers that start with M.

Q.   All right.  But back to my question, you don't know if any of these M numbers of exemplars that you tested were made by the same manufacturer or not, do you?

A.   I don't have any information at this point one way or the other.

Q.   Now, you -- before we went on the record, you mentioned that you have a flash drive and on the flash drive -- well, let's do it this way:  Just tell me briefly what's on this flash drive that you have.

A.   It's just pictures of the different remotes that we looked at and some of the testing methodology that we performed, and I think there's one or two videos of the actual testing that was performed.

Q.   All right.  I -- I'm going to ask, then, that this flash drive be marked as Rasty Exhibit No.1 and that you give the flash drive to the court reporter and that the court reporter download and make copies of all the photos, videos and other materials on the flash drive.  And those will all be collectively Exhibit No. 1.  Is that okay?

A.   Absolutely.

Q.   All right.  Excellent.

(Deposition Exhibit 1 marked.)

MR. MEYERSON:  Now, Cliff, I just e-mailed you that second report.

MR. HARRISON:  Okay.  Great.  I'll take a look at it -- let me get some other stuff done, and then I might take a break and take a look at it.  Thank you.

Q. (BY MR. HARRISON) As I understand your criticism in this case of the remote, Dr. Rasty, it's that the remote violated UL 4200A; is that right?

A. Yeah. It didn't comply with the requirements of 4200A.

Q. And that's because that the exemplar that you tested that's referenced in your April 11th report can be removed with, you say, one movement; is that correct?

A. That's correct.

Q. And because you say it can be removed -- the cover can be removed with one movement, it's your contention that that violates 4200; is that correct?

A. Yeah. It's one movement, number one; and number two, it's a very slight movement, if that. So it's both that it's one movement, and the slightness of that movement is also what I'm critical of.

Q. Well, 4200 doesn't say anything about slightness of the movement, does it?

A. It doesn't. But what I'm saying is that if it was just one movement but required, like, such a force that would not have been reasonably expected for a child to be able to exert, then one would -- one could argue that, okay, maybe the one movement may have been sufficient. But not only was it a one-movement action, but the one movement was within -- like within a half a

pound.  So it was both the one movement and also the slightness of that movement.

Q.  I appreciate that, but the fact is that 4200 doesn't list as any kind of requirement any slightness or resistance as a criteria, does it?

A.  No, it doesn't.  You're absolutely right.  But I'm just -- I'm just noting that it's not only a single movement; it's not a double movement.  That single movement also is almost like -- I wouldn't even call that a full movement, if you will.  So it's like a fraction of a single movement.

Q.  Would you also agree with me that 4200 is not a mandatory standard?

A.  What do you mean by "mandatory standards"?

Q.  It is not required by any regulatory agency or law in this country that a manufacturer follow 4200, is it?

A.  Well, no, it's not a -- it's not a, like, building code or something that's mandatory.  A lot of the standards are actually minimum safety rules and practices.  So it's not -- it's not like you have to do it or else.  You're absolutely right.  It's a minimum safety standards.

Q.  And there is no established engineering standard that says a failure of a manufacturer to comply

with such a voluntary standard thereby makes a product defective, is there?

    A.  Well, I would disagree with that.

    Q.  Okay.  Then identify it for me.

    A.  Identify what?

    Q.  The standard that you say exists.

    A.  Just general engineering practice that the reason that we have standards is because they are the minimum safety procedures, good practices, that one needs to abide by.  And as engineers, I teach all my engineers that they need to adhere to safety standards in order -- I mean, they're there for a reason.  They're not there because somebody just felt like filling up some paper and just put it out there for someone's health, right?

    Q.  But --

    A.  So while -- while there is no code that says, "You have to do this or you'll go to jail," they're there for the purpose of maintaining minimum standards, and it's not good engineering practice to disregard safety standards just because they're not mandatory.

    Q.  All right.  Back to my question, though.  There is no engineering requirement that says a failure to comply with a voluntary standard makes a product defective, is there?  And if you say there is, please

LEXITAS

point me to it.

MR. MEYERSON:  Objection.  That's an ambiguous question.

Q.  (BY MR. HARRISON)  Go ahead.

A.  No, I can't answer your question.  The only way I can answer your question is based on sound engineering practices that when you -- I mean, you can look up any design -- engineering design book, and they tell you that in order to have sound engineering design, you have to design it according to applicable standards and good practices and things that are out there.  You can't just disregard them.

Q.  (BY MR. HARRISON)  All right.  Now, this standard, this 4200, though, is voluntary, isn't it?

A.  Well, a lot of standards are voluntary.

Q.  I asked about this one.  This standard is voluntary, isn't it?

A.  What do you mean by "voluntary"?

Q.  Do you not know what I mean by "voluntary"?

A.  No, no, because --

MR. MEYERSON:  Cliff, are you saying is it illegal to make a product --

Q.  (BY MR. HARRISON)  Do you under- --

MR. MEYERSON:  -- without complying with that standard?

Jahan Rasty                                               Pages 14

Q.   (BY MR. HARRISON)   Tell me what problem you have with the word "voluntary," Dr. Rasty.

A.   I mean, voluntary -- I don't think it's voluntary for you to design something with disregard to applicable standards.

Q.   But it's not applicable if it's voluntary, is it?

A.   I don't understand your question.

Q.   All right.  So will you at least agree with me that there is no legal requirement that 4200 be complied with in the United States, is there?

A.   The legal requirement, so long as nothing goes wrong and nothing fails, obviously nobody says that, "Okay.  Because you didn't follow a standard, there is some precautions."  But if you design something that was out of specs and out of standards, even though those standards are voluntary, if something happens, then -- then there's implications, of course.

Q.   You just used the word "spec" and "standard" in the same sentence.  Spec is -- a spec is different from a standard, isn't it?

A.   Well, they're the specs that are specified in the standards.  I mean, the procedures, the good practices.  I mean, these standards are not there, again, for just somebody trying to fill up a standard

book.  They're there because as engineers that are involved in the industry over the years and experienced, a group of people sit there and have identified certain hazards, certain minimum good engineering practices, that need to be adhered to in order to have a safe -- in order to have a safe product.  And if you don't do that -- I mean, you might get away with it.  But if you don't, then you haven't taken advantage of all years of experience and -- and knowledge that has gone into developing these standards, and that would not be good practice.  And in my opinion, that -- that is how defects happen, because people try to design things without adhering to these standards because they are, like you're saying, voluntary.

MR. HARRISON:  Objection, nonresponsive.

Q.  (BY MR. HARRISON)  You know, I've allowed about two hours for this deposition.  I don't have six or seven hours to listen to this.  Now, if you will answer my question, we might get out of here in two hours.

A.  I have all day.  I like --

Q.  Well, I have about two hours, and I'm not going to listen to this all day when it's nonresponsive.

Now, my question is --

MR. MEYERSON:  Why don't we do this --

Q.  (BY MR. HARRISON)  Let me ask a question now.

Are there specs that are required to be followed by law in designing products?

A.   There are certain codes that, yeah, that you are -- I mean, building code, for example, you are supposed to as a --

Q.   I'll take that as a yes.  Okay?

A.   Okay.

Q.   It's a yes or no.

A.   Okay.

Q.   You said "yes," so stop.

A.   All right.

Q.   Next question:  4200 isn't one of them, is it?  It's a yes or a no.

Hello?

A.   Is it -- does it -- does it market on there that it's mandatory?  The answer is "no."

Q.   All right.  Thank you.

A.   But as far as engineering design --

Q.   Everything else that you're going to say for the next half hour is going to be nonresponsive.

A.   Okay.  Nonresponsive.  In my opinion, you have to adhere to --

Q.   Okay.  Next question:  Is it your contention that 4200 requires two movements to remove the back of a cover of a remote like this?

A.  Yes.

Q.  That's pretty good, so I know you can do it.

A.  When you ask the right question, I'll answer the right question.

MR. MEYERSON:  Counsel, I know you're being tongue-in-cheek, Cliff, but I object to your tongue-in-cheekness.

MR. HARRISON:  All right.  Sustained.

A.  You ask me the right question, and I'll give you the right answer.

Q.  (BY MR. HARRISON)  Okay.  Thank you.

So the two movements, if we could -- can we describe them in lay terms as a force downward and then out away from you?  That would be the two movements we're talking about?

A.  That would qualify.

Q.  Okay.  And if two movements are required on the subject remote, then that subject remote is in compliance with even 4200, isn't it?

A.  Could you repeat that, please?

Q.  Yeah.  If two movements were necessary to remove the cover from the subject remote, then the subject remote is in compliance with 4200, isn't it?

A.  The two independent movements.  If there are two independent movements, then yes.

Q.  Down and out are two independent movements, aren't they?

A.  Correct.

Q.  All right.  And if it's in compliance with 4200, you would agree that it's not defective, wouldn't you?

A.  Well, again, it depends on the situation, whether how much -- I mean, when you say "down," how much down?  If it's just like putting the weight of your finger on it, well, that's not enough down force.

Q.  4200 doesn't speak to how much down is required, does it?

A.  Well, actually, it does.  You have to make sure, you know, that when you say "down," it's enough down to where it doesn't open up on its own.  You know, it's significant enough that that could be considered a downward force.

Q.  There's nothing in 4200 that sets out any kind of test criteria to see how much down is required and how much out is required, is there?

A.  It doesn't specify quantitatively, but qualitatively it does specifically say that the two independent actions need to be followed.

Q.  Now, with respect to your testing, at no time did you ever test the actual subject remote, did you?

A.   No, I don't believe I did.  It was an exemplar of the remote that was given to me.

Q.   Given to you by the lawyers?

A.   Correct.

Q.   Lawyers for the Gartner family?

A.   Correct.

Q.   And -- but you can't say sitting here today that those exemplars were even made by this same manufacturer that made the subject remote, can you?

A.   Well, they -- they appeared to be very similar.

Q.   They look similar to the remote, I guess.  That's your testimony?

A.   That's correct.  I don't have any reason to believe, based on the way they appeared, that they were different.

Q.   Well, you don't have any reason to believe that they were made by the same manufacturer either, do you?

A.   Well, I don't -- I don't have any reason to believe that they're not because they look identical.

Q.   Have you done anything to confirm whether they were -- any of the exemplars were or were not made by the same manufacturer --

A.   No.

Q.   -- as the subject remote?

A.   Just other than visual inspection and looking

to see if they appear to be similar, I haven't done anything else.

Q. Is there any particular reason why you chose to not test the actual subject remote in this case?

A. The actual subject remote?

MR. MEYERSON: Are you confused here, Doctor? Because we gave you the subject remote.

THE WITNESS: Yeah. They just -- the subject remote is the subject exemplar.

MR. MEYERSON: No. The subject remote, the actual remote that was in the Gartner home.

THE WITNESS: Okay. Maybe I did test that, then. Yeah, I am confused. Sorry.

Q. (BY MR. HARRISON) Well, then I'm confused because your report says you only tested the exemplar; you didn't test the subject remote. Is that true or not?

A. Hold on one second. Sorry. I've got to refer back to my report. I think -- okay. We were given the subject and a subject exemplar that looked identical to the subject, but the testing, because we didn't want to, like, alter anything about it, was conducted on the exemplar.

Q. Okay. So you did not test the subject remote because you were afraid you might alter something on it?

A.   That's correct.  But as far as operation of it, it looked like -- I mean, I tested it myself.  I examined it, and it looked like it -- or it felt like it would open up with the same degree of ease as the exemplar, so we decided to do the testing on the exemplar.

Q.   Okay.  So you're saying that it felt like it opened up about the same way that the exemplar opened up?

A.   That's correct.  I mean, they both were kind of requiring just one single action along the length of the remote to open up and -- but because the testing requires the application of the force and attaching things to the exemplar, we didn't -- to the remote, we didn't want to do that to the subject, so we performed all the testing on the exemplar.

Q.   Well, there's nothing that's accepted about the methodology of picking up a remote and holding it in your hand and saying, "Hey, it feels like the other one" --

MR. MEYERSON:  Objection --

Q.   (BY MR. HARRISON)   -- is there?

MR. MEYERSON:  Objection.  That calls for a legal conclusion.

Q.   (BY MR. HARRISON)  Well, how -- tell me where I

can go read in any kind of engineering literature that it's accepted methodology to pick up something and say, "This feels like the other one."  I mean, how can I -- you can't measure that.  Would you agree?

A.  Not quantitatively, but very qualitatively, I can -- I can touch it and it was coming -- you know, coming undone.  So for me, it felt exactly the same.  But to then measure it quantitatively, then we tested the exemplar.  But they both felt the same.

Q.  All right.  But saying that they both feel the same is not anything that anybody can measure or reproduce, is it?

A.  No.  I think -- I think you can reproduce that. You can give it to a -- to an average person that would be -- they would be able to tell you that they open up with the same degree of ease.

Q.  If it can be done to an average person, then we don't need you, do we?

A.  Yeah, you --

MR. MEYERSON:  Objection, calls for -- whoa -- calls for a legal conclusion.

Q.  (BY MR. HARRISON)  In other words, if a layperson can do it, there's no reason for any kind of expertise to assist the jury, is there?

MR. MEYERSON:  Objection -- whoa.

THE WITNESS:  I'm sorry.

MR. MEYERSON:  If I open my mouth, please --

THE WITNESS:  Okay.  Go on.  Sorry.

MR. MEYERSON:  It calls for a legal conclusion, Mr. Harrison.

MR. HARRISON:  All right.  That one's overruled.

Go ahead.

MR. MEYERSON:  No.

MR. HARRISON:  Are you telling him not to answer?

MR. MEYERSON:  No.  I'm telling you if you were the judge, then you made a bad call.  So please don't overrule and sustain my objections on the record.

Q.  (BY MR. HARRISON)  Okay.  Go ahead and answer it if you can, Doctor.

A.  Okay.  No, I would disagree with you on that.

Q.  Well, then how can I measure quantitatively when someone says, "I pick it up and it feels the same"?

A.  Well, then you -- like I said, we did test it quantitatively, and it required about half a pound.  So it's a very slight touch to -- for the lid to come off.

Q.  But you didn't test the subject quantitatively. You tested another remote.

A.   That is the standard practice that we don't put any force or anything on the actual subject.  That's the standard forensic engineering practice in the absence of both parties being there, and that's why we only tested the exemplar, which is the same -- to me, it felt and looks the same as the actual subject.

Q.   All right.  But how do you measure things like rate of error when you're dealing with a statement that "It felt the same to me"?  How do I -- how do I measure that?

A.   I guess if you have experience as much as I do, then you would be able to tell.

Q.   Okay.  So --

A.   I'm relying on my experience to be able to tell that.

Q.   Okay.  Have you ever heard the word "ipse dixit," a Latin term that means it is what I say it is because I say it is?

A.   No, I'm not saying ipse dixit.  I'm saying based on my experience that the two remotes were identical, and we measured the amount of force that it takes to take the lid off from the compartment on the exemplar.

Q.   All right.  How about the test that you used on this exemplar?  Is there any place in any engineering

methodology that I can go read up on that says this is an accepted way to measure the force required to take this cover off this exemplar?

A. I don't understand your question.

Q. Well, as I understand the -- let's back up, then, and talk about the test. As I understand, you took a remote that looked like the subject remote and felt like the subject remote, and you put a piece of duct tape on the cover of the subject remote. Am I -- are you with me so far? Is that correct so far?

A. Correct.

Q. And then you hung it up, and then you pulled down on it to see how much force it would take to pull the cover off this exemplar remote; is that right?

A. Correct.

Q. Now, in doing that -- first of all, where can I go read anywhere in the engineering literature that that's an acceptable way to do that type of test?

A. What type of test? Putting a load cell on something?

Q. Yeah.

A. Any engineering discipline. It's not -- I mean, you're not going to find any passage or any paragraph or any chapter that has anything to do with the way of exerting force on a remote control battery

compartment lid.  But that's a very, I mean, acceptable way of -- you've got to apply the force.

Q.  All right.

A.  Now, the method of applying the force or the means by which you do that is not specified anywhere, and this was the best way that we could actually connect to both the load cell and connect to the lid without further experience and without any further disturbance, and there is nothing wrong with that.

Q.  All right.  Well, let me -- let me ask it this way:  With respect to doing the specific kind of test you did, there is no methodology that's set out anywhere in UL 4200 that states that this kind of test is the way to test this type of product, is it?

A.  What kind of test?  We're applying a load. We're not --

Q.  The kind you did.

A.  Yeah.  We're applying a load.  You're measuring the amount of load that it takes or amount of force that it takes parallel to the direction of the remote in order to slide the battery compartment lid off of it. That's -- you don't need procedures for that.

Q.  Well, but the answer to the question, though, then, is there are no procedures set forth in UL 4200 that outline how to test this product, is there?

LEXITAS

A.   I can't refer you to any specific passage.

Q.   This type of test you did, when you pull the remote down with -- it had duct tape on the back of it, and you pulled it down and measured the force, isn't it possible to pull it down and put two directions of force on that cover of the battery compartment?

A.   Two directions of force?

Q.   Yeah.

A.   What do you mean by "two directions of force"?

Q.   Well, if I'm pulling down and the duct tape is on the back side, the opposite side from me, and if I push the end of the remote out so that that cover is rotating downward, and I pull on it, then there's force being put in two directions on that cover, isn't it?

A.   No.  You're pulling straight downward in the vertical direction.  You're not pulling at any other direction.

Q.   I didn't ask what you did yet.  I'm asking if you tilted it, then you could put two directions of force on that cover, couldn't you?

A.   No, I disagree, because it's not fixed against anything.  If you rotated it, the whole thing has a swivel on top, so it would just rotate with you.  It's not rigid.

Q.   All right.  Are you telling me that if I pull

down on that and I also push the end of the remote -- the top end of the remote away from me, that that wouldn't be putting two directions of force on that cover?

A.   That's correct.

Q.   It wouldn't be?

A.   It wouldn't.

Q.   All right.  Did you do that?  Did you tilt it away from yourself?

A.   No, because that was not the purpose.  The purpose was just to pull straight down.  And if you look at Figure 2 on top of Page 11, that -- the eye bolts that are in there, they have multiple degrees of freedom.  So even if you did that, you would not be applying additional forces there because the whole thing would just rotate with you.  It's not a rigid connection, in other words.

Q.   But wouldn't you be applying a different direction of force if you tilted the top end of the remote away from you?

A.   No, sir.

Q.   Did you video any of these tests?

A.   Yes, I believe we did.

Q.   Are they on the flash drive?

A.   Yes.

Q.   Did you video all of these tests?

A.   Yes.

Q.   Now, I understand that the results of this test is that this cover came off, in your words, fairly easily.

A.   Yeah.  By less than a pound, about half a pound.

Q.   All right.  But you -- again, you didn't test the actual subject remote?

A.   No.

Q.   Did you read any of the testimony in this case, deposition testimony?

A.   I believe -- again, I've got to go back to -- it's been a while in this case.

Q.   Specifically, did you read Mr. Gartner's deposition testimony?

A.   I don't recall.

Q.   Okay.  So do you recall one way or another him testifying that they had owned and used this remote for approximately 13 months and to his knowledge the cover had never come off?

A.   I don't recall.

Q.   All right.  Would that be -- if someone uses it for 13 months and it never comes off, is that inconsistent with your test that you did on these other

remotes where the cover came off very easily?

A. No. It all depends on how it was handled, you know.

Q. Well, let's go -- let's talk about that, then, for a minute. You don't know how the cover came off in this case, do you?

A. I haven't seen a video of it, or was there?

Q. Well, you don't know how it came off, do you?

A. I know it came off, but how it came off -- what do you mean by "how it came off"? It slid off.

Q. How do you -- you don't know that it slid off. You don't know that it wasn't taken off somehow, do you?

A. It came off. It came off. I don't know the mechanism that caused it to come off.

Q. You don't know who took it off, do you?

A. I do not.

Q. You don't know if it was the child -- the younger child who ultimately swallowed the battery. You don't know if she took it off one way or another, do you?

A. I do not.

Q. You don't know if the 8- or 9-year-old child who was in the house that sometimes used the remote took it off, do you?

A. No, sir.

Q.    You don't know if he purposefully took it off for some reason or not, do you?

A.    I do not.

Q.    Or what forces anyone who took it off might have applied to that remote to get the cover off, do you?

A.    It wouldn't have been much, but I don't have a number.

Q.    When you say "it wouldn't have been much," that's not really consistent with them using it for 13 months and it never coming off before, is it?

MR. MEYERSON:  Objection.  That is an ambiguous question.  It doesn't make sense.

A.    It really depends on the direction of the force because, you know, you can handle something and then -- if you don't apply the force in the horizontal direction, then it doesn't come off as it's sitting somewhere.  It just needs the force in the right direction.

Q.    (BY MR. HARRISON)  Your qualifications are as a -- let's see -- metallurgist and failure analysis; is that right?

A.    Machine design also.

Q.    What types of machines?

A.    Just design in general.  When we say -- when we

use the term "machine design," it's not necessarily --
refers to any machines, but that's just a term in
mechanical engineering.  Machine design means any
aspects of design.

Q.  Well, what types of machines have you designed?

A.  I've been involved in lots of different types
of not necessarily machines but components in general.
That's what we call in engineering machine design.  It's
really component design.

Q.  Well, what types of components have you
designed?

A.  All sorts of different components, anywhere
from axles, from manufacturing equipment, to bearings,
to gears, to legs for tables, to tree stands, to being
involved in design of implants, all sorts of different
types of products.

Q.  Have you ever designed anything like a remote
control, a TV remote control like is involved in this
case?

A.  No, sir.

Q.  Have you -- you list on your CV that you have
expertise in failure analysis.  What exactly do you mean
by "failure analysis"?

A.  I'm the director of the forensic engineering
program at Texas Tech, so we teach the different

Jahan Rasty                                              Pages 33

methodology for figuring out why components fail to perform their intended design function.  So failure in engineering is when a component fails to perform its intended design function.  That's the umbrella definition.  So failure analysis would refer to the art of determining how and the why of why components actually fail to perform their intended design function.

Q.  What types of components?

A.  Any kind of component.

Q.  Give me examples of the types of components you have tested and have experience in in conducting this failure analysis.

A.  How much time do we have here?  I mean, I've been at this for a couple of decades.  So, I mean, anything from -- I've worked on failures of large components, let's say, cranes and ship equipment, to very delicate medical implants, to -- to battery components in, you know, laptops, to bolts and nuts, to the leg of a chair, to ceiling collapse, to a floor breaking up.  I mean, I've worked on a lot of different components.

My area of expertise is design and failure analysis.  So just like you, who are knowledgeable about legal principles, the -- really the subject doesn't preclude me from application of sound engineering

LEXITAS

principles, just like you can apply your legal principles that you've learned in law school to a wide variety of cases.

Q.   Do you -- before you got involved in this case, had you ever conducted any kind of failure analysis on a TV remote like is involved in this case?

A.   You know, my memory after five years fails me, but over the last five years, I don't -- I don't remember working on a remote control device like this; no, I don't.  But that doesn't mean that I haven't, you know, going past five, ten years.

Q.   Of course, if the cover on a remote like this comes open as intended, it's not a failure analysis situation, then, is it?

A.   As I mentioned to you earlier, failure is defined as when a part or a component or what have you fails to do its intended design function.  Now, if the intended design function is actually for something to open or fail even, then it's not a failure.  Like the crumple zone on a car, it's designed to fail and in doing so, it actually is not failing because in doing so, it absorbs energy.

Q.   But you don't know whether it failed in this case or not, do you?

A.   No.  I -- are you talking about the -- the

remote?

Q.   Yeah.

A.   No.   In my opinion, it has failed because its design function is to not come undone as easily as it does in order to expose a known hazard, namely, the battery.   And when it doesn't do that, then in my opinion, it's defective, and it has failed.

Q.   But you don't know that it came open easily or not in this case, do you?

A.   Well, again, based on my examination of both the exemplar and the subject, it does come undone very easily and in violation of the applicable standards.

Q.   Tell me what -- what rates you charge in doing this kind of lawsuit work.

A.   My consulting rate varies.   My personal consulting rate is at 440 per hour.

Q.   Okay.   What do you mean, "it varies"?

A.   Well, it depends on the degree or level of associates that I -- that I use in order to set up some of these experiments.   Like, for example, the testing apparatus to set things up, I use my technicians that are at lower rates, kind of like you guys at a law firm with the paralegals and the associates and, you know, the juniors that you give some of the work to.   So when I'm getting ready to do a case, I have junior engineers

that work with me.

Q.  Well, I'm not asking about the junior engineer rates.  I'm asking about your rate.

A.  Well, yeah, but you said about this case.  What I'm saying is that in this case, even some of the work that was done in setting up the experiments was charged at the lower rates because I used the assistance of some of my junior engineers to set up the instrumentation, set up the experiments and all of that.

Q.  All right.

A.  But my -- my personal rate when I'm involved is at the higher rate that I mentioned.

Q.  440 an hour?

A.  Correct.

Q.  Is there a different rate for testifying?

A.  540 an hour.

Q.  Why do you charge more to testify?

A.  Because I call that kind of a hostile environment that I need to be subjected to and the additional preparation and having to deal with some of the attorneys.  I guess it's just more stressful work for me.

Q.  What's your rate if you testify live at trial?

A.  Same, 540.

Q.  And for depositions, it's 540?

A.   Anytime I'm testifying, it's 540.

Q.   Got ya.  How long have you been doing lawsuit-type work?

A.   I mean, my company -- I'm actually a professor at Texas Tech University.  I'm not a lawsuit work-type expert, as you alluded to.  But I do do -- because of the fact that I'm a forensic engineering director at Texas Tech, I get involved in these kind of works from time to time because it -- you know, I'm -- I'm actually practicing what I preach at school.  And -- but this is my area of expertise that I teach, and from time to time I get involved in litigation-related work.

Q.   Well, it looks like you've got a separate company called Real-World Forensic Engineering; is that right?

A.   That's correct.

Q.   So that's not affiliated with Texas Tech.

A.   It's not.  That's when I do consulting work which is not affiliated with Texas Tech, I do it using my consulting firm.

Q.   I got ya.  So my question, then, is:  How much of your consulting -- I assume that all of your consulting work with Real-World Forensic Engineering is lawsuit-type work, isn't it or not?

A.   No, it varies.  I do actually consult with a

lot of government agencies and also some industries that they need, like, help with design and testing and evaluation from time to time that they come and ask me to test things.  Or just this morning, somebody came in with some prototype that they wanted tested because they want to get a patent on it, and we're going to do the actual testing and evaluation because they need the stamp of a professional engineer, licensed engineer, on their product.  So we do some product testing and evaluation also.

Q.   Let me come at it this way:  Of the work that you do, how much of your work is lawsuit-related?

A.   I would say about probably 80 percent.

Q.   Okay.  And that 80 percent that is lawsuit-related, I'm assuming it all runs through this company, Real-World Forensic Engineering; is that right?

A.   That's correct.  And the rates that we were talking about, by the way, is not what I charge but what my company actually charges for my time, but then again, a company, as you know, has its own expenses and all that, so I don't see all of that money, by the way.

Q.   Okay.  But you own the company, though.

A.   I do own the company, yeah, and I also do own its expenses.

Q.   How long have you been with -- or how long have

you had this company, Real-World Forensic Engineering?

A.   2010.

Q.   Before 2010, did you do any lawsuit-type work?

A.   I did.  I mean, I'm on the faculty at Texas Tech, so, you know, a lot of attorneys call the university for professors in my area, which is design and damage mechanics, for assistance.  So yeah, I've done off-and-on consulting work over the years.

Q.   And then starting in 2010, you started this company, Real-World Forensic Engineering?

A.   That's right.

Q.   And would you say that most of their -- of its work is lawsuit-related?

A.   Most of its work is in failure analysis, which is sometimes the subject of litigation work.  That's correct.

Q.   How many employees does Real-World Forensic Engineering have?

A.   We have four full-time and five part-time employees.

Q.   How many law cases do you have going on now?

A.   I wouldn't be able to tell you right now.  I would have to look at the -- a dozen or so.

Q.   Okay.  Are all these for plaintiffs, for people who are filing lawsuits to try and recover money?

A.   No, sir.   Actually, I think a good portion of them are defense.

Q.   So you -- whoever wants to hire you and pay the 440 or 540 an hour, you'll work for?

A.   Not -- not -- whoever wants an answer to the question of why things failed, we will entertain that project.  We do charge for my time.

Q.   Do you have an idea how many depositions you've given?

A.   I don't keep a number in my head.

Q.   100?  200?  500?  Any idea?

A.   I don't remember to be honest with you.

Q.   Well, would you say it's more than a hundred?

A.   I don't know.  I don't know.  I only have a list of -- I guess for some federal courts, I have a list of previous testimonies, but it's a couple of dozen.

Q.   A couple of dozen depositions?

A.   Yes.

Q.   In your career or on your lawsuit list, your testimony list?

A.   I believe on my testimonies.  I don't have the numbers in front of me, so I can't answer that question.

Q.   Do you have your testimony history list in front of you?

A.   I do not.

Q.   All right.  Well, what you've produced, it's a four-year list, I believe; is that right?

A.   That's correct.

Q.   Because that's what generally federal courts ask a witness like you to keep --

A.   That's --

Q.   -- is a four-year list of testifying history.

A.   That's correct.

Q.   But you certainly gave depositions and worked on lawsuits for years going back to certainly 2010, when you started this engineering company, didn't you?

A.   Correct.

Q.   Any idea how many trials you've testified at?

A.   I would say maybe about a dozen.

Q.   Well, you certainly give a lot more depositions than you do trial testimony, I would guess, wouldn't you?

A.   That's correct.

Q.   I know you don't have this list in front of you, but maybe some of these names might ring a bell.  Basically, what I want to do is just go through some of these cases and get an idea of what kind of product was involved.

In 2019, you list Linda Bush versus Outback

Steakhouse of Florida.  Do you remember what that was about?

A.  Yes.  That was actually a defense case where Ms. Bush -- I testified in court, actually, on that one -- Ms. Bush had slipped and fell at an Outback restaurant.  It was actually a local case.  I do recall that one because I just testified this year on that.  And we were -- actually, that was one of our defense cases where we were measuring the coefficient of friction to opine on whether the floor was unreasonably slippery or not.

Q.  All right.  So the subject of your testimony was whether the floor in the Outback Steakhouse was slippery?

A.  What the coefficient of friction was and whether that coefficient of friction was below the standards for safe walkway surfaces or not.

Q.  Gene, G-e-n-e, Moore versus Bass Pro Outdoor World, do you remember that one?

A.  Yes, sir.

Q.  What was that about?

A.  That was about the design of a tree -- a hunting tree stand.

Q.  Okay.  And you worked for the plaintiff?

A.  Yes.

Q.   And so you said it was defective, I guess?

A.   On that one, I believe it was defective manufacturing.  They had a bad weld at one of the rungs that -- that caused the whole thing to collapse from under him.

Q.   Allen Adams versus WSTR Holdings, Inc., in Illinois, what was that about?

A.   That one -- that one was actually a defense case.

Q.   Well, what was it about?  What was the issue or problem?

A.   I think that was another tree stand, because we get a lot of tree stand cases for -- I think I've testified a number of times in court regarding tree stand cases.  So all these attorneys that get tree stand cases somehow get ahold of those transcripts, and they call me to look at their tree stand failures.  But that was another tree stand case.

Q.   I assume since you were working for the defense in that case, you -- your opinion was that the tree stand was not defective; is that right?

A.   No.  Actually, I don't know what happened to that case.  It settled very quickly.  I didn't really get involved too much in that.

Q.   D&S Interests, Limited versus United Fire

Lloyds, what's that?

A.    DS -- I don't recall the details of that.

Q.    In Gillespie County, United Fire Lloyds, was it a fire case or an insurance case?

A.    DS -- no, it might -- I think that one had to do with -- and forgive me because sometimes, you know, I don't remember the cases from their legal title a lot -- but that may have been a case of a situation where some sort of a water valve broke, and it had to do with the design of the water valve.

Q.    Sosa versus Carnival Corporation, what was that one?

A.    That was another -- one of the areas of my Ph.D. work was tribology, which is the science of measuring coefficient of friction on surfaces.  So from time to time, I'm asked to opine about the slipperiness of walkway surfaces.  So that one was actually about the measurement of coefficient of friction on a cruise ship, on a Carnival cruise ship.

Q.    Pleasan- -- Plasantio versus West Texas Gas, do you remember that one?

A.    Plasantio versus West Texas -- Plasantio versus West Texas Gas, I do not.

Q.    Ector County, Plasantio versus West Texas Gas, doesn't ring a bell?

Jahan Rasty                                               Pages 45

A.   As I sit here today right now, I do not recall the subject of that case.

Q.   MaxFlow Chemicals versus Rhino Water Management Systems Dallas?

A.   Yes.  That was a case of corrosion, actually, the failure of a pipeline due to corrosion.  It was a metallurgy case.

Q.   Plate, LLC versus Elite Tactical Systems; it looks like a Tennessee case.

A.   Yes, that is.  That has to do with a patent case because, again, my area of expertise being in the design area, I get involved in intellectual property cases from time to time.  That was, I guess, a comparison of two competing or infringing -- allegedly infringing --

Q.   What kind of product, though?

A.   It was a magazine for a gun.  It was a magazine loader.

Q.   Gordon Atwood Distributing versus Big Dog Tree Stands, that sounds like a tree stand case.

A.   That's another tree stand case, yes.

Q.   D&S Interests versus United Fire Lloyds?

A.   That one -- okay.

Q.   You know what?  That's the same one that's listed -- you had court testimony, and you also gave a

deposition in this case.

A.   Yes, yes, yes.  Now I remember that one.  That one had to do with opining about a failure of -- of galvanized roofing due to hail impact, another failure analysis case.

Q.   Flores and Almanza versus Verastegui and City of Abilene?

A.   Oh, that was -- that was a defense case.  It was a lawsuit that was brought against the City of Abilene.  It was -- the subject of that case was, I believe, if my memory serves me correctly, it was about the damage that had happened in a vehicle that had ran into one of their garbage trucks.

Q.   Rodriguez versus Merit Energy Dallas?

A.   I don't recall that one.

Q.   Landis versus Seaboard International, what was that about?

A.   I don't recall that one either.  Now, the further -- as you're going back further and further, my odds of remembering is going to diminish.

Q.   I know.  That makes sense.  I got ya.  Let's just try it, though.

A.   Okay.

Q.   Pheba Doe versus CenterPoint Energy in Houston?

A.   I don't recall that one.

Q.   Sanders versus Grandy's, Inc.?

A.   Say that again one more time.

Q.   Sanders versus Grandy's, Inc.

A.   I don't recall.

Q.   McClain Company, Inc. versus Lowry Plumbing, Heating and Air Conditioning?

A.   Yes.   That is actually another defense case that had to do with the design of fasteners that were used to secure a very large 40-ton HVAC system that was here in Lubbock, actually, put on a rooftop that, believe it or not, got blown off the roof by a 75-mile-per-hour wind gust that we had.   So it had to do with the design of the fasteners that they used to secure that.

Q.   How about Aurora versus AV Fuel Corp. and Amazing Grace Express?

A.   I don't recall.

          MR. MEYERSON:   Mr. Harrison, do you want to take a break fairly soon?

          MR. HARRISON:   Do you need to?

          MR. MEYERSON:   Yeah, a little, you know, three-minuter.

          MR. HARRISON:   Yeah, we can do that.

          MR. MEYERSON:   Okay.

          MR. HARRISON:   Yeah, let's take a short

break.

THE VIDEOGRAPHER:  Going off the record at 2:52 p.m.

(Break taken from 2:52 p.m. to 3:02 p.m.)

THE VIDEOGRAPHER:  Going back on record at 3:02 p.m.

Q.  (BY MR. HARRISON)  Aurora versus AV Fuel Corp. and Amazing Grace Express, do you recognize that one?

A.  I don't recall the content.  I do recognize the name, but I don't remember the subject matter.

Q.  How about Quintanilla versus Regency?

A.  I don't recall.

Q.  Spicewood fire litigation in Travis County?

A.  That -- yes, that was a very major fire case where, like, hundreds of, I guess, houses burned as a result of electrical shorts, and my involvement in that had to do with design of fixtures that kept the wires -- or supposed to keep the wires from falling, and they eventually fell and created sparks and then fire.

Q.  Flores versus Almanza -- no -- Flores and Almanza versus City of Abilene?

A.  I believe that's the same one that I told you had to do with damage to a garbage truck as a result of a collision.

Q.  Balboa versus Aaron's, Inc.?

A.   I don't recall.

Q.   Stevenson versus BBK Hunting Systems, Limited?

A.   Tree stand.

Q.   AIG Property and Casualty Company versus Charlotte Pipe and Foundry Company?

A.   That was a warning case regarding improper warning on a PV -- CPVC pipe.

Q.   Sateda versus City of Hale Center?

A.   I don't recall that one.

Q.   Walker versus Dick's Sporting Goods?

A.   Tree stand.

Q.   Biggs versus Bradford Management Company?

A.   I don't recall.

Q.   Diane Godines, G-o-d-i-n-e-s, versus Precision Drilling, Jim Wells County?

A.   That was an oil and gas component failure.

Q.   What kind of component; do you remember?

A.   I think it was a valve of some sort.

Q.   Condron versus Spectrum Brands, Inc.?

A.   I don't recall.

Q.   Pearson versus Reckitt, R-e-c-k-i-t-t, Benckiser, B-e-n-c-k-i-s-e-r, Reckitt Benckiser?

A.   I don't recall.

Q.   Cummings versus GE?

A.   Cummings versus GE?  That was -- yeah, yeah, I

recall that one.  That was about one of those voluntary things you were referring to on standards where it had to do with -- we just did a literature search of what the industry standards, voluntary standards, were that a prudent engineer should have actually abided by those voluntary standards that they didn't.

Q.  Do you remember what kind of product you were talking about in that case?

A.  That was what the voluntary standards were for asbestos control.

Q.  All right.  So it was an industrial hygiene-type issue?

A.  It was about -- about asbestos exposure and what were the -- my involvement in that was to research what the applicable or relevant industry standards were back in the '60s and '70s that was the subject of this litigation.  That's all I opined about, is what did the industry know and what were the voluntary standards that a prudent engineer had to abide by even though they didn't -- they didn't have to do it by law.

Q.  Briggs and Stratton Power Products versus Osram, O-s-r-a-m, Sylvania, Inc.?

A.  That had to do with the design or the failure analysis of a metal halide bulb that exploded and the relevant issues with respect to the design of that.

Q.   Did you say halide bulb?

A.   Metal halide, yes.

Q.   Irene Ramirez and Jesus Chavez versus Ironrock Resources, Inc. and Alliance Recyclers and Universal Wrecking Corp.?

A.   I do not recall.

Q.   Eland Energy and Sundown Energy versus Ipsco Tubulars?  It sounds like a pipe case.  Maybe?

A.   Yeah.  Yeah, I don't recall.

Q.   Hodge versus Budget Inn of Brownfield?

A.   Oh, yeah.  That was a -- that was another defense case where allegedly the chair had failed. Again, that's a failure analysis case where we were looking at the leg of this chair to see if it was -- it actually failed due to some defect in the chair or not.

Q.   Carvajal versus Big Lots Stores?

A.   Carvajal versus -- oh, yeah, that was one of these citronella torches that exploded.  It had to do with the design of the wick system that was inside of one of these, you know, citronella torches, like tiki torches that exploded.

Q.   Cerda, C-e-r-d-a, versus Canrig Drilling, Canrig, C-a-n-r-i-g, Drilling Technology?

A.   Design of -- of components on an oil rig.

Q.   What kind of components?

A.   It's a component that kind of like -- when they have these drill pipes on oil rigs, that they are stored, and then they move them in and out of place, and the component is used for sorting and storing these drill pipes on an oil rig so that they can be used.

Q.   Haitham, H-a-i-t-h-a-m, Abbas Alshammari versus Tyson Fresh Meats?

A.   That had to do with the design of a guard system on meat processing at Tyson.

Q.   Cummings versus GE?

A.   The same -- same asbestos case that I told you about earlier.

Q.   Can you give me an idea of just some of the other different types of products that you have testified about?

A.   Again, my area of expertise has to do with design and failure analysis.  So I can list a number of cases where my background, experience and education applies because my background is in damage mechanics, material science, metallurgy and design.  So any material that -- or component that is designed and is made of materials, my background applies to.  So I've worked on, as you -- as you noted from the number of cases that you just recited, that I've worked on a lot of different types of cases.  I've worked on really,

really large aerospace components, to very, very fine

medical device implants.  So as long as a material is

made -- component is made of materials, which all

components are made of some material, and there is some

engineering design involved in designing them, then --

then I -- I have been involved in those situations

regardless of the type of the product.

Q.  Can you give me examples of products?

A.  I mean, I'm not going to remember all the cases

but I've worked --

Q.  I didn't ask for all of them.  Can you give me

examples of products?

A.  Sure.  I mean --

Q.  Please do.

A.  Yeah.  I mean, I've worked on light bulbs, to

maybe links for a chain, to oil- and gas-related valves,

to medical device implants, to maybe a dog leash, to a

roofing material, to a chair, to a couch that trapped

somebody to a hospital bed that collapsed during

surgery, to iPhone batteries, to laptop batteries, to --

I mean, how long do you want me to go?

Q.  Give me a few more.

A.  Those are the ones that comes to my mind.

Q.  You can't think of any others?

A.  Not that I'm sitting here right now.

Q.   Is there any type of product that you wouldn't testify about?

A.   Well, just like you wouldn't take any other cases that your legal background doesn't apply to -- is there any case that you wouldn't take that your legal background doesn't apply to?  No.  As long as your legal background applies to it, you're going to take the case if you have the time.  My background is in material science and design, so as long as a component is made out of a material and design issues are involved, then my background applies.  And I don't appreciate the tone of your question either.

Q.   Okay.  So is there -- can you give me any examples of products that you would feel that you wouldn't be qualified to testify regarding?

A.   Again, as long as the scope of my engagement has to do with opining about whether this was a proper design or not, my background as a design professor and a material scientist makes me qualified.  So I cannot think of anything -- because everything is made up of some material.  So as long as it's made up of some material and some engineers worked on its design, then I can't think of -- the principles of engineering design, when we teach that, we don't say, "Okay.  By the way, these principles of engineering design only applies to a

design of a remote or only applies to a design of a chair or only designs to apply -- or applies to a design of a car.  No, we don't teach it that way.  Anything that is subject to stress, it doesn't matter what it is.  So the principles are universal.  It doesn't apply to just a remote or just a chair or just a table.  The principles of force and physics are universal.

MR. HARRISON:  Okay.  I think that's all my questions.  Thank you.  Pass the witness.

EXAMINATION

BY MR. MEYERSON:

Q.  Dr. Rasty, I've got a few questions for you.

Now, Mr. Harrison talked about how you didn't test the subject remote, but you tested an exemplar remote.  Why didn't you actually subject the subject remote to these tests?

A.  Well, I think I kind of answered it, but maybe I didn't answer it in detail, and that is that normally in doing failure analysis and forensic engineering work, we try not to touch the subject because of the -- you know, every time you do testing, there's a chance that something can happen to the subject, and the subject being the one and only one, we put the subject one next to the exemplar.  We photographed it very closely.  And everything as far as the design of the subject to the

design of the exemplar looked identical.  They even --
they even felt the same to the touch as far as the ease
with which the battery compartment would come out.  So I
didn't see any reason why we would want to take the risk
of running our test on the subject in case the defense
wanted a chance to -- to visit it in case something
would happen to it.

Q.  And that led to my next question, is that --
that explains.  So you did not test the subject because
you were concerned about damage to it prior to the
defense having a chance to test it?

A.  Exactly.  I mean, that's always a possibility.
And unless the other side is present, the protocol for
doing this kind of work is that we take an exemplar that
is substantially, if not identical, the same as the --
as the subject, and then we do all of our testing on the
exemplar to save the -- the subject for later.

Q.  I want to discuss a few of the photos that were
attached as Exhibit 1 in this deposition.  And I'll
represent for Mr. Harrison's sake they're photos of two
remotes side by side on top.  One says "Exemplar"; the
other "Subject."

A.  Yeah.

Q.  It's photograph RMT_5662.JPG.

A.  Okay.

Q.   Was this a photo that you took?

A.   I did.

Q.   Okay.  And what is that?

A.   That is to document that -- the, I guess, similarity or the degree to which they're identical of the exemplar and the subject that -- that we examined.

Q.   All right.  And if we move on -- there's -- there's several photos, but we move on to RMT_5666.JPG.  What is -- what are these photos?

A.   Well, they are both -- the back side of both the exemplar and the subject with the battery compartment lid taken off to expose the inner side or the battery compartment to show that they're identical in terms of the way they were manufactured.  They just look identical to me.

Q.   Did you measure the two remotes?

A.   I did.

Q.   Were they --

A.   And all the measure- --

Q.   And that was -- my next question is --

A.   Yeah.

Q.   -- did they measure the same?

A.   Everything was identical.  I mean, we close-photographed those with close-up photography.  Every detail as far as even manufacturing witness marks

on them look identical.  So I'm pretty confident that those two were manufactured by, you know, the same process and the same outfit.

Q.  And so these subsequent photos that are all of these two remotes, were those photos that were taken as part of your process of determining whether or not the exemplar was identical to the subject?

A.  Yes.  Yes.

Q.  Did you reach an opinion as to whether or not the exemplar was identical to the subject?

A.  Yes.

Q.  And what was your opinion?

A.  It is identical.

Q.  Did you, in performing your analysis, come up with an opinion as to what would be a safer alternative design to the remote in question?

A.  Absolutely.

Q.  And what would be a safer alternative design?

A.  Well, safer alternative designs all over the place.  And, I mean, if you look at the Apple TV, you will see that it -- the back -- or the battery compartment, that it requires actually a tool to unscrew it to where it wouldn't come off unintentionally.

Q.  Now, this remote in question that we've been testing, is this a knockoff of an Apple TV remote?

A.   Yes.

Q.   And so in the remote in question, this compartment pops off fairly easy, exposing the button battery, right?

A.   That's correct.

Q.   Can you open that Apple TV remote -- you have in front of you an actual Apple TV remote, right?

A.   Yes.

Q.   Can you hold it up to the camera?

A.   (Witness complies.)

Q.   Can you open that up with just your hands and fingernail?

A.   No.   You need a coin or some sort of a tool to put in this slot and turn it counterclockwise.   In other words, you have to intend to open it.   It's not going to come off unintentionally.

Q.   So in your opinion -- going back to the remote in question, in your opinion, can a 1-, 2- or 3-year-old child easily open this compartment, exposing them to the button battery?

A.   Very easily.   I mean, all you have to do is barely touch it in the right direction and it comes off, as we've demonstrated in our tests.

Q.   And then can a 1-, 2- or 3-year-old child open up an Apple TV remote in your opinion?

A.   No, sir.

Q.   Was this alternative design -- was that technology available and feasible at the time that this remote in question was used?

A.   The technology of a threaded lid, yes.  It's been available for, yeah, centuries.

Q.   And -- but in a remote control, obviously not centuries but --

A.   Yes.  Yeah.  But yes, it's definitely been available, any type of lid that actually screws in, that technology.  I mean, that's just, you know, a little lid or a little, I guess, compartment lid.

Q.   How much would it -- is it possible to make such a design with plastic?

A.   Yes.

Q.   And would that cost any more for the remote manufacturer to make a twist-off design to access the button battery with plastic?

MR. HARRISON:  Objection, no foundation.

Q.   (BY MR. MEYERSON)  Well, do you have any opinions or any background as to the cost of manufacturing?

A.   The cost -- the cost of manufacturing is basically changing the mold.  Basically, instead of that mold, it would have been a mold that had a threaded, I

guess, compartment.  And so the cost would be comparable to that.  Because it's just instead of designing that mold, it would have been a different mold.  And even the one that we have, the subject, if it was properly designed, it may have worked.  It's just that the dimensions and the tolerances on that are cheaply made to where those tolerances don't work for its intended purpose.

MR. MEYERSON:  I'm going to object as nonresponsive.

Q.  (BY MR. MEYERSON)  The -- the cost is what I want to focus on.

A.  The cost would have been pretty much the same because, again, it's the cost of either designing the mold for the subject or the design of the mold for something that requires a screw-in part.

Q.  There's a box here.  Did you bring this?

A.  Yes.

Q.  Does this have the actual remote in it?

A.  Yes.

Q.  Where is it at?

A.  This one is an Apple one.  This one...

Q.  This is the exemplar remote.  Where's the subject remote?

MR. HARRISON:  I can shorten things if you

want.

MR. MEYERSON:  Do you have it, Cliff?

MR. HARRISON:  Yeah.

THE WITNESS:  Yeah, he has the subject.

MR. MEYERSON:  Oh, you have it?  My office e-mailed me and said that he had it, and I was confused because I thought you had it, Cliff, so --

MR. HARRISON:  No, you're right.

THE WITNESS:  It's in this box over here.

Okay.  Thank you for mentioning it.  So I guess he has it.

MR. MEYERSON:  Okay.  Thank you.

Okay.  I'll pass the witness.

MR. HARRISON:  I'm done.

THE VIDEOGRAPHER:  Going off the record at 3:23 p.m.

(Deposition concluded at 3:23 p.m.)